ORAL ARGUMENT NOT YET SCHEDULED

No. 25-1274

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

HIKVISION USA, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

*Respondents*.

———————————————

On Petition for Review of an Order of the
Federal Communications Commission

———————————————

**INITIAL BRIEF OF PETITIONER
HIKVISION USA, INC.**

———————————————

John T. Nakahata
Timothy J. Simeone
HWG LLP
1919 M St. NW, 8th Floor
Washington, DC 20036
(202) 730-1300

*Counsel to Hikvision USA, Inc.*

March 9, 2026

**CERTIFICATE AS TO PARTIES, ORDERS, AND RELATED CASES**

Pursuant to D.C. Rule 28(a)(1), Petitioners state as follows:

**Parties:** The Petitioner is Hikvision USA, Inc. ("Hikvision"). The Respondents are the Federal Communications Commission and the United States of America.

**Intervenors/Amici:** Motorola Solutions, Inc. is an Intervenor for Respondents. Hikvision is aware of no amici.

**Rulings Under Review:** Hikvision has petitioned for review of the decision of the Federal Communications Commission adopted as FCC 25-71 on October 28, 2025, released on October 29, 2025, titled *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, ET Docket No. 21-232, and published in the Federal Register on November 25, 2025, at 90 Fed. Reg. 53227.

**Related Cases:** Hikvision is aware of no related cases currently pending before the Court. This Court decided Hikvision's challenge (D.C. Cir. Docket Nos. 23-1032 and 23-1073) to a different order by the FCC in the same agency docket on April 2, 2024. *See Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024). The Court denied a motion to enforce the mandate in that case on February

27, 2025. *See Hikvision USA, Inc. v. FCC*, Nos. 23-1032 and 23-1073, 2025 U.S. App. LEXIS 4667 (D.C. Cir. Feb. 27, 2025).

## CORPORATE DISCLOSURE STATEMENT

Hikvision USA, Inc. ("Hikvision USA") is a California corporation and wholly owned subsidiary of Hangzhou Hikvision Digital Technology Co., Ltd., which is publicly traded on China's Shenzhen Stock Exchange. Hikvision USA is an importer of security equipment, primarily security cameras and related devices, manufactured by its parent company and mostly sold to small- to medium-sized businesses as end users by a network of distributors and dealer partners across the United States.

As a publicly traded company, Hikvision USA's parent company, Hangzhou Hikvision Digital Technology Co., Ltd., has a diverse set of public and private shareholders. The largest shareholder, owning approximately 37.28% of the company, is China Electronics Technology HIK Group Co., Ltd., a state-owned enterprise of the People's Republic of China. The second largest shareholder— with 10.50% of Hangzhou Hikvision Digital Technology Co., Ltd—is its founder, Hong Kong resident Kung Hung Ka (also written Gong Hongjia). No other person or entity holds more than 10% of the shares of Hangzhou Hikvision Digital Technology Co., Ltd. Other than Hangzhou Hikvision Digital Technology Co., Ltd., no other person or entity holds a 10% or greater ownership interest in Hikvision USA.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, ORDERS, AND RELATED CASES .............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ................................................... vi

GLOSSARY .................................................................. xi

INTRODUCTION ............................................................. 1

JURISDICTIONAL STATEMENT ............................................... 3

STATEMENT OF THE ISSUE ................................................. 3

STATUTES AND REGULATIONS ............................................... 4

STATEMENT OF THE CASE .................................................. 4

    I.    Factual and Regulatory Background ......................... 4

        A.    Radiofrequency Interference and the FCC's Pre-1968 Response ................................................ 4

        B.    Section 302 ................................................ 5

        C.    Recent Statutes and Their Implementation By the FCC ............ 9

    II.    This Proceeding ............................................ 13

SUMMARY OF ARGUMENT .................................................... 18

STANDING ................................................................. 21

STANDARD OF REVIEW ..................................................... 22

ARGUMENT ................................................................. 23

    I.    The Order Exceeds the Commission's Statutory Authority .... 23

A.     Section 302 Does Not Grant the FCC the Authority to Revoke Existing Equipment Authorizations Because Items Are on the "Covered List" ...........................................................................23

     1.    The Statutory Text, Context, and Prior FCC Actions Conflict with the FCC's Claim of Authority.................23

     2.    The Contrast Between Section 302 and Other Provisions of the Communications Act Confirms that Congress Has Not Granted the FCC Broad Public-Interest Authority over Radiofrequency Devices........................................30

     3.    The FCC's Interpretation of Section 302 Makes Congress's More Recent Actions Incomprehensible .....31

     4.    The Legislative History Confirms that Congress Gave the FCC Targeted Authority to Address Interference, Not Broad Power Over Any Issue Involving Electronic Equipment......................................................................33

B.     No Other Statute Grants the FCC Authority Here....................35

CONCLUSION .........................................................................................40

# TABLE OF AUTHORITIES

## CASES

*ACLU v. FCC,*
   823 F.2d 1554 (D.C. Cir. 1987) ........................................................22

*Am. Libr. Ass'n v. FCC,*
   406 F.3d 689 (D.C. Cir. 2005) ........................................ 6, 19, 27, 28

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ........................................................................31

*Competitive Enter. Inst. v. FCC,*
   970 F.3d 372 (D.C. Cir. 2020) ........................................................22

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ........................................................................22

*Ethyl Corp. v. EPA,*
   51 F.3d 1053 (D.C. Cir. 1995) ........................................................39

*Genus Med. Techs. LLC v. FDA,*
   994 F.3d 631 (D.C. Cir. 2021) ........................................................33

*Hikvision USA, Inc. v. FCC,*
   2025 U.S. App. LEXIS 4667 (D.C. Cir. Feb. 27, 2025)....................13

*Hikvision USA, Inc. v. FCC,*
   97 F.4th 938 (D.C. Cir. 2024). .................................................. 11, 13

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ...................................................... 30, 31

*La. Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986) ........................................................................23

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) .............................................................. 22, 26, 27

*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001) ......................................................23

*Mozilla Corp. v. FCC,*
   940 F.3d 1 (D.C. Cir. 2019) ............................................................39

*Nat'l Ass'n Regul. Util. Comm'rs v. FCC,*
   533 F.2d 601 (D.C. Cir. 1976) ........................................................23

*New Eng. Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) ...................................................................39

*Off. of Consumers' Couns. v. FERC*,
  655 F.2d 1132 (D.C. Cir. 1980) ...................................... 21, 39

*Russello v. United States*,
  464 U.S. 16 (1983) ...................................................................30

*Tozzi v. HHS*,
  271 F.3d 301 (D.C. Cir. 2001) .................................................22

*United States ex rel. Schweizer v. Océ N.V.*,
  677 F.3d 1228 (D.C. Cir. 2012) ...............................................26

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) .................................................................27

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) .................................................................39

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .................................................................26

**STATUTES**

28 U.S.C. § 2342(1) .........................................................................3

47 U.S.C. § 1004 ........................................................... 17, 36, 37

47 U.S.C. § 1005 ................................................................. 20, 37

47 U.S.C. § 1601 ...................................................... 10, 15, 17, 32

47 U.S.C. § 1602 ...........................................................................10

47 U.S.C. § 1608 ...........................................................................10

47 U.S.C. § 201 .............................................................................31

47 U.S.C. § 214 .............................................................................30

47 U.S.C. § 254 .............................................................................30

47 U.S.C. § 301 ...............................................................................4

47 U.S.C. § 302a ................................... 2, 6, 18, 24, 25, 26, 29

47 U.S.C. § 303 .................................... 4, 17, 20, 29, 36

47 U.S.C. § 402 .............................................................................3

47 U.S.C. §§ 151 *et seq.*..............................................................3

Communications Act of 1934,
 Pub. L. No. 73-416, 48 Stat. 1064......................................................37

Communications Amendments Act of 1982,
 Pub. L. No. 97-259, 96 Stat. 1087.......................................................6

John S. McCain National Defense Authorization Act of 2019,
 Pub. L. No. 115-232, 132 Stat. 1636 ...................................................9

Secure and Trusted Communications Networks Act,
 Pub. L. No. 116-124, 134 Stat. 158 (2020)........................................10

Secure Equipment Act,
 Pub. L. No. 117-55, 135 Stat. 423 (2021)................................... 11, 12, 21, 32, 38

Telecommunications Act of 1996,
 Pub L. No. 104-104, 110 Stat. 56........................................................8

Telephone Disclosure and Dispute Resolution Act,
 Pub. L. No. 102-556, 106 Stat. 4181 (1992)................................. 7, 29

## OTHER AUTHORITIES

114 Cong. Rec. 6170 (1968) ...............................................................34

Brief for Respondents, *Am. Libr. Ass'n. v. FCC*,
 No. 04-1037 (D.C. Cir. Nov. 5, 2004) ...............................................28

Comments of CTIA,
 ET Docket No. 21-232, EA Docket No. 21-233 (filed Apr. 7, 2023) ................14

Comments of Dahua Technology USA Inc.,
 ET Docket No. 21-232 (filed Apr. 7, 2023)........................................14

Comments of Hikvision USA, Inc.,
 ET Docket No. 21-232 (filed Apr. 7, 2023)................................. 14, 25

Comments of Information Technology Industry Council,
 ET Docket No. 21-232 (filed Apr. 11, 2023).......................................14

Comments of Telecommunications Industry Association,
 ET Docket No. 21-232, EA Docket No. 21-233 (filed Apr. 7, 2023) ................32

FCC Office of Engineering and Technology, *Equipment Authorization –
 RF Device: What is an RF Device?*, https://www.fcc.gov/oet/ea/rfdevice
 (last visited Mar. 6, 2026) ..................................................................4

H.R. Rep. No. 117-148 (2021)............................................................38

H.R. Rep. No. 90-1108 (1968)...................................... 5, 7, 20, 34, 35

H.R. Rep. No. 97-765 (1982) (Conf. Rep.) ............................................................6

S. Rep. No. 90-1276 (1968) ................................................................. 7, 34, 35

Wu Chen Decl. ....................................................................................................21

**ADMINISTRATIVE DECISIONS**

*Amendment of Parts 1, 2, 15, 90 and 95 of the Commission's Rules to Permit Radar Services in the 76-81 GHz Band*, Report and Order, 32 FCC Rcd. 8822 (2017) .......................................................... 17, 29

*Amendment of Parts 2 and 15 of the Commission's Rules to Further Ensure that Scanning Receivers Do Not Receive Cellular Radio Signals*, Report and Order, 14 FCC Rcd. 5390 (1999) ................................. 17, 29

*Amendment of Parts 2 and 15 to Prohibit Marketing of Radio Scanners Capable of Intercepting Cellular Telephone Conversations*, Report and Order, 8 FCC Rcd. 2911 (1993) ............................................. 17, 29

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, 90 Fed. Reg. 53227 (Nov. 25, 2025) .......................................................3

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Notice of Proposed Rulemaking and Notice of Inquiry, 36 FCC Rcd. 10578 (2021) ................................................................10

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 (2022) ............................................. 12, 13, 14, 17, 35, 36, 37

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC 25-71, ET Docket No. 21-232 (rel. Oct. 29, 2025) .......................... 2, 3, 15, 16, 17, 20, 21, 24, 25, 28, 35, 38, 39

*Revision of Part 15 of the Rules Regarding the Operation of Radio Frequency Devices Without an Individual License*, First Report and Order, 4 FCC Rcd. 3493 (1989) ............................................................8

*Revision of Part 15 to Conform it to Subpart J of Part 2 and to Reorganize the Rules Therein*, Opinion, 51 F.C.C.2d 459 (1975) ........................8

## REGULATIONS

47 C.F.R. § 2.939 ................................................................. 14, 16, 21, 39

47 C.F.R. Part 15 .............................................................................1

47 C.F.R. Part 2 ...............................................................................1

# GLOSSARY

| | |
|---|---|
| *1993 Receivers Order* | *Amendment of Parts 2 and 15 to Prohibit Marketing of Radio Scanners Capable of Intercepting Cellular Telephone Conversations*, Report and Order, 8 FCC Rcd. 2911 (1993) |
| *1999 Receivers Order* | *Amendment of Parts 2 and 15 of the Commission's Rules to Further Ensure that Scanning Receivers Do Not Receive Cellular Radio Signals*, Report and Order, 14 FCC Rcd. 5390 (1999) |
| *2017 Radar Services Order* | *Amendment of Parts 1, 2, 15, 90 and 95 of the Commission's Rules to Permit Radar Services in the 76-81 GHz Band*, Report and Order, 32 FCC Rcd. 8822 (2017) |
| *2021 Notice* | *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Notice of Proposed Rulemaking and Notice of Inquiry, 36 FCC Rcd. 10578 (2021) |
| *2022 Order & Further Notice* | *Protecting Against National Security Threats to the Communications Supply Chain*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 (2022) |
| CALEA | Communications Assistance for Law Enforcement Act |
| Covered List | Covered List of communications equipment produced by foreign companies in the 2019 Secure and Trusted Communications Networks Act |
| FCC or Commission | Federal Communications Commission |

| | |
|---|---|
| FCC Explanation | H.R. Rep. No. 90-1108, at 8 (1968) (Explanation of Proposed Amendment to Prescribe Regulations for the Manufacture, Import, Sale, and Shipment of Devices Which Cause Harmful Interference to Radio Reception (Mar. 22, 1967), *attached to* Letter from Rosel H. Hyde, Chairman, FCC to Hon. Harley O. Staggers, Chairman, House Committee on Interstate and Foreign Commerce (May 26, 1967)) |
| Hikvision or Hikvision USA | Hikvision USA, Inc. |
| kHz | Kilohertz |
| GHz | Gigahertz |
| *Order* | *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC 25-71, ET Docket No. 21-232 (rel. Oct. 29, 2025) |
| Petitioner | Hikvision USA, Inc. |
| Secure Networks Act | 2019 Secure and Trusted Communications Networks Act |
| Secure Equipment Act | 2021 Secure Equipment Act |
| Section 302 | 47 U.S.C. § 302a |
| Section 303 | 47 U.S.C. § 303 |
| Section 1601 | 47 U.S.C. § 1601 |

## INTRODUCTION

Petitioner Hikvision USA, Inc. ("Hikvision" or "Petitioner") is the U.S. subsidiary of a China-based company that manufactures video equipment sold through dealers and distributors in the United States. Like most electronic devices, these products require authorization under the Commission rules, 47 C.F.R. Parts 2 and 15, because they either intentionally or passively emit radiofrequency energy.

In a series of recent statutes, Congress authorized the Federal Communications Commission ("FCC" or "Commission") to condition or withhold regulatory actions as to radiofrequency equipment that is manufactured and sold by certain China-based companies, including, in some circumstances, Hikvision. Those statutes have, among other things, authorized the FCC to deny *new* equipment authorizations to specified companies for specified purposes when specific national-security findings identified in the statute are met.

In the *Order* under review here, however, the FCC purported to set up a regime for partially revoking *existing* equipment authorizations held by Hikvision and other companies. That scheme will allow the FCC—acting through lower-level agency subcomponents without further action by the full Commission—to

prevent continued importing and marketing, but not use, of products that the FCC has previously authorized for sale in the United States.

The *Order* does not claim that any of the new statutes authorized this partial revocation of existing authorizations. Rather, it relies on Section 302 of the Communications Act, which was initially enacted nearly sixty years ago, in 1968. Section 302 authorizes the FCC to issue regulations "governing the interference potential of devices which in their operation are capable of emitting radio frequency energy . . . in sufficient degree to cause harmful interference" and to "establish[] minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference" in a manner "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 302a(a) . The *Order* thus claims that a five-decade-old statute has always allowed the FCC to establish essentially *any* regulations "applicable" in any way to "radiofrequency devices" as long as the FCC finds that the result is in the public interest. *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, FCC 25-71, ET Docket No. 21-232, ¶ 42 (rel. Oct. 29, 2025) (JA __) ("*Order*").

That result is contrary to the plain text of Section 302; its interpretation by this Court and the FCC itself over many decades; the significant distinctions

between Section 302 and other parts of the Communications Act; and the abundant and clear legislative history demonstrating that Section 302 empowers the FCC to address the discrete issue of harmful interference, not reign over all issues relating to electronic devices.

The FCC's reading of Section 302, moreover, renders the newer statutes passed by Congress nonsensical. Under the agency's reading, those statutes actually limited the FCC's preexisting authority under Section 302, and, perversely, provide the agency more power to revoke existing authorizations than to deny new ones.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The FCC issued the final order under review on October 28, 2025, pursuant to its regulatory jurisdiction under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq*. *See Order* (JA \_\_). It was published in the Federal Register on November 25, 2025, at 90 Fed. Reg. 53227. Petitioner timely filed its petition for review on December 3, 2025.

## STATEMENT OF THE ISSUE

Whether the Communications Act gives the FCC free-ranging public-interest authority independent of radiofrequency interference concerns to revoke or limit existing equipment authorizations.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an addendum to this brief.

## STATEMENT OF THE CASE

## I.     FACTUAL AND REGULATORY BACKGROUND

### A.     Radiofrequency Interference and the FCC's Pre-1968 Response

Nearly all electric and electronic devices, from LED light bulbs to microwave ovens to video cameras, are capable of emitting radiofrequency energy and thus causing interference with services operating in the radiofrequency spectrum range of 9 kHz to 3000 GHz. *See* FCC Office of Engineering and Technology, *Equipment Authorization – RF Device: What is an RF Device?*, https://www.fcc.gov/oet/ea/rfdevice (last visited Mar. 6, 2026).

Until 1968, the FCC had no authority to create regulations governing the ability of manufacturers to distribute devices that could cause such harmful interference. Instead, the FCC relied on its authority under 47 U.S.C. §§ 301 and 303 to pursue the *users* of electronic devices *after* the interference had already occurred. *See* 47 U.S.C. § 301 ("No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio . . . (d) . . . when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders . . . ."); *id.* § 303(f) (authorizing the Commission to "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent

4

interference between stations and to carry out the provisions of this Act").[1]  As a congressional report from that time explained:

> [T]he Communications Act does not presently authorize the FCC to prescribe regulations to require that devices capable of emitting radio frequency energy must be designed to avoid interference with radio communications.  Thus, the FCC must now proceed on a case-by-case basis to locate devices which cause radio interference and stop such interference.

H.R. Rep. No. 90-1108, at 2.  Unfortunately, addressing interference in this post hoc manner greatly strained agency resources.  *See id.* ("[I]n fiscal year 1966 over 150,000 man-hours of time were devoted to tracing and eliminating interference of all types.").

## B.    Section 302

Congress enacted Section 302 specifically to address this problem.  Section 302 authorizes the FCC to require *manufacturers* of devices capable of emitting radiofrequency energy (that is, essentially all electronic devices) to meet standards

---

[1]    *See also* H.R. Rep. No. 90-1108, at 8 (1968) (Explanation of Proposed Amendment to Prescribe Regulations for the Manufacture, Import, Sale, and Shipment of Devices Which Cause Harmful Interference to Radio Reception (Mar. 22, 1967), *attached to* Letter from Rosel H. Hyde, Chairman, FCC to Hon. Harley O. Staggers, Chairman, House Committee on Interstate and Foreign Commerce (May 26, 1967) ("FCC Explanation")) ("[S]ection 301 . . . prohibits the use of equipment or apparatus which causes interference to radio communications, while section 303(f) empowers the Commission to prescribe regulations 'to prevent interference between stations.'").

designed to limit interference risk.  In its current form, Section 302 states in

relevant part:

> The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy.  Such regulations shall be applicable to the manufacture, import, sale, offer for sale, or shipment of such devices and home electronic equipment and systems, and to the use of such devices.

47 U.S.C. § 302a(a).[2]

Congress was explicit that the goal of Section 302 was to empower the FCC

to issue ex ante rules to ensure that devices do not cause interference: "The

purpose of the bill is to authorize the Federal Communications Commission to

prescribe reasonable regulations governing the interference potential of certain

---

[2]  What is now Section 302(a)(2) was added in 1982 so that the FCC could reduce the susceptibility of home electronics to interference from radiofrequency energy.  *See* Communications Amendments Act of 1982, Pub. L. No. 97-259, § 108, 96 Stat. 1087, 1091–92; *see also* H.R. Rep. No. 97-765, at 32 (1982) (Conf. Rep.) ("[T]he Conferees believe that Commission authority to impose appropriate regulations on home electronic equipment and systems is now necessary to insure that consumers' home electronic equipment and systems will not be subject to malfunction due to [radiofrequency interference]"); *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 707 (D.C. Cir. 2005) (discussing this amendment).

devices capable of interfering with radio communication." H.R. Rep. No. 90-1108, at 1. As the FCC represented in a letter reproduced in the House Report:

> The chief purpose of this legislation is to give the Commission adequate authority to deal with increasingly acute interference problems arising from expanded usage of electrical and electronic devices . . . .
>
> [T]he Commission has no specific rulemaking authority under the act to require that before equipment or apparatus which radiates electromagnetic energy is put on the market, it must be properly designed to prevent harmful interference to radio reception.

FCC Explanation, H.R. Rep. No. 90-1108, at 8.

The FCC Chair explained that the new legislation was intended to rectify the agency's inability to address interference problems by regulating manufacturers directly. He stated: "We can reasonably assure you that the pending legislation, if approved, will be used basically to require compliance by manufacturers and sellers with regulations [addressing interference] now applicable only to users." S. Rep. No. 90-1276, at 14 (1968) (Letter from the FCC Chairman to Director, Consumer Products Division, Electronics Industries Association (June 9, 1965)).[3]

---

[3] Later additions to Section 302 likewise address interference concerns. As noted above, *see supra* note 2, in 1982, Congress empowered the FCC to create minimum standards for certain electronic equipment. In 1992, Congress added Section 302(d), which required the Commission to issue regulations denying equipment authorizations for scanning receivers that could interfere with frequencies allocated to domestic cellular radio services. Telephone Disclosure and Dispute Resolution Act, Pub. L. No. 102-556, § 403, 106 Stat. 4181, 4195 (1992). And in 1996, Congress added Section 302(e) to authorize the FCC to "[d]elegat[e]" the task of "[e]quipment [t]esting and [c]ertification to [p]rivate

Consistent with the authority granted by Section 302, the FCC has promulgated extensive regulations at 47 C.F.R. Parts 2 and 15 requiring different forms of authorization or licenses for different classes of electronic products. In adopting those rules, the FCC has repeatedly demonstrated that it understood Section 302 to provide targeted authority to address interference issues. In a 1975 order revising 47 C.F.R. Part 15, the Commission recognized that Section 302 authorized it "to make reasonable regulations governing the interference potential of equipment capable of causing harmful interference to radiocommunications." *Revision of Part 15 to Conform it to Subpart J of Part 2 and to Reorganize the Rules Therein*, Opinion, 51 F.C.C.2d 459, 459 ¶ 2 (1975). This understanding was reiterated in its 1989 Order adopting a comprehensive revision to the Part 15 rules, in which the Commission emphasized that the new rules "are designed to provide a balance of our competing goals of eliminating unnecessary regulatory barriers and burdens on the development of new low power RF equipment and maintaining adequate interference protections" while attempting to "eliminate all unnecessary and overly restrictive technical regulations." *Revision of Part 15 of the Rules Regarding the Operation of Radio Frequency Devices Without an Individual License*, First Report and Order, 4 FCC Rcd. 3493, 3495 ¶ 13 (1989). These

---

[l]aboratories." Telecommunications Act of 1996, Pub. L. No. 104-104, § 403, 110 Stat. 56, 131.

statements demonstrate that the Commission itself has understood Section 302 as a grant of authority limited to interference prevention.

Over the years, Hikvision and its affiliates have received FCC authorization under the Parts 2 and 15 regulations to sell numerous products in the United States, including home and business security systems and "smart" products for residential use such as door locks, cleaning robots, and safe-driving systems.

## C.    Recent Statutes and Their Implementation By the FCC

Starting in 2019, Congress passed several statutes to prohibit specific uses of products manufactured by certain foreign companies and their affiliates where those technologies allegedly create a national security or public safety threat. None of those statutes, however, expanded the FCC's authority under Section 302 to revoke or limit pre-existing equipment authorizations.

In the John S. McCain National Defense Authorization Act of 2019, Pub. L. No. 115-232, 132 Stat. 1636, Congress imposed a ban on federal agencies using or procuring certain video surveillance or telecommunications equipment from a set of listed companies (including Hikvision) and their affiliates or subsidiaries. Those limitations apply only if the equipment is used "[f]or the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes." *Id.* § 889(f)(3)(B), at 1918.

In 2020, Congress supplemented those restrictions by adopting the Secure and Trusted Communications Networks Act ("Secure Networks Act"), Pub. L. No. 116-124, 134 Stat. 158. The Secure Networks Act required the FCC—relying on four types of national-security determinations by Congress or specified national-security agencies—to create a "Covered List" of equipment with statutorily defined characteristics, including that it "poses an unacceptable risk to the national security of the United States or the security and safety of United States persons" and is "essential to the provision of advanced communications service." 47 U.S.C. §§ 1601(c), 1608(4). The Secure Networks Act barred the use of FCC subsidies to purchase equipment on the covered list. *See id.* § 1602(a)(1).

After Congress passed the Secure Networks Act, the FCC in June 2021 issued a Notice of Proposed Rulemaking that proposed to go beyond that statute's prohibition on subsidies for Covered List items by banning new authorizations for equipment on the Covered List. *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program,* Notice of Proposed Rulemaking and Notice of Inquiry, 36 FCC Rcd. 10578, 10596 ¶ 40 (2021) ("*2021 Notice*") (JA __) ("In this Notice, we propose revisions to the Commission's equipment authorization rules and processes to prohibit authorization of any 'covered' equipment on the Covered List."). As this Court has noted, comments filed in response to that *2021 Notice* "expressed

uncertainty about whether the Secure Networks Act, the Communications Act, or any other statute empowered the FCC to ban equipment authorizations due to national-security concerns." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 942 (D.C. Cir. 2024).

To resolve that issue as to *new* authorizations, later in 2021 Congress passed the Secure Equipment Act, Pub. L. No. 117-55, 135 Stat. 423. The Secure Equipment Act ordered the FCC to adopt rules in the proceeding begun by the pending *2021 Notice* and "no longer review or approve any application for equipment authorization for equipment that is on the [Covered List]." *Id.* § 2(a)(2), at 423; *see Hikvision*, 97 F.4th at 942.

Importantly, however, the Secure Equipment Act gave the FCC no new power to revoke or limit *existing* authorizations. Rather, Congress considered that issue and explicitly decided only (1) that the FCC should not revoke authorizations in the pending proceeding and (2) to adopt a "rule of construction" stating that it was not "prohibit[ing]" the FCC from exercising whatever pre-existing authority the FCC had as to that issue. The Secure Equipment Act thus states:

(3) APPLICABILITY.—

(A) IN GENERAL.—In the rules adopted under paragraph (1), the Commission may not provide for review or revocation of any equipment authorization granted before the date on which such rules are adopted on the basis of the equipment being on the list described in paragraph (2).

(B) RULE OF CONSTRUCTION.—Nothing in this section may be construed to prohibit the Commission, other than in the rules adopted under paragraph (1), from—

  (i) examining the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the list described in paragraph (2); or

  (ii) adopting rules providing for any such review or revocation.

Secure Equipment Act § 2(a)(3), 135 Stat. at 423.

After Congress passed the Secure Equipment Act, the FCC adopted an order barring new authorizations of Covered List items to the extent they are used for, among other things, critical infrastructure. *See Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 (2022) ("*2022 Order & Further Notice*") (JA __). The same order also adopted a broad interpretation of "critical infrastructure" for purposes of Covered List determinations as "any systems or assets, physical or virtual, connected to the sixteen critical infrastructure sectors" identified in Presidential Policy Directive 21 or "the 55 [National Critical Functions] identified" in a Cybersecurity and Information Security Agency/National Risk Management Center document. *Id.* ¶ 212.

Hikvision challenged that ruling in this Court. The Court rejected the arguments Hikvision made as to whether the Secure Equipment Act codified the

existing content of the Covered List, *see Hikvision*, 97 F.4th at 946–48, but concluded that the FCC had not explained or justified its broad understanding of "critical infrastructure" for purposes of the relevant prohibition, *see id.* at 949–50. The Court thus "uph[e]ld the FCC's Order to the extent that it prohibits the authorization of Petitioners' equipment for sale and marketing in the United States for use in the physical security surveillance of critical infrastructure" but "vacate[d] the portions of the FCC's order defining 'critical infrastructure.'" *Id.* at 950. The Court's decision does not address revoking or limiting existing authorizations.[4]

## II. THIS PROCEEDING

As noted, the *2022 Order & Further Notice* reviewed in this Court's prior *Hikvision* case did not take any action to revoke existing equipment authorizations on the basis that it was "covered equipment." The FCC did indicate there, however, that it believed the Commission had authority to do so. *See, e.g., 2022 Order & Further Notice* ¶ 114 (JA __) ("[T]he Commission has the requisite authority under the Communications Act to review any existing equipment authorization that would, under the rules that we adopt in this Report and Order, be 'covered' equipment, and to determine the necessity for revoking such

---

[4] The Court subsequently denied a motion that Hikvision filed to enforce the mandate. *See Hikvision USA, Inc. v. FCC*, 2025 U.S. App. LEXIS 4667 (D.C. Cir. Feb. 27, 2025).

authorization, and . . . can undertake such revocation pursuant to current rules."). The Commission relied on 47 C.F.R. § 2.939(a)(4), which authorizes it to revoke equipment authorizations "[b]ecause of conditions coming to the attention of the Commission which would warrant it in refusing to grant an original application." *See id*.

When the FCC released that order, it issued as part of the same document a Further Notice of Proposed Rulemaking seeking comment on "what particular circumstances would merit Commission action to revoke any existing authorization of 'covered equipment.'" *2022 Order & Further Notice* ¶ 289 (JA __). In response, Hikvision and other parties argued that the agency lacked authority to revoke prior authorizations except for reasons having to do with radiofrequency interference and that revoking existing authorizations raised supply-chain and reliance issues not implicated by preventing new authorizations. *See* Comments of Hikvision USA, Inc. at 3–16, ET Docket No. 21-232 (filed Apr. 7, 2023) ("Hikvision Comments") (JA __); *see also, e.g.*, Comments of CTIA at 14–18, ET Docket No. 21-232, EA Docket No. 21-233 (filed Apr. 7, 2023) (JA __); Comments of Information Technology Industry Council at 2–5, ET Docket No. 21-232 (filed Apr. 11, 2023) (JA __); Comments of Dahua Technology USA Inc. at 10–14, ET Docket No. 21-232 (filed Apr. 7, 2023) (JA __).

In the *Order* under review here, the FCC rejected arguments as to its legal authority and, although it did not rescind prior authorizations completely, it adopted a procedure under which it would partially revoke existing equipment authorizations. More specifically, under the *Order*, two agency subcomponents, the Public Safety and Homeland Security Bureau and the Office of Engineering and Technology, may, after seeking public comment, prevent equipment that has already been authorized from being imported or marketed in the United States. *See Order* ¶¶ 43–50 (JA __). The Commission directed that, for previously authorized covered equipment, those subdivisions must issue a notice with a "brief analysis of the relevant factors that would justify limitation on the authorization of previously authorized covered equipment prohibiting the importation and marketing of such." *Id.* ¶ 45 (JA __). The notices must include an "analysis [of], and seek comment on, any relevant public interest factors," and must "give particular weight to the fact that," by its inclusion on the Covered List, "the relevant equipment was determined to pose an 'unacceptable risk to the national security of the United States or the safety and security of United States persons.'" *Id.* (quoting 47 U.S.C. § 1601(b)(1)). After receiving comments and requesting additional information if necessary, the FCC subdivisions must determine "whether to implement the prohibition on importation and marketing, describing what equipment is subject to the limitation, and providing the reasons for such." *Id.* ¶ 47 (JA __).

As to its legal authority to take these actions, the FCC indicated that its prior order in this docket "concluded that it has the requisite authority under the Act to review any existing authorization for covered equipment, and to determine the necessity for revoking such authorization." *Id.* ¶ 41 (JA __). The FCC again cited its existing rule at 47 C.F.R. § 2.939(a) as providing "established procedures to revoke an equipment authorization because of conditions coming to the attention of the Commission which would warrant it in refusing to grant an original application." *Id.* The Commission then concluded that Section 302 of the Communications Act authorized the process it adopted in this Order to partially revoke existing equipment authorizations. The FCC read that statute to give it "public interest" authority over essentially all matters involving radiofrequency devices:

> Section 302 of the Act authorizes the Commission—consistent with the public interest, convenience, and necessity—to promulgate regulations applicable to the manufacture, import, sale, offer for sale, shipment, and use of radiofrequency devices and to prohibit the manufacture, import, sale, offer for sale, shipment, or use of such devices that fail to comply with those regulations. Consistent with our existing regulatory procedures to revoke an equipment authorization, we find, through this rulemaking proceeding, the Commission has the requisite authority to evaluate, craft, and implement this process to limit the scope of an existing authorization of covered equipment to prohibit continued importation and marketing of such equipment, and to establish a procedure to apply this limitation as appropriate. Our action is consistent with "the public interest" insofar as it protects American communications networks from devices specifically determined to "pose an unacceptable risk to the national security of the United States or the security and safety of United States persons."

Order ¶ 42 (JA __) (quoting 47 U.S.C. § 1601(b)); *see also id.* ¶ 42 n.179 (citing the *2022 Order & Further Notice* for its discussion of the "Commission's broad authority to regulate radiofrequency devices in the service of national security goals") (JA __); *2022 Order & Further Notice* ¶¶ 40–43 (JA __) (relying primarily on Section 302, but also mentioning 47 U.S.C. § 303(e) and section 105 of the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1004).

The *Order* also cited several prior instances where it claimed the Commission had "adopted prohibitions on the manufacture and importation of equipment where doing so served the public interest." *Order* ¶ 42 & n.176 (JA __) (citing *Amendment of Parts 1, 2, 15, 90 and 95 of the Commission's Rules to Permit Radar Services in the 76-81 GHz Band*, Report and Order, 32 FCC Rcd. 8822 (2017) ("*2017 Radar Services Order*"); *Amendment of Parts 2 and 15 of the Commission's Rules to Further Ensure that Scanning Receivers Do Not Receive Cellular Radio Signals*, Report and Order, 14 FCC Rcd. 5390 (1999) ("*1999 Receivers Order*"); *Amendment of Parts 2 and 15 to Prohibit Marketing of Radio Scanners Capable of Intercepting Cellular Telephone Conversations*, Report and Order, 8 FCC Rcd. 2911 (1993) ("*1993 Receivers Order*")).

## SUMMARY OF ARGUMENT

Established principles of statutory construction negate the FCC's claim that Congress granted it broad authority to regulate electronic devices in the public interest.  First and foremost, that claim is contrary to statutory text.  Section 302(a), the provision on which the FCC relies, gives the FCC authority to issue rules only as to two interference-related subjects—"the interference potential" of certain devices and "minimum performance standards" for home equipment susceptibility to interference.  47 U.S.C. § 302a(a).  It further states that, in adopting regulations covering the two enumerated topics, the FCC must act in a manner that is "consistent with the public interest, convenience, and necessity."  Section 302 thus establishes that the FCC's duty to act in the public interest is a *limitation* on the FCC's actions in two identified areas, not a freestanding source of broad authority.

Indeed, if the FCC's reading were correct, Congress would have had no reason to specify the two interference-related areas in which the agency is empowered to regulate.  In conflict with established rules of statutory interpretation, the FCC's reading renders that text superfluous.  Moreover, under the FCC's reading, it would be empowered to issue rules on *any* issue related to electronic devices, not just national security.  An agency decision finding such broad power nearly sixty years after a statute's enactment is inherently suspect.  That principle applies especially strongly here, where it cannot be reconciled with

the Commission's—or this Court's—understanding in prior litigation, including *American Library Ass'n*, where the Commission sought to regulate a radiofrequency-emitting apparatus, but did not even suggest that Section 302 supported its conclusion, and where the Court concluded that Section 302 actually undermined the agency's argument.

Notably, Congress knows how to give the FCC broad public-interest authority over a particular subject. Other provisions of the Communications Act do just that. Those provisions, however, use different language from the text of Section 302.

The FCC's reading also renders nonsensical the recent statutes Congress has passed specifically to address public-safety and national-security concerns. Under the FCC's interpretation, it had free-ranging authority in this area *before* Congress acted, so those statutes functioned as limitations on its existing jurisdiction. At least as implausibly, under the FCC's reading, those statutes would require the FCC to meet specific standards to deny *new* authorizations, while leaving the FCC with broad, largely unconstrained authority to revoke *existing* authorizations.

Finally, the legislative history strongly confirms that Congress understood Section 302 to deal with important but discrete issues relating to interference, not to authorize the FCC to take on any issue relating to electronic devices. As the House Report succinctly explained: "The purpose of the bill is to authorize the

Federal Communications Commission to prescribe reasonable regulations governing the interference potential of certain devices capable of interfering with radio communication." H.R. Rep. No. 90-1108, at 1.

To the extent that the FCC seeks to rely on other sources of authority, they likewise do not support the Commission's position. For instance, Section 303(e) authorizes the FCC to "[r]egulate the kind of apparatus to be used" but only "with respect to its external effects and the purity and sharpness of the emissions." 47 U.S.C. § 303(e). This case involves no such concerns. Similarly, to the extent the FCC seeks support from CALEA, the relevant provision there, 47 U.S.C. § 1005, requires a manufacturer only to cooperate with telecommunications carriers in meeting the carriers' capability and capacity requirements, and does not provide general authority over manufacturers' designs or the construction of telecommunications equipment.

The FCC explicitly did not contend in the *Order* that either the Secure Equipment Act or any other recent statute supplies it with the requisite authority here. *See Order* ¶ 42 n.178 (JA __) (responding to argument that the Secure Equipment Act does not provide the requisite authority by stating that "we do not here claim any new authority to revoke or limit equipment authorizations"). That concession comports with the reality that the Secure Equipment Act merely contains a rule of construction establishing that it does not "prohibit" the FCC from

exercising any existing revocation authority the agency may have. Secure Equipment Act § 2(a)(3)(B), 135 Stat. at 423. The lack of a prohibition is not the same as a grant of authority, and nothing in the Secure Equipment Act purports to provide such authority to revoke or limit existing equipment authorizations.

Finally, the *Order* cites a regulation, 47 C.F.R. § 2.939(a), that the FCC claims supports its action. *See Order* ¶ 41 (JA __). As this Court has explained, however, "no order or regulation issued by an administrative agency can confer on it any greater authority than it has under statute." *Off. of Consumers' Couns. v. FERC*, 655 F.2d 1132, 1148 n.32 (D.C. Cir. 1980). That bedrock principle controls here.

## STANDING

Hikvision has received FCC authorizations to import and market certain kinds of electronic equipment in the United States. In response to customers' hesitance to purchase Hikvision equipment in the wake of the *Order* and reduced or postponed purchases and cancelled projects—and to prevent them from terminating their partnerships with the company—Hikvision has had to begin selling its inventory at substantial discounts. *See* Addendum at 1, Wu Chen Decl. ¶¶ 4–5 (identifying customer responses and "profound and direct impact" on Hikvision's business operations). Hikvision has standing because it is the object of the agency action under review, and that *Order* is presently causing it financial

harm.  *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (permissible

theory of standing "does not rest on mere speculation about the decisions of third

parties; it relies instead on the predictable effect of Government action on the

decisions of third parties"); *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384

(D.C. Cir. 2020) ("[A]n entire line of cases finds redressability, as well as

causation, in . . . circumstances turning on third-party conduct that is voluntary but

reasonably predictable."); *Tozzi v. HHS*, 271 F.3d 301, 307–11 (D.C. Cir. 2001)

(manufacturer had standing to challenge agency decision classifying a chemical in

its product as a known carcinogen, based on evidence that third parties would be

more likely to buy the product without the classification).

## STANDARD OF REVIEW

This case presents a pure question of statutory interpretation.  It is therefore

controlled by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which

requires courts to "exercise their independent judgment in deciding whether an

agency has acted within its statutory authority."  *Id.* at 412.  Moreover, the issue

here is whether the textual authority the FCC cites—specifically, Section 302—

applies at all, not whether it has exercised delegated discretion appropriately.  *See*

*ACLU v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987) ("Where the issue is one

of whether a delegation of authority by Congress has indeed taken place . . . rather

than whether an agency has properly implemented authority indisputably delegated

to it, Congress can reasonably be expected both to have and to express a clear intent."); *Nat'l Ass'n Regul. Util. Comm'rs v. FCC*, 533 F.2d 601, 617 (D.C. Cir. 1976) ("[T]he allowance of 'wide latitude' in the exercise of delegated powers is not the equivalent of untrammelled freedom to regulate activities over which the statute fails to confer, or explicitly denies, Commission authority.") (citation omitted).

## ARGUMENT

## I. THE *ORDER* EXCEEDS THE COMMISSION'S STATUTORY AUTHORITY

### A. Section 302 Does Not Grant the FCC the Authority to Revoke Existing Equipment Authorizations Because Items Are on the "Covered List"

#### 1. The Statutory Text, Context, and Prior FCC Actions Conflict with the FCC's Claim of Authority

The FCC is a "creature of statute," and it has "no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (recognizing that "an agency literally has no power to act . . . unless and until Congress confers power upon it").

The challenged *Order* claims that Section 302 of the Communications Act provides authority for the FCC to establish a process by which to bar further sale and importation of devices the agency has already approved. Specifically, the *Order* states:

Section 302 of the Act authorizes the Commission—consistent with the public interest, convenience, and necessity—to promulgate regulations applicable to the manufacture, import, sale, offer for sale, shipment, and use of radiofrequency devices and to prohibit the manufacture, import, sale, offer for sale, shipment, or use of such devices that fail to comply with those regulations.

*Order* ¶ 42 (JA __).[5]

The plain language of Section 302, however, makes clear that it does not give the agency general authority to regulate on any issues involving radiofrequency devices any time the FCC determines that such action is in the "public interest." The relevant discussion of the "public interest" is in Section 302(a):

The Commission may, *consistent with the public interest, convenience, and necessity*, make reasonable regulations (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, or shipment of such devices and home electronic equipment and systems, and to the use of such devices.

---

[5] The FCC cites Section 302(b) in support of this statement. That provision states that "[n]o person shall manufacture, import, sell, offer for sale, or ship devices or home electronic equipment and systems, or use devices, which fail to comply with regulations promulgated pursuant to this section." 47 U.S.C. § 302a(b). Section 302(b) does not address the scope of the permissible "regulations promulgated pursuant to this section."

47 U.S.C. § 302a(a) (emphasis added). That text establishes that Section 302 authorizes the FCC to issues regulations in two substantive areas, both of which relate to interference concerns: (1) rules "governing the interference potential" of certain devices that may cause harmful interference and (2) rules "establishing minimum performance standards" for home equipment and systems to reduce their susceptibility to interference. In issuing regulations covering those two discrete topics, the FCC must act in a manner that is "consistent with the public interest, convenience, and necessity." *Id.* That language makes consistency with the public interest a *limitation* on—a condition of—exercising authority in the two enumerated substantive areas, not a source of freestanding authority over *additional* substantive areas.

The FCC construction of Section 302(a)—that it allows the agency to adopt essentially *any* "regulations applicable to the manufacture, import, sale, offer for sale, shipment, and use of radiofrequency devices" whether related to radiofrequency interference or not, *Order* ¶ 42 (JA __)—wrenches the reference to the "public interest, convenience, and necessity" from its placement in the statute and thus from its role as a constraint on the FCC's ability to issue rules in the two enumerated interference-related areas. While Hikvision made this statutory-language argument extensively to the FCC, *see* Hikvision Comments at 6–12 (JA __), the *Order* responds with only the conclusory assertion of authority quoted

above.  But this provides no reasoned justification to conclude, under *Loper Bright*, that Section 302 is *best* read to support the result the agency reached.

Moreover, if the FCC's understanding of the statute were correct, the specific text authorizing the Commission to make rules as to the "interference potential of devices" and "minimum performance standards for home electronic equipment and systems" would be irrelevant and superfluous.  47 U.S.C. § 302a(a); *cf. United States ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1234 (D.C. Cir. 2012) (citing "the longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous") (citation omitted).  Congress could simply have permitted the agency to regulate "radio frequency devices" in *any* manner "consistent with the public interest, convenience, and necessity."  But it did not do that.  Instead, Congress limited FCC regulations in the public interest to the two substantive areas identified above.

While the FCC applies its reading of Section 302(a) here to address purported national security issues, its construction cannot be confined to those issues.  As noted above, the FCC's understanding of the statute would justify *any* regulation of equipment that the FCC determined to be in the public interest.  Such a novel and expansive reading of a statute nearly sixty years after its enactment is inherently dubious.  *See, e.g., West Virginia v. EPA*, 597 U.S. 697, 724 (2022)

(rejecting agency's "'claim[] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority'") (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *cf. Loper Bright*, 603 U.S. at 386 ("[R]espect . . . [for agency decisions is] especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time.").

The Supreme Court's suspicion of novel and expansive agency interpretations of statutes they administer is especially applicable here because the FCC's current position renders its prior orders and arguments before this Court unfathomable.  In *American Library Ass'n*, for example, the Commission sought to regulate a radiofrequency-emitting "apparatus that can receive television broadcasts when . . . not engaged in the process of receiving a broadcast transmission."  406 F.3d at 691.  The Commission's regulation required such devices to be manufactured with the capability to prevent unauthorized redistributions of digital content by recognizing a "broadcast flag" embedded in previously broadcasted content.  This Court determined that the FCC lacked authority to impose such a requirement unrelated to the radiofrequency characteristics of the device on manufacturers.  *See id.* ("[T]he FCC has never before asserted such sweeping authority . . . . In our view, nothing has changed to give the FCC the authority that it now claims.").

Notably, at that time, the Commission did not seek to rely on its supposed Section 302 "public interest" authority to justify the challenged regulation. *See* Brief for Respondents at 33, *Am. Libr. Ass'n. v. FCC*, No. 04-1037 (D.C. Cir. Nov. 5, 2004) ("Nothing in the text of that statute or in the legislative history cited by petitioners indicates that Congress intended by enacting Section 302a to limit the Commission's authority to regulate *outside* the scope of that provision.") (emphasis added). Yet if Section 302 contains—as the Commission now claims— general "public interest" regulatory authority over electronic devices, that would have justified the broadcast flag rule, or indeed virtually *any* regulation of devices for receiving television broadcasts. For its part, this Court, far from finding that Section 302 supported the FCC in that case, cited Section 302 and its 1982 amendment authorizing the FCC to impose performance standards on household equipment, *supra* note [2], as evidence undermining the "FCC's current view that it always has had sweeping jurisdiction over receiver apparatus." *Am. Libr. Ass'n*, 406 F.3d at 707.

The three prior FCC decisions on which the *Order* relies, *see Order* ¶ 42 n.176 (JA __), are so readily distinguishable that they serve only to underscore that the agency's position here lacks support in decades of precedent and statutory interpretation. The first of the cited orders involved an FCC decision prohibiting vehicular radar in certain spectrum bands. *See 2017 Radar Services Order,* 32

FCC Rcd. 8822 ¶¶ 1, 26.  That prohibition thus implicated the agency's authority to manage spectrum, unlike here.  *See also* 47 U.S.C. § 303(g), (y) (directing the FCC to "generally encourage the larger and more effective use of radio in the public interest" and granting the FCC "authority to allocate electromagnetic spectrum so as to provide flexibility of use" as long as, among other things, it is in the public interest).

The other two FCC decisions cited are equally distinguishable.  They involved prohibitions relating to scanning receivers that could pick up cellular transmissions.  *See 1993 Receivers Order*, 8 FCC Rcd. 2911 ¶ 1 (banning the import and manufacture of certain scanning receivers); *1999 Receivers Order*, 14 FCC Rcd. 5390 ¶ 1 (amending regulations regarding scanning receivers).  In stark contrast to this case, Congress had amended Section 302 through the Telephone Disclosure and Dispute Resolution Act § 403, 106 Stat. at 4195, to give the FCC authority over that specific issue, and the FCC's action explicitly implemented that legislation.  *See 1993 Receivers Order*, 8 FCC Rcd. 2911 ¶¶ 1, 4–5; *1999 Receivers Order*, 14 FCC Rcd. 5390 ¶¶ 2–3; 47 U.S.C. § 302a(d)(1) (establishing that "the Commission shall prescribe and make effective regulations denying equipment authorization (under part 15 of title 47, Code of Federal Regulations, or any other part of that title) for any scanning receiver that is capable of" receiving cellular transmissions, among other things).

## 2. The Contrast Between Section 302 and Other Provisions of the Communications Act Confirms that Congress Has Not Granted the FCC Broad Public-Interest Authority over Radiofrequency Devices

The contrast between the text of Section 302(a) and the language of other parts of the Communications Act further undermines the FCC's argument. Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citations omitted).

For instance, in Section 214 of the Communications Act, Congress authorized the Commission to consider the "public convenience and necessity" generally in determining whether to grant licenses to common carriers:

> No carrier shall . . . operate any line[] or extension thereof[] . . . unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the . . . operation[] . . . of such additional or extended line.

47 U.S.C. § 214(a).

Similarly, in 47 U.S.C. § 254(c)(1)(D), Congress stated that the Commission, in "defin[ing]" services supported by universal service funds, "shall consider the extent to which such telecommunications services . . . are consistent with the public interest, convenience, and necessity." The Fifth Circuit, in *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 437–40 (5th Cir. 2021), relied on that much

30

broader language, together with the similarly generous text of 47 U.S.C. § 201(b), which authorizes the FCC to "prescribe such rules and regulations as may be necessary in the public interest," to conclude (and even then only under step II of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44 (1984)) that the FCC could permissibly bar the use of universal-service funds to purchase Huawei products. *See Huawei Techs. USA*, 2 F.4th at 440 ("conclud[ing] that the agency reasonably interpreted the public interest provisions, especially in light of" other language in Section 254 that is also inapplicable here).

As explained above, Section 302's reference to the "public interest" is a *limitation* on the Commission's authority requiring the Commission to consider the public interest when evaluating specified interference issues. In contrast to Section 254(c)(1)(D), it does not authorize the Commission to exercise public-interest authority more generally.

### 3. The FCC's Interpretation of Section 302 Makes Congress's More Recent Actions Incomprehensible

The FCC's understanding of Section 302, moreover, makes a hash of the recent statutes that explicitly delegate to the FCC far more limited authority than the Commission claims here. If the FCC were correct about the scope of its authority under the pre-existing Section 302, then the Secure Equipment Act and Secure Networks Act not only would have been unnecessary, but also would have

*withdrawn* authority from the FCC.  The Secure Networks Act prohibits the FCC

from placing an entity on the Covered List except pursuant to a national security

finding by a national security agency, the Department of Commerce, or Congress.

*See* 47 U.S.C. § 1601(c).  The Secure Equipment Act, in turn, directs the FCC not

to grant *new* equipment applications for items that are on the Covered List.  *See*

Secure Equipment Act § 2(a)(2), 135 Stat. at 423 (FCC may "no longer review or

approve any application for equipment authorization for equipment that is on the

[Covered List]").  If the FCC were correct about the scope of Section 302, then,

prior to the passage of these statutes, it could have denied new applications

regardless of whether an item was on the Covered List and without any explicit

findings by Congress or an enumerated national security agency.  Under that

understanding, the effect of Congress's extensive recent actions would have been

to limit the agency's preexisting authority, which is implausible on its face.

At least as improbably, under the FCC's current interpretation, the agency

would have authority under Section 302 to revoke or limit any *existing*

authorizations—where action threatens particularly significant reliance interests

and greater harm to both manufacturers and consumers[6]—for any electronic device

---

[6]  *See, e.g.,* Comments of Telecommunications Industry Association at 7–8, ET
Docket No. 21-232, EA Docket No. 21-233 (filed Apr. 7, 2023) (JA __) ("It is
beyond doubt that any action the FCC takes to revoke existing authorizations
will negatively impact manufacturers who relied on those existing

whenever it decided that action was in the public interest.  To deny *new* authorizations, however, the FCC would still need to satisfy the specific, constraining requirements of the Secure Equipment Act, including placement of an item on the Covered List.  Moreover, on this reading, revocation authority under Section 302 would not be limited to national security issues, as authority to deny authorizations under the Secure Equipment Act is.  Such a scheme makes no sense.

4. **The Legislative History Confirms that Congress Gave the FCC Targeted Authority to Address Interference, Not Broad Power Over Any Issue Involving Electronic Equipment**

Although the statutory text and context are sufficient to resolve this issue, the legislative history confirms the clear congressional intent to authorize the FCC to create ex ante rules governing the specific issue of interference, not to give it free-ranging authority over any issue involving devices.  *See, e.g., Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 643 (D.C. Cir. 2021) (finding legislative history confirmed that statute sought only to facilitate FDA's regulation of a specific category of products and did "not grant the FDA near-limitless discretion" to categorize any device as a drug).

Here, the legislative history makes clear that Congress understood that it was adopting what is now Section 302(a) to address an important, but specific,

---

authorizations, as well as U.S. consumers who purchased Commission-authorized equipment.").

problem: the inability of the FCC to issue regulations governing the

radiofrequency-interference potential of devices before they were marketed and

sold. The committee reports and floor statements of key legislators explain

repeatedly that this was the purpose of the legislation. For instance:

> The purpose of this legislation . . . is to give the Federal Communications Commission adequate authority to deal with increasingly acute interference problems arising from the expanding usage of electrical and electronic devices which cause, or are capable of causing, harmful interference to radio reception. It is designed to empower the Commission to deal with the interference problem at its root source—the sale by some manufacturers of equipment and apparatus which do not comply with the Commission's rules.

S. Rep. No. 90-1276, at 1.

> The purpose of the bill is to authorize the Federal Communications Commission to prescribe reasonable regulations governing the interference potential of certain devices capable of interfering with radio communication.

H.R. Rep. No. 90-1108, at 1.

> This [legislation] only applies to devices capable of emitting radio frequency energy which could cause harmful interference to radio communications.

114 CONG. REC. 6170 (1968) (Hon. Harley O. Staggers, Chairman of

Committee on Interstate and Foreign Commerce); *see also supra* pp. 5–7.

(collecting quotations).

Further, the legislative history includes a letter from the FCC Chairman

assuring affected stakeholders that:

> The purpose of the pending bills is to extend our authority and thereby permit the Commission to apply its regulations directly to the manufacture and sale of the equipment. Thus, the fundamental difference between the existing and the requested additional authority is to permit regulation of equipment capable of causing interference to radio reception before this equipment is sold to the public.

S. Rep. No. 90-1276, at 13; *see* FCC Explanation, H.R. Rep. No. 90-1108, at 13 ("What the Commission seeks here is a more rational scheme of regulation which will be possible by shifting the emphasis from the present cumbersome technique of 'user regulation' to the preventive techniques of dealing with interference control at the source of the apparatus.").

The ample and consistent legislative history confirms that the text of the statute means what it says: Congress granted the FCC authority to deal with the specific issue of interference, not to regulate electronic devices generally as long as the agency believed that served the public interest.

**B.    No Other Statute Grants the FCC Authority Here.**

1.    Although the *Order* explicitly relies on Section 302 as the source of the FCC's authority, in footnote 179 (JA ___), the *Order* includes a "see also" cite to paragraphs 40 to 43 of the *2022 Order & Further Notice*, and describes those paragraphs as "discussing the Commission's broad authority to regulate radiofrequency devices in the service of national security goals." Like the *Order* itself, those paragraphs rely first and foremost on Section 302. *See 2022 Order & Further Notice* ¶ 40 (JA ___) ("[T]he inclusion of the phrase 'public interest' in

section 302(a) provides independent authority to take into account, in our consideration of the public interest, the national defense, and the promotion of safety of life and property . . . ."). The *2022 Order & Further Notice*'s discussion then briefly mentions Section 303(e) of the Communications Act, 47 U.S.C. § 303(e), and Section 105 of CALEA, 47 U.S.C. § 1004. *See 2022 Order & Further Notice* ¶ 41 (JA __).

To the extent the FCC relies on those other statutory provisions here, they do not expand the agency's authority over manufacturers or radiofrequency devices beyond the specific limitations imposed in Section 302(a). Section 303(e) authorizes the FCC to "[r]egulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein." The paragraph in *2022 Order & Further Notice* never explains how that language authorizes regulations to address alleged national-security concerns. In any event, Section 303(e)'s reference to "external effects" together with its reference to the "purity and sharpness of emissions" make clear that the provision addresses electromagnetic emissions, not any issue of any kind involving radiofrequency devices. Indeed, if the reference to "external effects" was as broad as the FCC claims, Congress would not have needed to pass Section 302 in 1968 even to deal with harmful interference, as this part of Section

303 predated that amendment. *See* Communications Act of 1934, Pub. L. No. 73-416, § 303, 48 Stat. 1064, 1082.

As to CALEA, even the *2022 Order & Further Notice* did not contend that it was a separate source of authority to regulate equipment. It is not even cited in the ordering clauses of that decision. *See 2022 Order & Further Notice* ¶ 342 (JA __). Moreover, the cited provision of CALEA applies only to "telecommunications carrier[s]," not equipment manufacturers, and requires that "any interception of communications or access to call-identifying information" that is "effected within" the telecommunications carrier's "switching premises" be activated only where there is a "court order or other lawful authorization" and with the "affirmative intervention" of a carrier employee acting in accord with FCC regulations. 47 U.S.C. § 1004. Nothing about that language indicates that it provides broad authorization to regulate *manufacturers* as to *all* their radiofrequency devices. And the very next statutory provision, 47 U.S.C. § 1005, which does address manufacturers' obligations, requires a manufacturer only to cooperate with telecommunications carriers in meeting the carriers' capability and capacity requirements, and does not provide general authority over manufacturers' designs or construction of telecommunications equipment. *See id.* § 1005(b).

2.     Notably, the FCC does *not* contend in the *Order* under review that either the Secure Equipment Act or any other recent statute provides it with the

affirmative authority it purports to exercise here.  As the FCC stated in addressing a commenter's argument that the Secure Equipment Act did not grant it the power it asserted here: "[W]e do not here claim any new authority to revoke or limit equipment authorizations.  The adoption of this new procedure is consistent with our existing authority to revoke equipment authorizations . . . ."  *Order* ¶ 42 n.178 (JA __).

That concession is mandated by the statutory text.  The Secure Equipment Act contains a rule of construction that makes clear that it does not "prohibit" the FCC from exercising any existing authority the agency may have to "(i) examin[e] the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the [Covered List]; or (ii) adopt[] rules providing for any such review or revocation."  Secure Equipment Act § 2(a)(3)(B), 135 Stat. at 423; *see also* H.R. Rep. No. 117-148, at 5 (2021) ("The legislation prohibits the FCC from revoking previously issued authorizations as part of the relevant rulemaking proceeding, but does not prohibit the FCC from acting in a separate proceeding to take such action.").  The lack of a prohibition, of course, is not the same as an affirmative grant of authority, and nothing in the Secure Equipment Act purports to be such a grant of authority to revoke or limit existing equipment authorizations.  As this Court has explained, it will not "presume a delegation of power merely because Congress has not expressly withheld such power."  *Ethyl*

*Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995); *see New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (savings clause in Federal Power Act did not provide affirmative grant of authority for state to restrict electricity in interstate commerce in violation of the Commerce Clause); *Va. Uranium, Inc. v. Warren,* 587 U.S. 761, 769–770 (2019) (holding that Atomic Energy Act's provisions, including saving clause, "did nothing to extend the [agency's] power to activities, like mining, historically beyond its reach"); *Mozilla Corp. v. FCC*, 940 F.3d 1, 74–76 (D.C. Cir. 2019) (FCC cannot expand its power to preempt state law through saving clauses or ancillary authority when Congress has not granted such jurisdiction).

3.     Finally, the *Order* cites to the existence of a regulation, 47 C.F.R. § 2.939(a), *see Order* ¶ 41 & n.173 (JA __), as establishing "procedures to revoke an equipment authorization because of conditions coming to the attention of the Commission which would warrant it in refusing to grant an original application." That regulation is irrelevant, however, as to the scope of the FCC's *statutory* authority.  "[N]o order or regulation issued by an administrative agency can confer on it any greater authority than it has under statute."  *Off. of Consumers' Couns.*, 655 F.2d at 1148 n.32.  The agency's lawful application of its regulation can be no broader than its statutory authority.  For all the reasons discussed, Congress did not

grant the FCC the authority that would be necessary to lawfully apply that

regulation here.

## CONCLUSION

For the foregoing reasons, the Court should hold unlawful, vacate, and set

aside the *Order*.


Respectfully submitted,


/s/ John T. Nakahata
John T. Nakahata
Timothy J. Simeone
HWG LLP
1919 M St. NW, 8th Floor
Washington, DC 20036
(202) 730-1300
jnakahata@hwglaw.com


*Counsel to Hikvision USA, Inc.*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.  I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 9,205 words according to the word-count feature of Microsoft Word.

/s/ John T. Nakahata
John T. Nakahata

## CERTIFICATE OF SERVICE

I certify that on this 9th day of March 2026, the foregoing brief was filed via CM/ECF.  Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ John T. Nakahata
John T. Nakahata

# ADDENDUM

# TABLE OF CONTENTS

**Declarations in Support of Standing**

Declaration of Wu Chen ........................................................................1

**Statutes and Regulations**

47 U.S.C. § 151 ....................................................................................3

47 U.S.C. § 201 ....................................................................................4

47 U.S.C. § 214(a) ...............................................................................5

47 U.S.C. § 254(c) ...............................................................................6

47 U.S.C. § 301 ....................................................................................7

47 U.S.C. § 302a ..................................................................................8

47 U.S.C. § 303 ..................................................................................12

47 U.S.C. § 1004 ................................................................................20

47 U.S.C. § 1005 ................................................................................21

47 U.S.C. § 1601 ................................................................................22

47 U.S.C. § 1602 ................................................................................24

47 U.S.C. § 1608(4) ...........................................................................25

47 C.F.R. § 2.939(a) ...........................................................................26

Secure Equipment Act, Pub. L. No. 117-55, 135 Stat. 423 (2021) ........................27

Secure and Trusted Communications Networks Act, Pub. L. No. 116-124, 134 Stat. 158 (2020) ...........................................................................29

John S. McCain National Defense Authorization Act of 2019, Pub. L. No. 115-232, § 889, 132 Stat. 1636, 1917–19 ........................................46

Communications Act of 1934, Pub Law No. 73-416, § 303, 48 Stat. 1064, 1082–83 ...........................................................................50

Communications Amendments Act of 1982, Pub. L. No. 97-259, § 108, 96 Stat. 1087, 1091–92 ........................................................52

Telephone Disclosure and Dispute Resolution Act, Pub. L. No. 102-556, § 403, 106 Stat. 4181, 4195 (1992) ..............................................53

Telecommunications Act of 1996, Pub L. No. 104-104, § 403, 110 Stat. 56, 131 .54

## DECLARATION OF WU CHEN

I, Wu Chen (a.k.a. Eric Chen), hereby declare the following:

1.　　I am currently employed by Hikvision USA, Inc. ("Hikvision USA") as General Manager and am responsible for oversight of U.S. operations, including sales strategy, distribution channel management, customer relations, operational planning, and financial performance. In this role, I regularly interact with customers and review company sales data, customer purchasing patterns, and operational performance metrics.

2.　　I joined Hangzhou Hikvision Digital Technology Company's ("Hikvision") headquarters in China in 2008 as a member of the sales organization. From 2008 through 2018, I held various sales and business development responsibilities supporting the company's global operations. In 2018, I was appointed General Manager of Hikvision USA, a role in which I have served continuously ever since.

3.　　Hikvision USA has petitioned this Court for review of the decision the Federal Communications Commission adopted as FCC 25-71 on October 28, 2025 and released on October 29, 2025, titled *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, ET Docket No. 21-232 (the "*Order*"). Hikvision USA was a participant in the proceeding and is aggrieved by the challenged *Order*.

4.　　As a result of the issuance of the *Order*, Hikvision USA observed measurable changes in customer procurement and project planning behavior. Beginning in late 2025, customers indicated that the *Order* created uncertainty about their continuing ability to obtain Hikvision USA equipment and some customers reduced purchase volumes, postponed planned deployments, or cancelled projects involving Hikvision USA equipment.

For example:

• Certain distribution partners reduced or deferred planned stocking orders while conducting internal compliance and risk reviews related to the *Order*.

• Integrator customers postponed or suspended deployment of projects involving Hikvision USA equipment pending customer regulatory or compliance review.

• Some customers requested information regarding alternative suppliers or indicated that project stakeholders required evaluation of non-Hikvision USA equipment due to perceived regulatory risk.

•Customers increasingly requested extended payment terms or additional return flexibility, reflecting increased uncertainty surrounding future deployment of Hikvision USA products.

5.　　These changes resulting from the *Order* have had a profound and direct impact on Hikvision USA's business operations. Specifically, they have necessitated adjustments to our

sales forecasts, disrupted our inventory planning processes, and complicated our cash collection efforts. Furthermore, in response to customer requests and to prevent customers from abruptly terminating their partnerships with us, Hikvision USA has been compelled to offer substantial discounts, thereby sacrificing a portion of our profit margins.

      6.     The decline in sales performance and the increased operational uncertainty associated with the *Order* have been among several factors that contributed to workforce reductions and cost-containment measures within Hikvision USA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: February 27, 2026

Wu Chen

## §151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

# 47 U.S.C. § 201

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

## §214. Extension of lines or discontinuance of service; certificate of public convenience and necessity

(a) Exceptions; temporary or emergency service or discontinuance of service; changes in plant, operation or equipment

No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line: *Provided*, That no such certificate shall be required under this section for the construction, acquisition, or operation of (1) a line within a single State unless such line constitutes part of an interstate line, (2) local, branch, or terminal lines not exceeding ten miles in length, or (3) any line acquired under section 221 of this title: *Provided further*, That the Commission may, upon appropriate request being made, authorize temporary or emergency service, or the supplementing of existing facilities, without regard to the provisions of this section. No carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby; except that the Commission may, upon appropriate request being made, authorize temporary or emergency discontinuance, reduction, or impairment of service, or partial discontinuance, reduction, or impairment of service, without regard to the provisions of this section. As used in this section the term "line" means any channel of communication established by the use of appropriate equipment, other than a channel of communication established by the interconnection of two or more existing channels: *Provided, however*, That nothing in this section shall be construed to require a certificate or other authorization from the Commission for any installation, replacement, or other changes in plant, operation, or equipment, other than new construction, which will not impair the adequacy or quality of service provided.

**§254. Universal service**

**(c) Definition**

(1) In general

Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

**(2) Alterations and modifications**

The Joint Board may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

**(3) Special services**

In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h).

## §301. License for radio communication or transmission of energy

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or (f) upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

# 47 U.S.C. § 302a

## §302a. Devices which interfere with radio reception

### (a) Regulations

The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, or shipment of such devices and home electronic equipment and systems, and to the use of such devices.

### (b) Restrictions

No person shall manufacture, import, sell, offer for sale, or ship devices or home electronic equipment and systems, or use devices, which fail to comply with regulations promulgated pursuant to this section.

### (c) Exceptions

The provisions of this section shall not be applicable to carriers transporting such devices or home electronic equipment and systems without trading in them, to devices or home electronic equipment and systems manufactured solely for export, to the manufacture, assembly, or installation of devices or home electronic equipment and systems for its own use by a public utility engaged in providing electric service, or to devices or home electronic equipment and systems for use by the Government of the United States or any agency thereof. Devices and home electronic equipment and systems for use by the Government of the United States or any agency thereof shall be developed, procured, or otherwise acquired, including offshore procurement, under United States Government criteria, standards, or specifications designed to achieve the objectives of reducing interference to radio reception and to home electronic equipment and systems, taking into account the unique needs of national defense and security.

### (d) Cellular telecommunications receivers

(1) Within 180 days after October 28, 1992, the Commission shall prescribe and make effective regulations denying equipment authorization (under part 15 of

title 47, Code of Federal Regulations, or any other part of that title) for any scanning receiver that is capable of—

    (A) receiving transmissions in the frequencies allocated to the domestic cellular radio telecommunications service,

    (B) readily being altered by the user to receive transmissions in such frequencies, or

    (C) being equipped with decoders that convert digital cellular transmissions to analog voice audio.

(2) Beginning 1 year after the effective date of the regulations adopted pursuant to paragraph (1), no receiver having the capabilities described in subparagraph (A), (B), or (C) of paragraph (1), as such capabilities are defined in such regulations, shall be manufactured in the United States or imported for use in the United States.

**(e) Delegation of equipment testing and certification to private laboratories**

The Commission may-

(1) authorize the use of private organizations for testing and certifying the compliance of devices or home electronic equipment and systems with regulations promulgated under this section;

(2) accept as prima facie evidence of such compliance the certification by any such organization; and

(3) establish such qualifications and standards as it deems appropriate for such private organizations, testing, and certification.

**(f) State and local enforcement of FCC regulations on use of citizens band radio equipment**

(1) Except as provided in paragraph (2), a State or local government may enact a statute or ordinance that prohibits a violation of the following regulations of the Commission under this section:

    (A) A regulation that prohibits a use of citizens band radio equipment not authorized by the Commission.

    (B) A regulation that prohibits the unauthorized operation of citizens band radio equipment on a frequency between 24 MHz and 35 MHz.

(2) A station that is licensed by the Commission pursuant to section 301 of this title in any radio service for the operation at issue shall not be subject to action by a State or local government under this subsection. A State or local government statute or ordinance enacted for purposes of this subsection shall identify the exemption available under this paragraph.

(3) The Commission shall, to the extent practicable, provide technical guidance to State and local governments regarding the detection and determination of violations of the regulations specified in paragraph (1).

(4)(A) In addition to any other remedy authorized by law, a person affected by the decision of a State or local government agency enforcing a statute or ordinance under paragraph (1) may submit to the Commission an appeal of the decision on the grounds that the State or local government, as the case may be, enacted a statute or ordinance outside the authority provided in this subsection.

(B) A person shall submit an appeal on a decision of a State or local government agency to the Commission under this paragraph, if at all, not later than 30 days after the date on which the decision by the State or local government agency becomes final, but prior to seeking judicial review of such decision.

(C) The Commission shall make a determination on an appeal submitted under subparagraph (B) not later than 180 days after its submittal.

(D) If the Commission determines under subparagraph (C) that a State or local government agency has acted outside its authority in enforcing a statute or ordinance, the Commission shall preempt the decision enforcing the statute or ordinance.

(5) The enforcement of statute or ordinance that prohibits a violation of a regulation by a State or local government under paragraph (1) in a particular case shall not preclude the Commission from enforcing the regulation in that case concurrently.

(6) Nothing in this subsection shall be construed to diminish or otherwise affect the jurisdiction of the Commission under this section over devices capable of interfering with radio communications.

(7) The enforcement of a statute or ordinance by a State or local government under paragraph (1) with regard to citizens band radio equipment on board a "commercial motor vehicle", as defined in section 31101 of title 49, shall require probable cause to find that the commercial motor vehicle or the individual operating the vehicle is in violation of the regulations described in paragraph (1).

## §303. Powers and duties of Commission

Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

(a) Classify radio stations;

(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

(d) Determine the location of classes of stations or individual stations;

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter: *Provided, however,* That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this chapter will be more fully complied with;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

(h) Have authority to establish areas or zones to be served by any station;

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

(k) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

(l)

(1) Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to persons who are found to be qualified by the Commission and who otherwise are legally eligible for employment in the United States, except that such requirement relating to eligibility for employment in the United States shall not apply in the case of licenses issued by the Commission to (A) persons holding United States pilot certificates; or (B) persons holding foreign aircraft pilot certificates which are valid in the United States, if the foreign government involved has entered into a reciprocal agreement under which such foreign government does not impose any similar requirement relating to eligibility for employment upon citizens of the United States;

(2) Notwithstanding paragraph (1) of this subsection, an individual to whom a radio station is licensed under the provisions of this chapter may be issued an operator's license to operate that station.

(3) In addition to amateur operator licenses which the Commission may issue to aliens pursuant to paragraph (2) of this subsection, and notwithstanding section 301 of this title and paragraph (1) of this subsection, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

(m)

(1) Have authority to suspend the license of any operator upon proof sufficient to satisfy the Commission that the licensee—

(A) has violated, or caused, aided, or abetted the violation of, any provision of any Act, treaty, or convention binding on the United States, which the Commission is authorized to administer, or any regulation made by the Commission under any such Act, treaty, or convention; or

(B) has failed to carry out a lawful order of the master or person lawfully in charge of the ship or aircraft on which he is employed; or

(C) has willfully damaged or permitted radio apparatus or installations to be damaged; or

(D) has transmitted superfluous radio communications or signals or communications containing profane or obscene words, language, or meaning, or has knowingly transmitted—

    (1) false or deceptive signals or communications, or

    (2) a call signal or letter which has not been assigned by proper authority to the station he is operating; or

(E) has willfully or maliciously interfered with any other radio communications or signals; or

(F) has obtained or attempted to obtain, or has assisted another to obtain or attempt to obtain, an operator's license by fraudulent means.

(2) No order of suspension of any operator's license shall take effect until fifteen days' notice in writing thereof, stating the cause for the proposed suspension, has been given to the operator licensee who may make written application to the Commission at any time within said fifteen days for a hearing upon such order. The notice to the operator licensee shall not be effective until actually received by him, and from that time he shall have fifteen days in which to mail the said application. In the event that physical conditions prevent mailing of the application at the expiration of the fifteen-day period, the application shall then be mailed as soon as possible thereafter, accompanied by a satisfactory explanation of the delay. Upon receipt by the Commission of such application for hearing, said order of suspension shall be held in abeyance until the conclusion of the hearing which shall be conducted under such rules as the Commission may prescribe. Upon the conclusion of said hearing the Commission may affirm, modify, or revoke said order of suspension.

(n) Have authority to inspect all radio installations associated with stations required to be licensed by any Act, or which the Commission by rule has authorized to operate without a license under section 307(e)(1) of this title, or which are subject to the provisions of any Act, treaty, or convention binding on the United States, to ascertain whether in construction, installation, and operation they conform to the requirements of the rules and regulations of the Commission, the provisions of any Act, the terms of any treaty or convention binding on the United States, and the conditions of the license or other instrument of authorization under which they are constructed, installed, or operated.

(o) Have authority to designate call letters of all stations;

(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this chapter;

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation. The permittee or licensee, and the tower owner in any case in which the owner is not the permittee or licensee, shall maintain the painting and/or illumination of the tower as prescribed by the Commission pursuant to this section. In the event that the tower ceases to be licensed by the Commission for the transmission of radio energy, the owner of the tower shall maintain the prescribed painting and/or illumination of such tower until it is dismantled, and the Commission may require the owner to dismantle and remove the tower when the Administrator of the Federal Aviation Agency determines that there is a reasonable possibility that it may constitute a menace to air navigation.

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.

(s) Have authority to require that apparatus designed to receive television pictures broadcast simultaneously with sound be capable of adequately receiving all frequencies allocated by the Commission to television broadcasting when such

apparatus is shipped in interstate commerce, or is imported from any foreign country into the United States, for sale or resale to the public.

(t) Notwithstanding the provisions of section 301(e) of this title, have authority, in any case in which an aircraft registered in the United States is operated (pursuant to a lease, charter, or similar arrangement) by an aircraft operator who is subject to regulation by the government of a foreign nation, to enter into an agreement with such government under which the Commission shall recognize and accept any radio station licenses and radio operator licenses issued by such government with respect to such aircraft.

(u) Require that, if technically feasible—

(1) apparatus designed to receive or play back video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States and uses a picture screen of any size—

(A) be equipped with built-in closed caption decoder circuitry or capability designed to display closed-captioned video programming;

(B) have the capability to decode and make available the transmission and delivery of video description services as required by regulations reinstated and modified pursuant to section 613(f) of this title; and

(C) have the capability to decode and make available emergency information (as that term is defined in section 79.2 of the Commission's regulations (47 CFR 79.2)) in a manner that is accessible to individuals who are blind or visually impaired; and

(2) notwithstanding paragraph (1) of this subsection—

(A) apparatus described in such paragraph that use a picture screen that is less than 13 inches in size meet the requirements of subparagraph (A), (B), or (C) of such paragraph only if the requirements of such subparagraphs are achievable (as defined in section 617 of this title);

(B) any apparatus or class of apparatus that are display-only video monitors with no playback capability are exempt from the requirements of such paragraph; and

(C) the Commission shall have the authority, on its own motion or in response to a petition by a manufacturer, to waive the requirements of this subsection for any apparatus or class of apparatus—

> (i) primarily designed for activities other than receiving or playing back video programming transmitted simultaneously with sound; or

> (ii) for equipment designed for multiple purposes, capable of receiving or playing video programming transmitted simultaneously with sound but whose essential utility is derived from other purposes.

(v) Have exclusive jurisdiction to regulate the provision of direct-to-home satellite services. As used in this subsection, the term "direct-to-home satellite services" means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

(w) Omitted.

(x) Require, in the case of an apparatus designed to receive television signals that are shipped in interstate commerce or manufactured in the United States and that have a picture screen 13 inches or greater in size (measured diagonally), that such apparatus be equipped with a feature designed to enable viewers to block display of all programs with a common rating, except as otherwise permitted by regulations pursuant to section 330(c)(4) of this title.

(y) Have authority to allocate electromagnetic spectrum so as to provide flexibility of use, if—

(1) such use is consistent with international agreements to which the United States is a party; and

(2) the Commission finds, after notice and an opportunity for public comment, that—

> (A) such an allocation would be in the public interest;

> (B) such use would not deter investment in communications services and systems, or technology development; and

> (C) such use would not result in harmful interference among users.

(z) Require that—

(1) if achievable (as defined in section 617 of this title), apparatus designed to record video programming transmitted simultaneously with sound, if such apparatus is manufactured in the United States or imported for use in the United States, enable the rendering or the pass through of closed captions, video description signals, and emergency information (as that term is defined in section 79.2 of title 47, Code of Federal Regulations) such that viewers are able to activate and de-activate the closed captions and video description as the video programming is played back on a picture screen of any size; and

(2) interconnection mechanisms and standards for digital video source devices are available to carry from the source device to the consumer equipment the information necessary to permit or render the display of closed captions and to make encoded video description and emergency information audible.

(aa) Require—

(1) if achievable (as defined in section 617 of this title) that digital apparatus designed to receive or play back video programming transmitted in digital format simultaneously with sound, including apparatus designed to receive or display video programming transmitted in digital format using Internet protocol, be designed, developed, and fabricated so that control of appropriate built-in apparatus functions are accessible to and usable by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) that if on-screen text menus or other visual indicators built in to the digital apparatus are used to access the functions of the apparatus described in paragraph (1), such functions shall be accompanied by audio output that is either integrated or peripheral to the apparatus, so that such menus or indicators are accessible to and usable by individuals who are blind or visually impaired in real-time;

(3) that for such apparatus equipped with the functions described in paragraphs (1) and (2) built in access to those closed captioning and video description features through a mechanism that is reasonably comparable to a button, key, or icon designated for activating the closed captioning or accessibility features; and

(4) that in applying this subsection the term "apparatus" does not include a navigation device, as such term is defined in section 76.1200 of the Commission's rules (47 CFR 76.1200).

(bb) Require—

(1) if achievable (as defined in section 617 of this title), that the on-screen text menus and guides provided by navigation devices (as such term is defined in section 76.1200 of title 47, Code of Federal Regulations) for the display or selection of multichannel video programming are audibly accessible in real-time upon request by individuals who are blind or visually impaired, except that the Commission may not specify the technical standards, protocols, procedures, and other technical requirements for meeting this requirement;

(2) for navigation devices with built-in closed captioning capability, that access to that capability through a mechanism is reasonably comparable to a button, key, or icon designated for activating the closed captioning, or accessibility features; and

(3) that, with respect to navigation device features and functions—

(A) delivered in software, the requirements set forth in this subsection shall apply to the manufacturer of such software; and

(B) delivered in hardware, the requirements set forth in this subsection shall apply to the manufacturer of such hardware.

## §1004. Systems security and integrity

A telecommunications carrier shall ensure that any interception of communications or access to call-identifying information effected within its switching premises can be activated only in accordance with a court order or other lawful authorization and with the affirmative intervention of an individual officer or employee of the carrier acting in accordance with regulations prescribed by the Commission.

## §1005. Cooperation of equipment manufacturers and providers of telecommunications support services

### (a) Consultation

A telecommunications carrier shall consult, as necessary, in a timely fashion with manufacturers of its telecommunications transmission and switching equipment and its providers of telecommunications support services for the purpose of ensuring that current and planned equipment, facilities, and services comply with the capability requirements of section 1002 of this title and the capacity requirements identified by the Attorney General under section 1003 of this title.

### (b) Cooperation

Subject to sections 1003(e), 1007(a), and 1008(b) and (d) of this title, a manufacturer of telecommunications transmission or switching equipment and a provider of telecommunications support services shall, on a reasonably timely basis and at a reasonable charge, make available to the telecommunications carriers using its equipment, facilities, or services such features or modifications as are necessary to permit such carriers to comply with the capability requirements of section 1002 of this title and the capacity requirements identified by the Attorney General under section 1003 of this title.

**§1601. Determination of communications equipment or services posing national security risks**

**(a) Publication of covered communications equipment or services list**

Not later than 1 year after March 12, 2020, the Commission shall publish on its website a list of covered communications equipment or services.

**(b) Publication by Commission**

The Commission shall place on the list published under subsection (a) any communications equipment or service, if and only if such equipment or service—

> (1) is produced or provided by any entity, if, based exclusively on the determinations described in paragraphs (1) through (4) of subsection (c), such equipment or service produced or provided by such entity poses an unacceptable risk to the national security of the United States or the security and safety of United States persons; and
> (2) is capable of—
>> (A) routing or redirecting user data traffic or permitting visibility into any user data or packets that such equipment or service transmits or otherwise handles;
>> (B) causing the network of a provider of advanced communications service to be disrupted remotely; or
>> (C) otherwise posing an unacceptable risk to the national security of the United States or the security and safety of United States persons.

**(c) Reliance on certain determinations**

In taking action under subsection (b)(1), the Commission shall place on the list any communications equipment or service that poses an unacceptable risk to the national security of the United States or the security and safety of United States persons based solely on one or more of the following determinations:

> (1) A specific determination made by any executive branch interagency body with appropriate national security expertise, including the Federal Acquisition Security Council established under section 1322(a) of title 41.
> (2) A specific determination made by the Department of Commerce pursuant to Executive Order No. 13873 (84 Fed. Reg. 22689; relating to securing the information and communications technology and services supply chain).

(3) The communications equipment or service being covered telecommunications equipment or services, as defined in section 889(f)(3) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1918).

(4) A specific determination made by an appropriate national security agency.

**(d) Updating of list**

(1) In general

The Commission shall periodically update the list published under subsection (a) to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

(2) Monitoring of determinations

The Commission shall monitor the making or reversing of the determinations described in paragraphs (1) through (4) of subsection (c) in order to place additional communications equipment or services on the list published under subsection (a) or to remove communications equipment or services from such list. If a determination described in any such paragraph that provided the basis for a determination by the Commission under subsection (b)(1) with respect to any communications equipment or service is reversed, the Commission shall remove such equipment or service from such list, except that the Commission may not remove such equipment or service from such list if any other determination described in any such paragraph provides a basis for inclusion on such list by the Commission under subsection (b)(1) with respect to such equipment or service.

(3) Public notification

For each 12-month period during which the list published under subsection (a) is not updated, the Commission shall notify the public that no updates were necessary during such period to protect national security or to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

## §1602. Prohibition on use of certain Federal subsidies

(a) In general

    (1) Prohibition

A Federal subsidy that is made available through a program administered by the Commission and that provides funds to be used for the capital expenditures necessary for the provision of advanced communications service may not be used to—

    (A) purchase, rent, lease, or otherwise obtain any covered communications equipment or service; or

    (B) maintain any covered communications equipment or service previously purchased, rented, leased, or otherwise obtained.

    (2) Timing

Paragraph (1) shall apply with respect to any covered communications equipment or service beginning on the date that is 60 days after the date on which the Commission places such equipment or service on the list required by section 1601(a) of this title. In the case of any covered communications equipment or service that is on the initial list published under such section, such equipment or service shall be treated as being placed on the list on the date on which such list is published.

(b) Completion of proceeding

Not later than 180 days after March 12, 2020, the Commission shall adopt a Report and Order to implement subsection (a). If the Commission has, before March 12, 2020, taken action that in whole or in part implements subsection (a), the Commission is not required to revisit such action, but only to the extent such action is consistent with this section.

## §1608. Definitions

In this chapter:

(4) Communications equipment or service

The term "communications equipment or service" means any equipment or service that is essential to the provision of advanced communications service.

## § 2.939 Revocation, withdrawal, or limitation of equipment authorization.

(a) The Commission may revoke, or place limitations pursuant to paragraph (e) of this section on, any equipment authorization:

(1) For false statements or representations made either in the application or in materials or response submitted in connection therewith or in records required to be kept by § 2.938.

(2) If upon subsequent inspection or operation it is determined that the equipment does not conform to the pertinent technical requirements or to the representations made in the original application.

(3) If it is determined that changes have been made in the equipment other than those authorized by the rules or otherwise expressly authorized by the Commission.

(4) Because of conditions coming to the attention of the Commission which would warrant it in refusing to grant an original application.

**Secure Equipment Act, Pub. L. No. 117-55, 135 Stat. 423 (2021)**

**SECURE EQUIPMENT ACT OF 2021**

An Act

To ensure that the Federal Communications Commission prohibits authorization of radio frequency devices that pose a national security risk.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Secure Equipment Act of 2021".

## SEC. 2. UPDATES TO EQUIPMENT AUTHORIZATION PROCESS OF FEDERAL COMMUNICATIONS COMMISSION.

(a) RULEMAKING.—

(1) IN GENERAL.—Not later than 1 year after the date of the enactment of this Act, the Commission shall adopt rules in the proceeding initiated in the Notice of Proposed Rulemaking in the matter of Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program (ET Docket No. 21–232; FCC 21–73; adopted June 17, 2021), in accordance with paragraph (2), to update the equipment authorization procedures of the Commission.

(2) UPDATES REQUIRED.—In the rules adopted under paragraph (1), the Commission shall clarify that the Commission will no longer review or approve any application for equipment authorization for equipment that is on the list of covered communications equipment or services published by the Commission under section 2(a) of the Secure and Trusted Communications Networks Act of 2019 (47 U.S.C. 1601(a)).

(3) APPLICABILITY.—

(A) IN GENERAL.—In the rules adopted under paragraph (1), the Commission may not provide for review or revocation of any equipment authorization granted before the date on which such rules are adopted on the basis of the equipment being on the list described in paragraph (2).

(B) RULE OF CONSTRUCTION.—Nothing in this section may be construed to prohibit the Commission, other than in the rules adopted under paragraph (1), from—

(i) examining the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the list described in paragraph (2); or

(ii) adopting rules providing for any such review or revocation.

(b) DEFINITION.—In this section, the term "Commission" means the Federal Communications Commission.

**Secure and Trusted Communications Networks Act ("Secure Networks Act"), Pub. L. No. 116-124, 134 Stat. 158 (2020)**

## SECURE AND TRUSTED COMMUNICATIONS NETWORKS ACT OF 2019

### An Act

To prohibit certain Federal subsidies from being used to purchase communications equipment or services posing national security risks, to provide for the establishment of a reimbursement program for the replacement of communications equipment or services posing such risks, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Secure and Trusted Communications Networks Act of 2019".

## SEC. 2. DETERMINATION OF COMMUNICATIONS EQUIPMENT OR SERVICES POSING NATIONAL SECURITY RISKS.

(a) PUBLICATION OF COVERED COMMUNICATIONS EQUIPMENT OR SERVICES LIST.—Not later than 1 year after the date of the enactment of this Act, the Commission shall publish on its website a list of covered communications equipment or services.

(b) PUBLICATION BY COMMISSION.—The Commission shall place on the list published under subsection (a) any communications equipment or service, if and only if such equipment or service—

(1) is produced or provided by any entity, if, based exclusively on the determinations described in paragraphs (1) through (4) of subsection (c), such equipment or service produced or provided by such entity poses an unacceptable risk to the national security of the United States or the security and safety of United States persons; and

(2) is capable of—

(A) routing or redirecting user data traffic or permitting visibility into any user data or packets that such equipment or service transmits or otherwise handles;

(B) causing the network of a provider of advanced communications service to be disrupted remotely; or

(C) otherwise posing an unacceptable risk to the national security of the United States or the security and safety of United States persons.

(c) RELIANCE ON CERTAIN DETERMINATIONS.—In taking action under subsection (b)(1), the Commission shall place on the list any communications equipment or service that poses an unacceptable risk to the national security of the United States or the security and safety of United States persons based solely on one or more of the following determinations:

(1) A specific determination made by any executive branch interagency body with appropriate national security expertise, including the Federal Acquisition Security Council established under section 1322(a) of title 41, United States Code.

(2) A specific determination made by the Department of Commerce pursuant to Executive Order No. 13873 (84 Fed. Reg. 22689; relating to securing the information and communications technology and services supply chain).

(3) The communications equipment or service being covered telecommunications equipment or services, as defined in section 889(f)(3) of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232; 132 Stat. 1918).

(4) A specific determination made by an appropriate national security agency.

(d) UPDATING OF LIST.—

(1) IN GENERAL.—The Commission shall periodically update the list published under subsection (a) to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

(2) MONITORING OF DETERMINATIONS.—The Commission shall monitor the making or reversing of the determinations described in paragraphs (1) through (4) of subsection (c) in order to place additional communications equipment or services on the list published under subsection (a) or to remove communications equipment or services from such list. If a determination described in any such paragraph that provided the basis for a determination by the Commission under subsection (b)(1) with respect to any communications equipment or service is reversed, the Commission shall remove such equipment

or service from such list, except that the Commission may not remove such equipment or service from such list if any other determination described in any such paragraph provides a basis for inclusion on such list by the Commission under subsection (b)(1) with respect to such equipment or service.

(3) PUBLIC NOTIFICATION.—For each 12-month period during which the list published under subsection (a) is not updated, the Commission shall notify the public that no updates were necessary during such period to protect national security or to address changes in the determinations described in paragraphs (1) through (4) of subsection (c).

## SEC. 3. PROHIBITION ON USE OF CERTAIN FEDERAL SUBSIDIES.

(a) IN GENERAL.—

(1) PROHIBITION.—A Federal subsidy that is made available through a program administered by the Commission and that provides funds to be used for the capital expenditures necessary for the provision of advanced communications service may not be used to—

(A) purchase, rent, lease, or otherwise obtain any covered communications equipment or service; or

(B) maintain any covered communications equipment or service previously purchased, rented, leased, or otherwise obtained.

(2) TIMING.—Paragraph (1) shall apply with respect to any covered communications equipment or service beginning on the date that is 60 days after the date on which the Commission places such equipment or service on the list required by section 2(a). In the case of any covered communications equipment or service that is on the initial list published under such section, such equipment or service shall be treated as being placed on the list on the date on which such list is published.

(b) COMPLETION OF PROCEEDING.—Not later than 180 days after the date of the enactment of this Act, the Commission shall adopt a Report and Order to implement subsection (a). If the Commission has, before the date of the enactment of this Act, taken action that in whole or in part implements subsection (a), the Commission is not required to revisit such action, but only to the extent such action is consistent with this section.

## SEC. 4. SECURE AND TRUSTED COMMUNICATIONS NETWORKS REIMBURSEMENT PROGRAM.

(a) IN GENERAL.—The Commission shall establish a reimbursement program, to be known as the "Secure and Trusted Communications Networks Reimbursement

Program", to make reimbursements to providers of advanced communications service to replace covered communications equipment or services.

(b) ELIGIBILITY.—The Commission may not make a reimbursement under the Program to a provider of advanced communications service unless the provider—

(1) has 2,000,000 or fewer customers; and

(2) makes all of the certifications required by subsection (d)(4).

(c) USE OF FUNDS.—

(1) IN GENERAL.—A recipient of a reimbursement under the Program shall use reimbursement funds solely for the purposes of—

(A) permanently removing covered communications equipment or services purchased, rented, leased, or otherwise obtained before—

(i) in the case of any covered communications equipment or services that are on the initial list published under section 2(a), August 14, 2018; or

(ii) in the case of any covered communications equipment or services that are not on the initial list published under section 2(a), the date that is 60 days after the date on which the Commission places such equipment or services on the list required by such section;

(B) replacing the covered communications equipment or services removed as described in subparagraph (A) with communications equipment or services that are not covered communications equipment or services; and

(C) disposing of the covered communications equipment or services removed as described in subparagraph (A) in accordance with the requirements under subsection (d)(7).

(2) LIMITATIONS.—A recipient of a reimbursement under the Program may not—

(A) use reimbursement funds to remove, replace, or dispose of any covered communications equipment or service purchased, rented, leased, or otherwise obtained on or after—

(i) in the case of any covered communications equipment or service that is on the initial list published under section 2(a), August 14, 2018; or

(ii) in the case of any covered communications equipment or service that is not on the initial list published under section 2(a), the date that is 60 days after the date on which the Commission places such equipment or service on the list required by such section; or

(B) purchase, rent, lease, or otherwise obtain any covered communications equipment or service, using reimbursement funds or any other funds (including funds derived from private sources).

(d) IMPLEMENTATION.—

(1) SUGGESTED REPLACEMENTS.—

(A) DEVELOPMENT OF LIST.—The Commission shall develop a list of suggested replacements of both physical and virtual communications equipment, application and management software, and services or categories of replacements of both physical and virtual communications equipment, application and management software and services.

(B) NEUTRALITY.—The list developed under subparagraph (A) shall be technology neutral and may not advantage the use of reimbursement funds for capital expenditures over operational expenditures, to the extent that the Commission determines that communications services can serve as an adequate substitute for the installation of communications equipment.

(2) APPLICATION PROCESS.—

(A) IN GENERAL.—The Commission shall develop an application process and related forms and materials for the Program.

(B) COST ESTIMATE.—

(i) INITIAL ESTIMATE.—The Commission shall require an applicant to provide an initial reimbursement cost estimate at the time of application, with supporting materials substantiating the costs.

(ii) UPDATES.—During and after the application review process, the Commission may require an applicant to—

(I) update the initial reimbursement cost estimate submitted under clause (i); and

(II) submit additional supporting materials substantiating an updated cost estimate submitted under subclause (I).

(C) MITIGATION OF BURDEN.—In developing the application process under this paragraph, the Commission shall take reasonable steps to mitigate the administrative burdens and costs associated with the application process, while taking into account the need to avoid waste, fraud, and abuse in the Program.

(3) APPLICATION REVIEW PROCESS.—

(A) DEADLINE.—

(i) IN GENERAL.—Except as provided in clause (ii) and subparagraph (B), the Commission shall approve or deny an application for a reimbursement under the Program not later than 90 days after the date of the submission of the application.

(ii) ADDITIONAL TIME NEEDED BY COMMISSION.—If the Commission determines that, because an excessive number of applications have been filed at one time, the Commission needs additional time for employees of the Commission to process the applications, the Commission may extend the deadline described in clause (i) for not more than 45 days.

(B) OPPORTUNITY FOR APPLICANT TO CURE DEFICIENCY.—If the Commission determines that an application is materially deficient (including by lacking an adequate cost estimate or adequate supporting materials), the Commission shall provide the applicant a 15-day period to cure the defect before denying the application. If such period would extend beyond the deadline under subparagraph (A) for approving or denying the application, such deadline shall be extended through the end of such period.

(C) EFFECT OF DENIAL.—Denial of an application for a reimbursement under the Program shall not preclude the applicant from resubmitting the application or submitting a new application for a reimbursement under the Program at a later date.

(4) CERTIFICATIONS.—An applicant for a reimbursement under the Program shall, in the application of the applicant, certify to the Commission that—

(A) as of the date of the submission of the application, the applicant—

(i) has developed a plan for—

(I) the permanent removal and replacement of any covered communications equipment or services that are in the communications network of the applicant as of such date; and

(II) the disposal of the equipment or services removed as described in subclause (I) in accordance with the requirements under paragraph (7); and

(ii) has developed a specific timeline (subject to paragraph (6)) for the permanent removal, replacement, and disposal of the covered communications equipment or services identified under clause (i), which timeline shall be submitted to the Commission as part of the application; and

(B) beginning on the date of the approval of the application, the applicant—

(i) will not purchase, rent, lease, or otherwise obtain covered communications equipment or services, using reimbursement funds or any other funds (including funds derived from private sources); and

(ii) in developing and tailoring the risk management practices of the applicant, will consult and consider the standards, guidelines, and best practices set forth in the cybersecurity framework developed by the National Institute of Standards and Technology.

(5) DISTRIBUTION OF REIMBURSEMENT FUNDS.—

(A) IN GENERAL.—The Commission shall make reasonable efforts to ensure that reimbursement funds are distributed equitably among all applicants for reimbursements under the Program according to the needs of the applicants, as identified by the applications of the applicants.

(B) NOTIFICATION.—If, at any time during the implementation of the Program, the Commission determines that $1,000,000,000 will not be sufficient to fully fund all approved applications for reimbursements under the Program, the Commission shall immediately notify—

(i) the Committee on Energy and Commerce and the Committee on Appropriations of the House of Representatives; and

(ii) the Committee on Commerce, Science, and Transportation and the Committee on Appropriations of the Senate.

(6) REMOVAL, REPLACEMENT, AND DISPOSAL TERM.—

(A) DEADLINE.—Except as provided in subparagraphs (B) and (C), the permanent removal, replacement, and disposal of any covered communications equipment or services identified under paragraph (4)(A)(i) shall be completed not later than 1 year after the date on which the Commission distributes reimbursement funds to the recipient.

(B) GENERAL EXTENSION.—The Commission may grant an extension of the deadline described in subparagraph (A) for 6 months to all recipients of reimbursements under the Program if the Commission—

(i) finds that the supply of replacement communications equipment or services needed by the recipients to achieve the purposes of the Program is inadequate to meet the needs of the recipients; and

(ii) provides notice and a detailed justification for granting the extension to—

（I) the Committee on Energy and Commerce of the House of Representatives; and

（II) the Committee on Commerce, Science, and Transportation of the Senate.

(C) INDIVIDUAL EXTENSION.—

(i) PETITION.—A recipient of a reimbursement under the Program may petition the Commission for an extension for such recipient of the deadline described in subparagraph (A) or, if the Commission has granted an extension of such deadline under subparagraph (B), such deadline as so extended.

(ii) GRANT.—The Commission may grant a petition filed under clause (i) by extending, for the recipient that filed the petition, the deadline described in subparagraph (A) or, if the Commission has granted an extension of such deadline under subparagraph (B), such deadline as so extended, for a period of not more than 6 months if the Commission finds that, due to no fault of such recipient, such recipient is unable to complete the permanent removal, replacement, and disposal described in subparagraph (A).

(7) DISPOSAL OF COVERED COMMUNICATIONS EQUIPMENT OR SERVICES.—The Commission shall include in the regulations promulgated under subsection (g) requirements for the disposal by a recipient of a reimbursement under the Program of covered communications equipment or services identified under paragraph (4)(A)(i) and removed from the network of the recipient in order to prevent such equipment or services from being used in the networks of providers of advanced communications service.

(8) STATUS UPDATES.—

(A) IN GENERAL.—Not less frequently than once every 90 days beginning on the date on which the Commission approves an application for a reimbursement under the Program, the recipient of the reimbursement shall submit to the Commission a status update on the work of the recipient to permanently remove, replace, and dispose of the covered communications equipment or services identified under paragraph (4)(A)(i).

(B) PUBLIC POSTING.—Not earlier than 30 days after the date on which the Commission receives a status update under subparagraph (A), the Commission shall make such status update public on the website of the Commission.

(C) REPORTS TO CONGRESS.—Not less frequently than once every 180 days beginning on the date on which the Commission first makes funds available to a recipient of a reimbursement under the Program, the Commission shall prepare and submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a report on—

(i) the implementation of the Program by the Commission; and

(ii) the work by recipients of reimbursements under the Program to permanently remove, replace, and dispose of covered communications equipment or services identified under paragraph (4)(A)(i).

(e) MEASURES TO AVOID WASTE, FRAUD, AND ABUSE.—

(1) IN GENERAL.—The Commission shall take all necessary steps to avoid waste, fraud, and abuse with respect to the Program.

(2) SPENDING REPORTS.—The Commission shall require recipients of reimbursements under the Program to submit to the Commission on a regular basis reports regarding how reimbursement funds have been spent, including detailed accounting of the covered communications equipment or services permanently removed and disposed of, and the replacement equipment or services purchased, rented, leased, or otherwise obtained, using reimbursement funds.

(3) AUDITS, REVIEWS, AND FIELD INVESTIGATIONS.—The Commission shall conduct—

(A) regular audits and reviews of reimbursements under the Program to confirm that recipients of such reimbursements are complying with this Act; and

(B) random field investigations to ensure that recipients of reimbursements under the Program are performing the work such recipients are required to perform under the commitments made in the applications of such recipients for reimbursements under the Program, including the permanent removal, replacement, and disposal of the covered communications equipment or services identified under subsection (d)(4)(A)(i).

(4) FINAL CERTIFICATION.—

(A) IN GENERAL.—The Commission shall require a recipient of a reimbursement under the Program to submit to the Commission, in a form and at an appropriate time to be determined by the Commission, a certification stating that the recipient—

(i) has fully complied with (or is in the process of complying with) all terms and conditions of the Program;

(ii) has fully complied with (or is in the process of complying with) the commitments made in the application of the recipient for the reimbursement;

(iii) has permanently removed from the communications network of the recipient, replaced, and disposed of (or is in the process of permanently removing, replacing, and disposing of) all covered communications equipment or services that were in the network of the recipient as of the date of the submission of the application of the recipient for the reimbursement; and

(iv) has fully complied with (or is in the process of complying with) the timeline submitted by the recipient under subparagraph (A)(ii) of paragraph (4) of subsection (d) and the other requirements of such paragraph.

(B) UPDATED CERTIFICATION.—If, at the time when a recipient of a reimbursement under the Program submits a certification under subparagraph (A), the recipient has not fully complied as described in clause (i), (ii), or (iv) of such subparagraph or has not completed the permanent removal, replacement, and disposal described in clause (iii) of such subparagraph, the Commission shall require the recipient to file an updated certification when the recipient has fully complied as described in such clause (i), (ii), or (iv) or completed such permanent removal, replacement, and disposal.

(f) EFFECT OF REMOVAL OF EQUIPMENT OR SERVICE FROM LIST.—

(1) IN GENERAL.—If, after the date on which a recipient of a reimbursement under the Program submits the application for the reimbursement, any covered communications equipment or service that is in the network of the recipient as of such date is removed from the list published under section 2(a), the recipient may—

(A) return to the Commission any reimbursement funds received for the removal, replacement, and disposal of such equipment or service and be released from any requirement under this section to remove, replace, or dispose of such equipment or service; or

(B) retain any reimbursement funds received for the removal, replacement, and disposal of such equipment or service and remain subject to the requirements of this section to remove, replace, and dispose of such

equipment or service as if such equipment or service continued to be on the list published under section 2(a).

(2) ASSURANCES.—In the case of an assurance relating to the removal, replacement, or disposal of any equipment or service with respect to which the recipient returns to the Commission reimbursement funds under paragraph (1)(A), such assurance may be satisfied by making an assurance that such funds have been returned.

(g) RULEMAKING.—

(1) COMMENCEMENT.—Not later than 90 days after the date of the enactment of this Act, the Commission shall commence a rulemaking to implement this section.

(2) COMPLETION.—The Commission shall complete the rulemaking under paragraph (1) not later than 1 year after the date of the enactment of this Act.

(h) RULE OF CONSTRUCTION REGARDING TIMING OF REIMBURSEMENT.—Nothing in this section shall be construed to prohibit the Commission from making a reimbursement under the Program to a provider of advanced communications service before the provider incurs the cost of the permanent removal, replacement, and disposal of the covered communications equipment or service for which the application of the provider has been approved under this section.

(i) EDUCATION EFFORTS.—The Commission shall engage in education efforts with providers of advanced communications service to—

(1) encourage such providers to participate in the Program; and

(2) assist such providers in submitting applications for the Program.

(j) SEPARATE FROM FEDERAL UNIVERSAL SERVICE PROGRAMS.—The Program shall be separate from any Federal universal service program established under section 254 of the Communications Act of 1934 (47 U.S.C. 254).

## SEC. 5. REPORTS ON COVERED COMMUNICATIONS EQUIPMENT OR SERVICES.

(a) IN GENERAL.—Each provider of advanced communications service shall submit an annual report to the Commission, in a form to be determined by the Commission, regarding whether such provider has purchased, rented, leased, or otherwise obtained any covered communications equipment or service on or after—

(1) in the case of any covered communications equipment or service that is on the initial list published under section 2(a), August 14, 2018; or

(2) in the case of any covered communications equipment or service that is not on the initial list published under section 2(a), the date that is 60 days after the date on which the Commission places such equipment or service on the list required by such section.

(b) RULE OF CONSTRUCTION.—If a provider of advanced communications service certifies to the Commission that such provider does not have any covered communications equipment or service in the network of such provider, such provider is not required to submit a report under subsection (a) after making such certification, unless such provider later purchases, rents, leases, or otherwise obtains any covered communications equipment or service.

(c) JUSTIFICATION.—If a provider of advanced communications service indicates in a report under subsection (a) that such provider has purchased, rented, leased, or otherwise obtained any covered communications equipment or service as described in such subsection, such provider shall include in such report—

(1) a detailed justification for such action;

(2) information about whether such covered communications equipment or service has subsequently been removed and replaced pursuant to section 4; and

(3) information about whether such provider plans to continue to purchase, rent, lease, or otherwise obtain, or install or use, such covered communications equipment or service and, if so, why.

(d) PROCEEDING.—The Commission shall implement this section as part of the rulemaking required by section 4(g).

## SEC. 6. HOLD HARMLESS.

In the case of a person who is a winner of the Connect America Fund Phase II auction, has not yet been authorized to receive Connect America Fund Phase II support, and demonstrates an inability to reasonably meet the build-out and service obligations of such person under Connect America Fund Phase II without using equipment or services prohibited under this Act, such person may withdraw the application of such person for Connect America Fund Phase II support without being found in default or subject to forfeiture. The Commission may set a deadline to make such a withdrawal that is not earlier than the date that is 60 days after the date of the enactment of this Act.

## SEC. 7. ENFORCEMENT.

(a) VIOLATIONS.—A violation of this Act or a regulation promulgated under this Act shall be treated as a violation of the Communications Act of 1934 (47 U.S.C. 151 et seq.) or a regulation promulgated under such Act, respectively. The Commission shall enforce this Act and the regulations promulgated under this Act in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Communications Act of 1934 were incorporated into and made a part of this Act.

(b) ADDITIONAL PENALTIES.—

(1) IN GENERAL.—Except as provided in paragraph (2), in addition to penalties under the Communications Act of 1934, a recipient of a reimbursement under the Program found to have violated section 4, the regulations promulgated under such section, or the commitments made by the recipient in the application for the reimbursement—

(A) shall repay to the Commission all reimbursement funds provided to the recipient under the Program;

(B) shall be barred from further participation in the Program;

(C) shall be referred to all appropriate law enforcement agencies or officials for further action under applicable criminal and civil laws; and

(D) may be barred by the Commission from participation in other programs of the Commission, including the Federal universal service support programs established under section 254 of the Communications Act of 1934 (47 U.S.C. 254).

(2) NOTICE AND OPPORTUNITY TO CURE.—The penalties described in paragraph (1) shall not apply to a recipient of a reimbursement under the Program unless—

(A) the Commission provides the recipient with notice of the violation; and

(B) the recipient fails to cure the violation within 180 days after the Commission provides such notice.

(c) RECOVERY OF FUNDS.—The Commission shall immediately take action to recover all reimbursement funds awarded to a recipient of a reimbursement under the Program in any case in which such recipient is required to repay reimbursement funds under subsection (b)(1)(A).

## SEC. 8. NTIA PROGRAM FOR PREVENTING FUTURE VULNERABILITIES.

(a) FUTURE VULNERABILITY PROGRAM.—

(1) ESTABLISHMENT.—Not later than 120 days after the date of the enactment of this Act, including an opportunity for notice and comment, the Assistant Secretary, in cooperation with the Director of National Intelligence, the Director of the Federal Bureau of Investigation, the Secretary of Homeland Security, and the Commission, shall establish a program to share information regarding supply chain security risks with trusted providers of advanced communications service and trusted suppliers of communications equipment or services.

(2) ACTIVITIES.—In carrying out the program established under paragraph (1), the Assistant Secretary shall—

(A) conduct regular briefings and other events to share information with trusted providers of advanced communications service and trusted suppliers of communications equipment or services;

(B) engage with trusted providers of advanced communications service and trusted suppliers of communications equipment or services, in particular such providers and suppliers that—

(i) are small businesses; or

(ii) primarily serve rural areas;

(C) not later than 180 days after the date of the enactment of this Act, submit to the Committee on Energy and Commerce of the House of Representatives and the Committee on Commerce, Science, and Transportation of the Senate a plan for—

(i) declassifying material, when feasible, to help share information regarding supply chain security risks with trusted providers of advanced communications service and trusted suppliers of communications equipment or services; and

(ii) expediting and expanding the provision of security clearances to facilitate information sharing regarding supply chain security risks with trusted providers of advanced communications service and trusted suppliers of communications equipment or services; and

(D) ensure that the activities carried out through the program are consistent with and, to the extent practicable, integrated with, ongoing activities of the Department of Homeland Security and the Department of Commerce.

(3) SCOPE OF PROGRAM.—The program established under paragraph (1) shall involve only the sharing of information regarding supply chain security risks by the Federal Government to trusted providers of advanced

communications service and trusted suppliers of communications equipment or services, and not the sharing of such information by such providers and suppliers to the Federal Government.

(b) REPRESENTATION ON CSRIC OF INTERESTS OF PUBLIC AND CONSUMERS.—

(1) IN GENERAL.—The Commission shall appoint to the Communications Security, Reliability, and Interoperability Council (or any successor thereof), and to each subcommittee, workgroup, or other subdivision of the Council (or any such successor), at least one member to represent the interests of the public and consumers.

(2) INITIAL APPOINTMENTS.—The Commission shall make the initial appointments required by paragraph (1) not later than 180 days after the date of the enactment of this Act. Any member so appointed shall be in addition to the members of the Council, or the members of the subdivision of the Council to which the appointment is being made, as the case may be, as of the date of the enactment of this Act.

(c) DEFINITIONS.—In this section:

(1) ASSISTANT SECRETARY.—The term "Assistant Secretary" means the Assistant Secretary of Commerce for Communications and Information.

(2) FOREIGN ADVERSARY.—The term "foreign adversary" means any foreign government or foreign nongovernment person engaged in a long-term pattern or serious instances of conduct significantly adverse to the national security of the United States or security and safety of United States persons.

(3) SUPPLY CHAIN SECURITY RISK.—The term "supply chain security risk" includes specific risk and vulnerability information related to equipment and software.

(4) TRUSTED.—The term "trusted" means, with respect to a provider of advanced communications service or a supplier of communications equipment or service, that the Assistant Secretary has determined that such provider or supplier is not owned by, controlled by, or subject to the influence of a foreign adversary.

## SEC. 9. DEFINITIONS.

In this Act:

(1) ADVANCED COMMUNICATIONS SERVICE.—The term "advanced communications service" has the meaning given the term "advanced

telecommunications capability" in section 706 of the Telecommunications Act of 1996 (47 U.S.C. 1302).

(2) APPROPRIATE NATIONAL SECURITY AGENCY.—The term "appropriate national security agency" means—

 (A) the Department of Homeland Security;

 (B) the Department of Defense;

 (C) the Office of the Director of National Intelligence;

 (D) the National Security Agency; and

 (E) the Federal Bureau of Investigation.

(3) COMMISSION.—The term "Commission" means the Federal Communications Commission.

(4) COMMUNICATIONS EQUIPMENT OR SERVICE.—The term "communications equipment or service" means any equipment or service that is essential to the provision of advanced communications service.

(5) COVERED COMMUNICATIONS EQUIPMENT OR SERVICE.—The term "covered communications equipment or service" means any communications equipment or service that is on the list published by the Commission under section 2(a).

(6) CUSTOMERS.—The term "customers" means, with respect to a provider of advanced communications service—

 (A) the customers of such provider; and

 (B) the customers of any affiliate (as defined in section 3 of the Communications Act of 1934 (47 U.S.C. 153)) of such provider.

(7) EXECUTIVE BRANCH INTERAGENCY BODY.—The term "executive branch interagency body" means an interagency body established in the executive branch.

(8) PERSON.—The term "person" means an individual or entity.

(9) PROGRAM.—The term "Program" means the Secure and Trusted Communications Networks Reimbursement Program established under section 4(a).

(10) PROVIDER OF ADVANCED COMMUNICATIONS SERVICE.—The term "provider of advanced communications service" means a person who provides advanced communications service to United States customers.

(11) RECIPIENT.—The term "recipient" means any provider of advanced communications service the application of which for a reimbursement under the Program has been approved by the Commission, regardless of whether the provider has received reimbursement funds.

(12) REIMBURSEMENT FUNDS.—The term "reimbursement funds" means any reimbursement received under the Program.

## SEC. 10. SEVERABILITY.

If any provision of this Act, or the application of such a provision to any person or circumstance, is held to be unconstitutional, the remaining provisions of this Act, and the application of such provisions to any person or circumstance, shall not be affected thereby.

## SEC. 11. DETERMINATION OF BUDGETARY EFFECTS.

The budgetary effects of this Act, for the purpose of complying with the Statutory Pay-As-You-Go Act of 2010, shall be determined by reference to the latest statement titled "Budgetary Effects of PAYGO Legislation" for this Act, submitted for printing in the Congressional Record by the Chairman of the House Budget Committee, provided that such statement has been submitted prior to the vote on passage.

## SEC. 889. PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT.

(a) PROHIBITION ON USE OR PROCUREMENT.—(1) The head of an executive agency may not—

(A) procure or obtain or extend or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system; or

(B) enter into a contract (or extend or renew a contract) with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.

(2) Nothing in paragraph (1) shall be construed to—

(A) prohibit the head of an executive agency from procuring with an entity to provide a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(B) cover telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(b) PROHIBITION ON LOAN AND GRANT FUNDS.—(1) The head of an executive agency may not obligate or expend loan or grant funds to procure or obtain, extend or renew a contract to procure or obtain, or enter into a contract (or extend or renew a contract) to procure or obtain the equipment, services, or systems described in subsection (a).

(2) In implementing the prohibition in paragraph (1), heads of executive agencies administering loan, grant, or subsidy programs, including the heads of the Federal Communications Commission, the Department of Agriculture, the Department of Homeland Security, the Small Business Administration, and the Department of Commerce, shall prioritize available funding and technical support to assist affected businesses, institutions and organizations as is reasonably necessary for those affected entities to transition from covered

communications equipment and services, to procure replacement equipment and services, and to ensure that communications service to users and customers is sustained.

(3) Nothing in this subsection shall be construed to—

(A) prohibit the head of an executive agency from procuring with an entity to provide a service that connects to the facilities of a third-party, such as backhaul, roaming, or interconnection arrangements; or

(B) cover telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles.

(c) EFFECTIVE DATES.—The prohibition under subsection (a)(1)(A) shall take effect one year after the date of the enactment of this Act, and the prohibitions under subsections (a)(1)(B) and (b)(1) shall take effect two years after the date of the enactment of this Act.

(d) WAIVER AUTHORITY.—

(1) EXECUTIVE AGENCIES.—The head of an executive agency may, on a one-time basis, waive the requirements under subsection (a) with respect to an entity that requests such a waiver. The waiver may be provided, for a period of not more than two years after the effective dates described in subsection (c), if the entity seeking the waiver—

(A) provides a compelling justification for the additional time to implement the requirements under such subsection, as determined by the head of the executive agency; and

(B) submits to the head of the executive agency, who shall not later than 30 days thereafter submit to the appropriate congressional committees, a full and complete laydown of the presences of covered telecommunications or video surveillance equipment or services in the entity's supply chain and a phase-out plan to eliminate such covered telecommunications or video surveillance equipment or services from the entity's systems.

(2) DIRECTOR OF NATIONAL INTELLIGENCE.—The Director of National Intelligence may provide a waiver on a date later than the effective dates described in subsection (c) if the Director determines the waiver is in the national security interests of the United States.

(f) DEFINITIONS.—In this section:

(1) APPROPRIATE CONGRESSIONAL COMMITTEES.—The term "appropriate congressional committees" means—

(A) the Committee on Banking, Housing, and Urban Affairs, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(B) the Committee on Financial Services, the Committee on Foreign Affairs, and the Committee on Oversight and Government Reform of the House of Representatives.

(2) COVERED FOREIGN COUNTRY.—The term "covered foreign country" means the People's Republic of China.

(3) COVERED TELECOMMUNICATIONS EQUIPMENT OR SERVICES.— The term "covered telecommunications equipment or services" means any of the following:

(A) Telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

(B) For the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company (or any subsidiary or affiliate of such entities).

(C) Telecommunications or video surveillance services provided by such entities or using such equipment.

(D) Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

(4) EXECUTIVE AGENCY.—The term "executive agency" has the meaning given the term in section 133 of title 41, United States Code.

# Communications Act of 1934, Pub Law No. 73-416, § 303, 48 Stat. 1064, 1082–83

## GENERAL POWERS OF COMMISSION

SEC. 303. Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

(a) Classify radio stations;

(b) Prescribe the nature of the service to be rendered by each class of licensed stations and each station within any class;

(c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate;

(d) Determine the location of classes of stations or individual stations;

(e) Regulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein;

(f) Make such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act : Provided, however, That changes in the frequencies, authorized power, or in the times of operation of any station, shall not be made without the consent of the station licensee unless, after a public hearing, the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this Act will be more fully complied with;

(g) Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest;

(h) Have authority to establish areas or zones to be served by any station;

(i) Have authority to make special regulations applicable to radio stations engaged in chain broadcasting;

(j) Have authority to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable;

(k) Have authority to exclude from the requirements of any regulations in whole or in part any radio station upon railroad rolling stock, or to modify such regulations in its discretion;

(l) Have authority to prescribe the qualifications of station operators, to classify them according to the duties to be performed, to fix the forms of such licenses, and to issue them to such citizens of the United States as the Commission finds qualified;

(m) Have authority to suspend the license of any operator for a period not exceeding two years upon proof sufficient to satisfy the Commission that the licensee (1) has violated any provision of any Act or treaty binding on the United States which the Commission is authorized by this Act to administer or any regulation made by the Commission under any such Act or treaty ; or (2) has failed to carry out the lawful orders of the master of the vessel on which he is employed ; or (3) has willfully damaged or permitted radio apparatus to be damaged ; or (4) has transmitted superfluous radio communications or signals or radio communications containin profane or obscene words or language ; or (5) has willfully or-maliciously interfered with any other radio communications or signals;

(n) Have authority to inspect all transmitting apparatus to ascertain whether in construction and operation it conforms to therequirements of this Act, the rules and regulations of the Commission, and the license under which it is constructed or operated;

(o) Have authority to designate call letters of all stations;

(p) Have authority to cause to be published such call letters and such other announcements and data as in the judgment of the Commission may be required for the efficient operation of radio stations subject to the jurisdiction of the United States and for the proper enforcement of this Act;

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation.

# Communications Amendments Act of 1982, Pub. L. No. 97-259, § 108, 96 Stat. 1087, 1091–92

## INTERFERENCE WITH ELECTRONIC EQUIPMENT

SEC. 108. (a)

(1) The first sentence of section 302(a) of the Communications Act of 1934 (47 U.S.C. 302(a)) is amended by inserting "(1)" after "regulations", and by inserting before the period at the end thereof the following: "; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy".

(2) The last sentence of section 302(a) of the Communications Act of 1934 (47 U.S.C. 302(a)) is amended by striking out "shipment, or use of such devices" and inserting in lieu thereof "or shipment of such devices and home electronic equipment and systems, and to the use of such devices".

(3) Section 302(b) of the Communications Act of 1934 (47 U.S.C. 302(b)) is amended by striking out "ship, or use devices" and inserting in lieu thereof "or ship devices or home electronic equipment and systems, or use devices,"

(4) Section 302(c) of the Communications Act of 1934 (47 U.S.C. 302(c)) is amended—

    (A) in the first sentence thereof, by inserting "or home electronic equipment and systems" after "devices" each place it appears therein; and

    (B) in the last sentence thereof, by inserting "and home electronic equipment and systems" after "Devices", by striking out "common objective" and inserting in lieu thereof "objectives", and by inserting "and to home electronic equipment and systems" after "reception".

(b) Any minimum performance standard established by the Federal Communications Commission under section 302(a)(2) of the Communications Act of 1934, as added by the amendment made in subsection (a)(1), shall not apply to any home electronic equipment or systems manufactured before the date of the enactment of this Act.

**Telephone Disclosure and Dispute Resolution Act, Pub. L. No. 102-556, § 403, 106 Stat. 4181, 4195 (1992)**

(a) AMENDMENT.—Section 302 of the Communications Act of 1934 (47 U.S.C. 302) is amended by adding at the end the following new subsection:

"(d)

(1) Within 180 days after the date of enactment of this Regulations, subsection, the Commission shall prescribe and make effective regulations denying equipment authorization (under part 15 of title 47, Code of Federal Regulations, or any other part of that title) for any scanning receiver that is capable of—

"(A) receiving transmissions in the frequencies allocated to the domestic cellular radio telecommunications service,

"(B) readily being altered by the user to receive transmissions in such frequencies, or

"(C) being equipped with decoders that convert digital cellular transmissions to analog voice audio.

"(2) Beginning 1 year after the effective date of the regulations adopted pursuant to paragraph (1), no receiver having the capabilities described in subparagraph (A), (B), or (C) of paragraph (1), as such capabilities are defined in such regulations, shall be manufactured in the United States or imported for use in the United States.".

(b) REPORT TO CONGRESS.—The Commission shall report to Congress no later than June 1, 1993, on available security features for both analog and digital radio signals. This report shall include a study of security technologies currently available as well as those in development. The study shall assess the capabilities of such technologies, level of security afforded, and cost, with wide-spread deployment of such technologies.

(c) EFFECT ON OTHER LAWS.—This section shall not affect section 2512(2) of title 18, United States Code.

SEC. 403. ELIMINATION OF UNNECESSARY COMMISSION REGULATIONS AND FUNCTIONS.

(a) MODIFICATION OF AMATEUR RADIO EXAMINATION PROCEDURES.—Section 4(f)(4) (47 U.S.C. 154(f)(4)) is amended—

(1) in subparagraph (A)—

(A) by inserting ''or administering'' after ''for purposes of preparing'';

(B) by inserting ''of'' after ''than the class''; and

(C) by inserting ''or administered'' after ''for which the examination is being prepared'';

(2) by striking subparagraph (B);

(3) in subparagraph (H), by striking ''(A), (B), and (C)'' and inserting ''(A) and (B)'';

(4) in subparagraph (J)—

(A) by striking ''or (B)''; and

(B) by striking the last sentence; and

(5) by redesignating subparagraphs (C) through (J) as subparagraphs (B) through (I), respectively.

(b) AUTHORITY TO DESIGNATE ENTITIES TO INSPECT.—Section 4(f)(3) (47 U.S.C. 154(f)(3)) is amended by inserting before the period at the end the following: ''; and Provided further, That, in the alternative, an entity designated by the Commission may make the inspections referred to in this paragraph''. (c) EXPEDITING INSTRUCTIONAL TELEVISION FIXED SERVICE PROCESSING.—Section 5(c)(1) (47 U.S.C. 155(c)(1)) is amended by striking the last sentence and inserting the following: ''Except for cases involving the authorization of service in the instructional television fixed service, or as otherwise provided in this Act, nothing in this paragraph shall authorize the Commission to provide for the conduct, by any person or persons other than persons referred to in paragraph (2) or (3) of section 556(b) of title 5, United States Code, of any hearing to which such section applies.''.

(d) REPEAL SETTING OF DEPRECIATION RATES.—The first sentence of section 220(b) (47 U.S.C. 220(b)) is amended by striking ''shall prescribe for such carriers'' and inserting ''may prescribe, for such carriers as it determines to be appropriate,''.

(e) USE OF INDEPENDENT AUDITORS.—Section 220(c) (47 U.S.C. 220(c)) is amended by adding at the end thereof the following: ''The Commission may obtain the services of any person licensed to provide public accounting services under the law of any State to assist with, or conduct, audits under this section. While so employed or engaged in conducting an audit for the Commission under this section, any such person shall have the powers granted the Commission under this subsection and shall be subject to subsection (f) in the same manner as if that person were an employee of the Commission.''.

(f) DELEGATION OF EQUIPMENT TESTING AND CERTIFICATION TO PRIVATE LABORATORIES.—Section 302 (47 U.S.C. 302) is amended by adding at the end the following:

''(e) The Commission may—

''(1) authorize the use of private organizations for testing and certifying the compliance of devices or home electronic equipment and systems with regulations promulgated under this section;

''(2) accept as prima facie evidence of such compliance the certification by any such organization; and

''(3) establish such qualifications and standards as it deems appropriate for such private organizations, testing, and certification.''.

(g) MAKING LICENSE MODIFICATION UNIFORM.—Section 303(f) (47 U.S.C. 303(f)) is amended by striking ''unless, after a public hearing,'' and inserting ''unless''.

(h) ELIMINATE FCC JURISDICTION OVER GOVERNMENT-OWNED SHIP RADIO STATIONS.—

(1) Section 305 (47 U.S.C. 305) is amended by striking subsection (b) and redesignating subsections (c) and (d) as (b) and (c), respectively.

(2) Section 382(2) (47 U.S.C. 382(2)) is amended by striking ''except a vessel of the United States Maritime Administration, the Inland and Coastwise Waterways Service, or the Panama Canal Company,''.

(i) PERMIT OPERATION OF DOMESTIC SHIP AND AIRCRAFT RADIOS WITHOUT LICENSE.—Section 307(e) (47 U.S.C. 307(e)) is amended to read as follows:

''(e)

(1) Notwithstanding any license requirement established in this Act, if the Commission determines that such authorization serves the public interest, convenience, and necessity, the Commission may by rule authorize the operation of radio stations without individual licenses in the following radio services: (A) the citizens band radio service; (B) the radio control service; (C) the aviation radio service for aircraft stations operated on domestic flights when such aircraft are not otherwise required to carry a radio station; and (D) the maritime radio service for ship stations navigated on domestic voyages when such ships are not otherwise required to carry a radio station.

''(2) Any radio station operator who is authorized by the Commission to operate without an individual license shall comply with all other provisions of this Act and with rules prescribed by the Commission under this Act.

''(3) For purposes of this subsection, the terms 'citizens band radio service', 'radio control service', 'aircraft station' and 'ship station' shall have the meanings given them by the Commission by rule.''.

(j) EXPEDITED LICENSING FOR FIXED MICROWAVE SERVICE.— Section 309(b)(2) (47 U.S.C. 309(b)(2)) is amended by striking subparagraph (A) and redesignating subparagraphs (B) through (G) as subparagraphs (A) through (F), respectively.

(k) FOREIGN DIRECTORS.—Section 310(b) (47 U.S.C. 310(b)) is amended—

(1) in paragraph (3), by striking ''of which any officer or director is an alien or''; and

(2) in paragraph (4), by striking ''of which any officer or more than one-fourth of the directors are aliens, or''.

(l) LIMITATION ON SILENT STATION AUTHORIZATIONS.—Section 312 (47 U.S.C. 312) is amended by adding at the end the following:

''(g) If a broadcasting station fails to transmit broadcast signals for any consecutive 12-month period, then the station license granted for the operation of that broadcast station expires at the end of that period, notwithstanding any provision, term, or condition of the license to the contrary.''.

(m) MODIFICATION OF CONSTRUCTION PERMIT REQUIREMENT.— Section 319(d) is amended by striking the last two sentences and inserting the following: ''With respect to any broadcasting station, the Commission shall not have any authority to waive the requirement of a permit for construction, except that the Commission may by regulation determine that a permit shall not be required for minor changes in the facilities of authorized broadcast stations. With respect to any other station or class of stations, the Commission shall not waive the requirement for a construction permit unless the Commission determines that the public interest, convenience, and necessity would be served by such a waiver.''.

(n) CONDUCT OF INSPECTIONS.—Section 362(b) (47 U.S.C. 362(b)) is amended to read as follows:

''(b) Every ship of the United States that is subject to this part shall have the equipment and apparatus prescribed therein inspected at least once each year by the Commission or an entity designated by the Commission. If, after such inspection, the Commission is satisfied that all relevant provisions of this Act and the station license have been complied with, the fact shall be so certified on the station license by the Commission. The Commission shall make such additional inspections at frequent intervals as the Commission determines may be necessary to ensure compliance with the requirements of this Act. The Commission may, upon a finding that the public interest could be served thereby—

''(1) waive the annual inspection required under this section for a period of up to 90 days for the sole purpose of enabling a vessel to complete its voyage and proceed to a port in the United States where an inspection can be held; or

''(2) waive the annual inspection required under this section for a vessel that is in compliance with the radio provisions of the Safety Convention and that is operating solely in waters beyond the jurisdiction of the United States: Provided, That such inspection shall be performed within 30 days of such vessel's return to the United States.''.

(o) INSPECTION BY OTHER ENTITIES.—Section 385 (47 U.S.C. 385) is amended— (1) by inserting ''or an entity designated by the Commission'' after ''The Commission''; and (2) by adding at the end thereof the following: ''In accordance with such other provisions of law as apply to Government contracts, the Commission may enter into contracts with any person for the purpose of carrying out such inspections and certifying compliance with those requirements, and may, as part of any such contract, allow any such person to accept reimbursement from the license holder for travel and expense costs of any employee conducting an inspection or certification.''.