**No. 25-1274**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

HIKVISION USA, INC.,
*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,
*Respondents*.

---

On Petition for Review of an Order of the
Federal Communications Commission

---

## BRIEF OF INTERVENOR MOTOROLA SOLUTIONS, INC.
## IN SUPPORT OF RESPONDENTS

---

Thomas M. Johnson, Jr.
 *Counsel of Record*
Bennett L. Ross
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

April 30, 2026                    *Counsel for Motorola Solutions, Inc.*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenor Motorola Solutions, Inc., through the undersigned counsel, certifies as follows:

**(A)     Parties and *Amici***

All parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioner.

**(B)     Ruling Under Review**

Reference to the rulings at issue appear in the Brief for Petitioner.

**(C)     Related Cases**

The case on review was not previously before this Court or any other court. A related challenge to an earlier order in the same agency docket, involving the same parties as this case, was previously decided by this Court in *Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024).  Motorola Solutions, Inc. is not aware of any other related cases.

Dated: April 30, 2026                          */s/ Thomas M. Johnson, Jr.*
                                                              Thomas M. Johnson, Jr.

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Motorola Solutions, Inc. ("MSI") hereby submits the following statement:

MSI is a global leader in mission-critical communications, command center software, and video security and analytics.  MSI has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

April 30, 2026

*/s/ Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... ii

TABLE OF AUTHORITIES ................................................................................. v

GLOSSARY .................................................................................................... xi

INTRODUCTION ............................................................................................ 1

ISSUES PRESENTED ...................................................................................... 3

STATUTES AND REGULATIONS .................................................................... 3

STATEMENT OF THE CASE ............................................................................ 3

    A.    The Government Recognizes The National-Security Threat Posed By Equipment Sourced From Foreign Adversaries. ........ 3

    B.    The Government Bans Its Agencies And Contractors From Using Equipment Provided By Chinese Manufacturers. ............ 5

    C.    The Government Seeks To Remove Chinese-Provided Equipment From America's Communications Networks ........... 6

    D.    The Government Prohibits The FCC From Authorizing The Importation And Sale Of Equipment Manufactured By Companies Controlled By Foreign Adversaries Such As China. ........................................................................................... 8

    E.    The Order Establishes A Process By Which The Government May Prohibit The Importation And Sale Of Equipment Previously Authorized By The Commission. ........................... 14

SUMMARY OF THE ARGUMENT ................................................................... 17

ARGUMENT ................................................................................................ 20

    I.    HIKVISION HAS FAILED TO ESTABLISH THIS COURT'S JURISDICTION. .20

        A.    Hikvision Has Failed To Establish Article III Standing. .......... 20

        B.    Hikvision Has Failed To Identify A Final Order. ..................... 28

    II.    THE ORDER IS LAWFUL. ...................................................................... 31

        A.    The Secure Equipment Act Grants The Commission Discretion To Use Covered-List Designations As A Basis To Limit Or Revoke Existing Equipment Authorizations. ........................... 31

B.     Hikvision's Contrary Reading Of The Commission's Authority Is Unconvincing. ...........................................................................37

CONCLUSION ......................................................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)..................................................................23

*American Gas Ass'n v. FERC*,
428 F.3d 255 (D.C. Cir. 2005)..................................................................26

\*AT&T Corp. v. Iowa Utilities Board*,
525 U.S. 366 (1999)..................................................................................33

*Bowles v. Whitmer*,
120 F.4th 1304 (6th Cir. 2024) ...............................................................21

*California v. Texas*,
593 U.S. 659 (2021)..................................................................................20

*Center for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026)................................................................21

*Crowley Government Services, Inc. v. GSA*,
143 F.4th 518 (D.C. Cir. 2025)................................................................39

*CSX Transportation, Inc. v. Surface Transportation Board*,
774 F.3d 25 (D.C. Cir. 2014)....................................................................30

\*Doe 1 v. Apple Inc.*,
96 F.4th 403 (D.C. Cir. 2024)..................................................................23

*Donnelly v. FAA*,
411 F.3d 267 (D.C. Cir. 2005)..................................................................39

*DRG Funding Corp. v. Secretary of HUD*,
76 F.3d 1212 (D.C. Cir. 1996)..................................................................30

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Entergy Arkansas, LLC v. FERC*,
134 F.4th 576 (D.C. Cir. 2025)...............................................................20, 22

*\*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)...............................................................24, 27, 28

*Gjoci v. United States Department of State*,
171 F.4th 430 (D.C. Cir. 2026)...............................................................23

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020)...............................................................32, 36

*\*Hikvision USA, Inc. v. FCC*,
97 F.4th 938 (D.C. Cir. 2024)...............................................1, 14, 32, 35, 36

*Huawei Technologies USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) ...............................................................6

*Industrial Energy Consumers of America v. FERC*,
125 F.4th 1156 (D.C. Cir. 2025)...............................................................25

*\*Lorillard v. Pons*,
434 U.S. 575 (1978)...............................................................32, 35

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...............................................................20

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021)...............................................................30

*Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*,
108 F.4th 458 (7th Cir. 2024) ...............................................................5

*\*Murthy v. Missouri*,
603 U.S. 43 (2024)...............................................................21, 23, 25, 26

*\*Nasdaq Stock Market LLC v. SEC*,
1 F.4th 34 (D.C. Cir. 2021)...............................................................28, 29, 30, 31

*National Ass'n of Manufacturers v. DOD*,
583 U.S. 109 (2018)...............................................................40

*Paxton v. Dettelbach*,
105 F.4th 708 (5th Cir. 2024) .............................................................24

*Pulsifer v. United States*,
601 U.S. 124 (2024) ...........................................................................39

*Secretary of Labor, Mine Safety & Health Administration v. KC Transport, Inc.*,
__ F.4th ____, 2026 WL 1042075 (D.C. Cir. Apr. 17, 2026) ...........................38

*Southwest Airlines Co. v. DOT*,
832 F.3d 270 (D.C. Cir. 2016) ............................................................30

*Sturgeon v. Frost*,
577 U.S. 424 (2016) ...........................................................................39

*United States v. Griffin*,
119 F.4th 1001 (D.C. Cir. 2024) ........................................................40

*United States v. Wilson*,
290 F.3d 347 (D.C. Cir. 2002) ...........................................................34

*Verizon Telephone Companies v. FCC*,
269 F.3d 1098 (D.C. Cir. 2001) .........................................................28

*In re Western Coal Traffic League*,
108 F.4th 905 (D.C. Cir. 2024) ..........................................................28

**Statutes**

28 U.S.C. § 2342 ..............................................................................18, 28

47 U.S.C. § 154 ......................................................................................10

47 U.S.C. § 302a .................................................................................8, 10

47 U.S.C. § 303 ......................................................................................10

47 U.S.C. § 1601 .................................................................................2, 40

John S. McCain National Defense Authorization Act for Fiscal Year
2019, Pub. L. No. 115-232, 132 Stat. 1636 (2018) ..................................5, 6, 25

Secure and Trusted Communications Networks Act of 2019, Pub. L.
No. 116-124, 134 Stat. 158 (2020) ..................................................6, 7

*Secure Equipment Act of 2021, Pub. L. No.
117-55, 135 Stat. 423 (2021) ................................................ 1, 2, 11, 18, 19, 32,
.................................................................. 33, 34, 35, 36, 37, 38, 39, 40

**Legislative Materials**

H.R. 3919 (June 15, 2021) ................................................................36

H. Rep. 117-148 (2021) ....................................................................37

U.S. House of Representatives, 112th Congress, Investigative Report
on the U.S. National Security Issues Posed by Chinese
Telecommunications Companies Huawei and ZTE (Oct. 8, 2012),
https://tinyurl.com/3j2j32nx .....................................................3, 4

*Unedited Transcript, House Energy and Commerce Committee
Markup (July 21, 2021), *available at* https://tinyurl.com/36ycw5f7 .................36

**Regulatory Materials**

47 C.F.R. § 2.801 ..............................................................................9

47 C.F.R. § 2.803 ..............................................................................9

47 C.F.R. § 2.805 ..............................................................................9

47 C.F.R. § 2.915 ..............................................................................9

*47 C.F.R. § 2.939 ................................. 2, 9, 10, 18, 32, 33, 34, 38, 39

*Amendment of Part 0 & 2,*
Report and Order, 45 F.C.C.2d 52 (1974).....................................8, 33

*Amendment of Part 2,*
Report and Order, 23 F.C.C.2d 79 (1970)........................................8

*Protecting Against National Security Threats to the Communications
Supply Chain Through the Equipment Authorization Program,*
36 FCC Rcd. 10578 (2021)....................................8, 9, 10, 17, 31, 35

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 (2022) .......... 12, 13, 14, 17, 25, 33, 34, 35, 38

*Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program, Second Report and Order and Second Further Notice of Proposed Rulemaking, ET Docket No 21-232 (rel. Oct. 29, 2025) .............. 14, 15, 16, 24, 26, 29, 36, 38

Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, Report and Order, 34 FCC Rcd. 11423 (2019) ....................................................6

Public Safety and Homeland Security Bureau and Office of Engineering and Technology Seek Comment on Prohibiting the Importation and Marketing of Previously Authorized Communications Equipment Added to the Covered List In 2024 or Earlier, Public Notice, PS Docket No. 26-72 (rel. Mar. 27, 2026) ....................16

**Other Authorities**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ...............................................................................34

FCC, Secure and Trusted Communications Networks Reimbursement Program Seventh Report (Dec. 19, 2025), https://tinyurl.com/4kn599x2 .................................................................8

GAO, Telecommunications Networks: Addressing Potential Security Risks of Foreign-Manufactured Equipment (May 21, 2013), https://tinyurl.com/5h8yhca2 ..............................................................4

List of Equipment and Services Covered By Section 2 of The Secure Networks Act, FCC (updated Apr. 22, 2026), https://www.fcc.gov/supplychain/coveredlist ....................................7

NIST, Supply Chain Risk Management Practices for Federal Information Systems and Organizations, Special Publication 800-161 (Apr. 2015), https://tinyurl.com/yrmwnjd4 ................................4

Press Release, Hikvision, Important Notice to Our Partner, https://tinyurl.com/43wmwfn6 (last visited Apr. 30, 2026) ...................16, 26, 29

Press Release, United States Attorney's Office, Northern District of Illinois, Chinese Telecommunications Company Fined $50 Million for Conspiring to Steal Technology from Motorola Solutions (Mar. 9, 2026), https://tinyurl.com/a8x8uap5...............................................................5

# GLOSSARY

| | |
|---|---|
| 2021 Notice | *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, 36 FCC Rcd. 10578 (2021) (JA___–___). |
| 2022 Order | *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 (2022) (JA___–___). |
| Order | *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, ET Docket No 21-232 (rel. Oct. 29, 2025) (JA___). |
| Secure Equipment Act | Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423. |

**INTRODUCTION**

Congress enacted the Secure Equipment Act to prevent the proliferation of "radio frequency devices that pose a national security risk." Pub. L. No. 117-55, Preamble, 135 Stat. 423, 423 (2021). As a manufacturer of devices that pose such "national-security risks," *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 942 (D.C. Cir. 2024), Petitioner Hikvision USA urges an interpretation of the Secure Equipment Act that would render it toothless. Specifically, Hikvision argues that this Court should vacate an order of the FCC that creates a process under which the agency may revoke authorizations for equipment that threatens U.S. national security. Hikvision's arguments are meritless.

However, this Court need not even reach those arguments because Hikvision has failed to establish this Court's jurisdiction for two reasons. *First*, Hikvision lacks standing to challenge the order on review because it has failed to show redressable injury. While Hikvision seeks forward-looking relief (vacatur), it has presented evidence of only backwards-looking economic harms. And Hikvision has failed to show that any unproven forward-looking injury is traceable to the order on review because that order does not impact Hikvision's equipment, and Hikvision's predictions about its customers' reactions to hypothetical future FCC decisions regarding such equipment are speculative. *Second*, Hikvision does not challenge a "final order" reviewable under the Hobbs Act because the order here is interlocutory:

1

it provides that two subordinate bureaus of the Commission may (or may not) revoke Hikvision's equipment authorizations in a future notice-and-comment proceeding.

Hikvision's challenge also fails on the merits. The Secure Equipment Act authorizes the Commission to use its existing equipment-authorization procedures to revoke equipment that poses a national-security risk. The statute directs the FCC "to update the equipment authorization procedures of the Commission," § 2(a)(1), by prohibiting the authorization of equipment that poses a national-security risk, § 2(a)(2). The procedures being "update[d]" included a provision that allows the FCC to revoke authorizations for equipment that could not be authorized in the first instance. 47 C.F.R. § 2.939(a)(4). Thus, the statute's prospective ban triggered the FCC's revocation discretion in the "equipment authorization procedures" Congress "update[d]." And indeed, the statute contains detailed instructions on when the FCC is permitted to "examin[e] the necessity of review or revocation of any equipment authorization on the basis of the equipment being" a national-security risk. § 2(a)(3).

While Hikvision resists this outcome, it myopically focuses on statutes that predate the Secure Equipment Act. It thus fails to seriously engage with the statutory text, structure, or purpose of Congress's most recent enactment on the FCC's equipment-authorization rules. As a result, Hikvision proposes an absurd interpretation. In its view, Congress deemed certain equipment "an unacceptable risk" to national security, 47 U.S.C. § 1601(b)(2)(C), and yet mandated that this

2

risky equipment remain forever on the market—rendering superfluous the Secure Equipment Act's entire subsection on revocation. That self-defeating scheme might benefit the nation's geopolitical adversaries, but it bears no resemblance to the statute enacted by Congress.

The Court should dismiss or deny the petition for review.

## ISSUES PRESENTED

1. Whether this Court has jurisdiction over Hikvision's challenge.

2. Whether the FCC had authority to adopt the order on review.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an addendum to the Respondent's brief.

## STATEMENT OF THE CASE

### A. The Government Recognizes The National-Security Threat Posed By Equipment Sourced From Foreign Adversaries.

In 2012, the House of Representatives Permanent Select Committee on Intelligence issued a blockbuster report about the national-security risks posed by Chinese telecommunications firms. *See* U.S. House of Representatives, 112th Congress, Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE (Oct. 8, 2012), https://tinyurl.com/3j2j32nx. The Committee documented "a growing recognition of vulnerabilities resulting from foreign-sourced telecommunications supply chains

used for U.S. national-security applications." *Id.* at 1. And in particular, the Committee found that "China has the means, opportunity, and motive to use telecommunications companies for malicious purposes," such as "economic espionage." *Id.* at 2.

The Government continued to study these national-security vulnerabilities. In 2013, the Government Accountability Office recognized that "reliance on a global supply chain" raised "threats posed by actors such as foreign intelligence services or counterfeiters that may … compromis[e] the availability, security, and resilience of … networks." GAO, Telecommunications Networks: Addressing Potential Security Risks of Foreign-Manufactured Equipment at 15 (May 21, 2013), https://tinyurl.com/5h8yhca2. Then, in 2015, the National Institute of Standards and Technology concluded that foreign-adversary-sourced equipment "present[ed] opportunities for … supply chain compromises." NIST, Supply Chain Risk Management Practices for Federal Information Systems and Organizations, Special Publication 800-161 at 2 (Apr. 2015), https://tinyurl.com/yrmwnjd4. "For example," NIST explained, "an adversary may have the power to insert malicious capability into a product or to coerce a manufacturer to hand over the manufacturing specifications of a sensitive U.S. system." *Ibid.*

These assessments were spot on—as Motorola knows firsthand. "Motorola spent years and tens of millions of dollars developing trade secrets embodied in its

line of high-end digital mobile radio (DMR) products." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 468 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1182 (2025). Then, a Chinese company called Hytera engaged in a years-long criminal scheme to steal Motorola's trade secrets and "launch[ ] a line of … radios that were functionally indistinguishable from Motorola's … radios." *Ibid.* Eventually, Hytera "concede[d]" in open court "that it engaged in the blatant theft of trade secrets and copying of proprietary computer code." *Ibid.* Hytera has since been criminally prosecuted, and its sentence included a $50-million fine and a five-year term of probation.[1] Like Hikvision, Congress has determined that Hytera's equipment poses a national-security risk. *See infra* Sections B, C.

**B. The Government Bans Its Agencies And Contractors From Using Equipment Provided By Chinese Manufacturers.**

In 2018, Congress prohibited federal agencies from procuring "covered telecommunications equipment or services" or from contracting with entities that use such equipment or services, subject only to limited exceptions. John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 889(a), 132 Stat. 1636, 1917 (2018). It also prohibited agencies from "obligat[ing]

---

[1] *See* Press Release, United States Attorney's Office, Northern District of Illinois, Chinese Telecommunications Company Fined $50 Million for Conspiring to Steal Technology from Motorola Solutions (Mar. 9, 2026), https://tinyurl.com/a8x8uap5.

or expend[ing] loan or grant funds to procure" such equipment or services. *Id.* § 889(b).

Congress defined "covered telecommunications equipment or services" to include equipment "produced or provided by an entity … owned or controlled by, or otherwise connected to, the government of" China. *Id.* § 889(f)(3)(D), (f)(2). Congress also included, by name, certain "equipment produced by … Hikvision." *Id.* § 889(f)(3)(B).

### C. The Government Seeks To Remove Chinese-Provided Equipment From America's Communications Networks.

The Universal Service Fund Rule. In 2019, the FCC built upon Congress's national-security efforts. It adopted rules to prohibit the use of federal universal-service subsidies "to purchase or obtain any equipment or services produced or provided by a covered company posing a national security threat to the integrity of communications networks or the communications supply chain." *Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs*, Report and Order, 34 FCC Rcd. 11423, ¶ 2 (2019). The Fifth Circuit upheld these regulations in full. *See generally Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021).

The Secure And Trusted Communications Act of 2019. Congress then expanded the FCC's prohibition on subsidizing Chinese-provided equipment and services. In the Secure and Trusted Communications Networks Act of 2019, Pub.

L. No. 116-124, 134 Stat. 158 (2020), it set up a mechanism to proactively remove vulnerable equipment from America's communications networks.

The heart of the statute is the Covered List. Congress requires the FCC to "publish on its website a list of covered communications equipment or services" that are deemed "an unacceptable risk to the national security of the United States or the security and safety of United States persons." *Id.* § 2. The Commission subsequently published—and continues to maintain—the Covered List on its website. *See List of Equipment and Services Covered By Section 2 of The Secure Networks Act*, FCC (updated Apr. 22, 2026), https://www.fcc.gov/supplychain/coveredlist. Certain Hikvision equipment is on the list because it poses an unacceptable risk to national security. *See ibid.*

The Covered List forms the foundation for a comprehensive effort to remove from America's communications networks equipment provided by Chinese manufacturers. The Secure and Trusted Communications Networks Act prohibits subsidies for any equipment or services on the list. Pub. L. No. 116-124, § 3, 134 Stat. at 159–60. And it established a fund "to make reimbursements to providers of advanced communications service to replace covered communications equipment or services." *Id.* § 4(a). The Commission administers this fund through its "Rip-And-Replace" initiative, which has distributed billions of dollars in subsidies. As a result, many "recipients … have permanently removed, replaced, and disposed of all

covered communications equipment and services that were in their networks." FCC, *Secure and Trusted Communications Networks Reimbursement Program Seventh Report* at 2 (Dec. 19, 2025), https://tinyurl.com/4kn599x2.

**D.** **The Government Prohibits The FCC From Authorizing The Importation And Sale Of Equipment Manufactured By Companies Controlled By Foreign Adversaries Such As China.**

<u>2021 Notice of Proposed Rulemaking.</u> In 2021, the Commission proposed a rule to prohibit the authorization of equipment that poses a threat to American safety or national security. *See generally Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, 36 FCC Rcd. 10578 (2021) ("2021 Notice") (JA___–___). The Commission's proposal sought to leverage its existing equipment-authorization regime.

That regime, adopted in 1970, was promulgated pursuant to Congress's authority under Section 302 of the Communications Act. *See* 47 U.S.C. § 302a; *accord 2021 Notice* ¶ 66; *Amendment of Part 2*, Report and Order, 23 F.C.C.2d 79, ¶ 1 (1970); *Amendment of Part 0 & 2*, Report and Order, 45 F.C.C.2d 52 (1974). Under Section 302(a), Congress empowered the Commission to regulate devices "capable of emitting radio frequency energy." 47 U.S.C. § 302a(a). And under Section 302(b), Congress prohibited the manufacture, importation, sale, and use of devices that "fail to comply with" the FCC's equipment-authorization procedures. *Id.* § 302a(b).

Those procedures reach all "radiofrequency devices," defined as "any device which in its operation is capable of emitting radiofrequency energy." 47 C.F.R. § 2.801. The Commission authorizes equipment if it complies with all relevant technical standards and "serve[s] the public interest, convenience and necessity." *Id.* § 2.915(a). And the Commission may revoke or limit an equipment authorization if, *inter alia*, "conditions com[e] to the attention of the Commission which would warrant it in refusing to grant an application." *Id.* § 2.939(a)(4). Without authorization, a radiofrequency device may not be operated, *id.* § 2.805, imported, or marketed, *id.* § 2.803, within the United States.

Pursuant to that well-established preexisting regime, the Commission proposed to "prohibit[ ] the authorization of any communications equipment on the [Covered List]." *2021 Notice* ¶ 3 (JA___). It also sought comment "on whether and under what circumstances [the agency] should revoke any existing authorizations of such 'covered' communications equipment." *Ibid.* The Commission reasoned that, with the Covered List, it had in hand a literal list of "equipment and services that specific, enumerated sources have deemed to pose an unacceptable risk to the national security of the United States or the security and safety of United States Persons." *Id.* ¶¶ 22, 37 (JA___, ___–___). And the Commission's equipment-authorization rules offered a gating mechanism to keep that known, discrete list of dangerous equipment out of the country. *See id.* ¶ 41 (JA___).

The Commission found that it had several sources of authority to adopt this policy. *First*, the Commission cited Section 302's grant of authority to regulate "devices which in their operation are capable of emitting radio frequency energy." 47 U.S.C. § 302a(a); *2021 Notice* ¶¶ 66–67 (JA___). *Second*, the Commission cited Section 303(e)'s grant of authority to "regulate the kind of apparatus to be used with respect to its external effects." 47 U.S.C. § 303(e); *2021 Notice* ¶ 66 (JA___). *Third*, the Commission found that under Section 4(i) of the Communications Act, the proposed rule was "necessary in the execution of [the Commission's] functions," 47 U.S.C. § 154(i), because prohibiting the importation and sale of covered equipment would "effectively preclude use of equipment on the Covered List by [universal-service subsidy] recipients" as Congress required in the "Secure Networks Act," *2021 Notice* ¶ 65 (JA___–___).

The Commission also found that adoption of its proposal would enable the revocation of covered equipment under its existing equipment-authorization rules. *Id.* ¶¶ 82–86 (JA___–___). For example, it proposed that under Section 2.939(a)(4) of those rules, the Commission could revoke authorizations for equipment on the Covered List because presence on the Covered List would be a "condition[ ] coming to the attention of the Commission which would warrant it in refusing to grant an original application." 47 C.F.R. § 2.939(a)(4) (2021); *2021 Notice* ¶ 85 (JA___).

Secure Equipment Act.  While this rulemaking was pending, Congress passed the Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423.  The statute instructed the Commission to "adopt rules in the" open rulemaking proceeding "to update the equipment authorization procedures of the Commission."  *Id.* § 2(a)(1).  Specifically, it required the Commission to "clarify that [it] will no longer review or approve any application for equipment authorization for equipment that is on the [Covered List]."  *Id.* § 2(a)(2).

The Secure Equipment Act also included specific instructions about the revocation of previously authorized equipment.  In implementing Congress's one-time mandate to update its equipment-authorization rules, the Commission could "not provide for review or revocation of any equipment authorization granted before the date on which such rules are adopted on the basis of the equipment being on the [Covered List]."  *Id.* § 2(a)(3)(A).  But *after* that one-time rule update, Congress provided that revocation was fair game.  "[O]ther than in the" one-time rule update, "[n]othing in" the statute "may be construed to prohibit the Commission … from (i) examining the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the [Covered List]; or (ii) adopting rules providing for any such review or revocation."  *Id.* § 2(a)(3)(B).

2022 Order.  Following Congress's directive, the FCC "adopt[ed] revisions to [its] equipment authorization program to prohibit authorization of equipment that

has been identified on the Commission's Covered List." *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493, ¶ 1 (2022) ("2022 Order") (JA___–___).

The FCC again identified several sources of authority. It first concluded "that the Secure Equipment Act provides the Commission with express authority to adopt rules that prohibit the review or approval of any application for equipment authorization for equipment that is listed on the Commission's Covered List." *Id.* ¶ 39 (JA___). The Commission then found that it had "statutory authority that predates Congress's 2021 enactment of the Secure Equipment Act"—namely, the authority identified in the 2021 Notice. *Id.* ¶ 40 (JA___). This authority included Section 302's grant of authority to regulate radiofrequency-emitting equipment, Section 1's instruction to regulate "for the purpose of national defense," Section 303(e)'s grant of authority to regulate apparatuses, and Section 4(i)'s grant of authority to adopt rules "as may be necessary in the execution of [the Commission's] functions." *Id.* ¶¶ 40–41 (JA___–___). The FCC concluded that its "pre-existing authority is confirmed by Congress's enactment of the Secure Equipment Act." *Id.* ¶ 42 (JA___).

The Commission also took action on revocation. It "adopt[ed] an expedited mechanism for review and revocation of equipment authorizations … where the application for such authorization contained a false statement or representation regarding the 'covered' status of such equipment." *Id.* ¶ 109 (JA___) (codified at 47 C.F.R. § 2.939(d)). And it "prohibit[ed] the modification of equipment if such modification would alter the equipment's status such that it would become 'covered' equipment." *Id.* ¶ 111 (JA___). Consistent with Section 2(a)(3)(A) of the Secure Equipment Act, the Commission did not pursue broader revocation of previously authorized equipment. *Id.* ¶ 116, 118 (JA___).

However, the Commission found that it had authority to pursue such broader revocation in a subsequent action. It first explained that it had revocation authority under "the same authorities … with respect to the equipment authorization program"—i.e., Sections 302, 303(e), 4(i), and 1 of the Communications Act. *Id.* ¶ 114 (JA___). It then found that under its existing equipment-authorization regime, revocation would be permissible because the equipment's presence on the covered list would be a "condition[ ] … which would warrant [the Commission] refusing to grant an original application" to authorize equipment. *Ibid.* (quoting 47 C.F.R. § 2.939(a)(4)). And it found that "such authority to revoke is confirmed by the Secure Equipment Act." *Id.* ¶ 115 (JA___). It explained that Section 2(a)(3)(B) of that statute expressly provides that it does not disturb the FCC's "existing authority

13

to adopt … rules or otherwise examine the necessity of providing for the review or revocation of equipment authorizations … even in cases where the sole basis for the Commission's equipment authorization action … is the equipment being included on the Covered List." *Id.* ¶¶ 116–17 (JA___–___).

Hikvision challenged two aspects of the 2022 Order in this Court: (i) the FCC's statutory authority to place Hikvision on the Covered List, and (ii) the reasonableness of the FCC's definition of "critical infrastructure." *See generally Hikvision USA, Inc. v. FCC*, 97 F.4th 938 (D.C. Cir. 2024). This Court rejected the first challenge, finding that Congress, through the Secure Equipment Act, "ratified the composition of the [covered] list." *Id.* at 946. The Court held arbitrary the "definition of 'critical infrastructure.'" *Id.* at 950.

### E. The Order Establishes A Process By Which The Government May Prohibit The Importation And Sale Of Equipment Previously Authorized By The Commission.

The order under review builds on years of efforts—by Congress, the Commission, and the whole of the Executive Branch—to keep America safe from equipment and services provided by Chinese companies. At issue here, the order establishes an interlocutory "process to place limitations on previously granted authorizations of covered equipment to prohibit the continued importation and marketing of such equipment." *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*,

Second Report and Order and Second Further Notice of Proposed Rulemaking, ET Docket No 21-232, ¶ 32 (rel. Oct. 29, 2025) ("Order") (JA___).

The Commission's policy rationale is straightforward. Devices on the Covered List "pose 'an unacceptable risk to the national security of the United States or the security and safety of United States persons.'" *Id.* ¶ 40 (JA___–___) (quoting 47 U.S.C. § 1601(b)(1)). Yet those devices "are still widely sold in the U.S" and thus "present continuing national security threats." *Ibid.* The Order creates a mechanism by which the Commission's Office of Engineering and Technology and Public Safety and Homeland Security Bureau may "limit the continued importation and marketing" of such devices. *Id.* ¶ 44 (JA___).

The Order does not alter any existing equipment authorizations. Instead, it "delegate[s] authority" from the Commission to the subordinate bureaus, *ibid.*, so that they may revoke existing equipment authorizations pursuant to a multi-step process, *id.* Appendix A (JA___–___) (§ 2.939(e)). *First*, the bureaus "will issue a public notice announcing the intent to limit the scope of [such] equipment authorizations" that "will include an assessment of the impact of the proposed prohibition with consideration of public interest factors." *Ibid.* (§ 2.939(e)(1)–(2)). *Second*, the bureaus "will provide for a public comment period of no less than 30 days." *Ibid.* (§ 2.939(e)(3)); *see id.* ¶ 47 (JA___). *Third*, the bureaus "will review the submissions" and "may request additional information as may be appropriate."

15

*Id.* Appendix A (§ 2.939(e)(4)) (JA___). *Fourth*, the bureaus "must make their determination as to whether to place limitations on the existing authorization to prohibit the further importation or marketing of the relevant devices, providing the reasons for such decision." *Ibid.* (§ 2.939(e)(4)). The bureaus have discretion to maintain existing equipment authorizations if "other factors outweigh the national security risks." *Id.* ¶ 46 (JA___)

The Order's preamble "direct[s]" the bureaus to begin this process "as soon as practicable." *Id.* ¶ 48 (JA___). The bureaus have, in turn, issued the public notice proposing limitations on existing equipment authorizations. *See Public Safety and Homeland Security Bureau and Office of Engineering and Technology Seek Comment on Prohibiting the Importation and Marketing of Previously Authorized Communications Equipment Added to the Covered List In 2024 or Earlier*, Public Notice, PS Docket No. 26-72 (rel. Mar. 27, 2026). The comment period is open until May 6, and Hikvision is urging its customers to "submit comments" in opposition to this "proposed action." Press Release, Hikvision, Important Notice to Our Partner, https://tinyurl.com/43wmwfn6 (last visited Apr. 30, 2026).

The Commission relied on the finding in the 2022 Order that "it has the requisite authority under the Act to review any existing authorization for covered equipment, and to determine the necessity for revoking such authorization." *Order* ¶ 41 & ¶ 42 n.178 (JA___–___). Thus, the agency adopted by cross reference its

assertions of authority under the Sections 332, 303(e), 4(i), and 1 of the Communications Act, each of which it found "confirmed by Congress's enactment of the Secure Equipment Act." *2022 Order* ¶¶ 39–42, 114–17 (JA___–___, ___–___); *2021 Notice* ¶¶ 65–68 (JA___–___).

Hikvision petitioned for review of the Order on December 3, 2025.

## SUMMARY OF THE ARGUMENT

I. The Court lacks jurisdiction. Hikvision has failed to show Article III standing because it has established neither redressable injury nor traceability. *First*, Hikvision has failed to show redressable injury because it seeks forward-looking relief (vacatur) but provides evidence of only backwards-looking injuries (already-incurred economic harms). It is blackletter law that without evidence of an ongoing or future injury, Hikvision lacks standing to pursue the relief it seeks. *Second*, even if Hikvision had established an ongoing or future injury (it did not), it has failed to show that such injury is traceable to the Order. That is because the Order does not prohibit Hikvision from importing or selling any equipment that was previously authorized; it merely establishes a procedure by which that *might* happen in the future if certain circumstances are met. As a result, Hikvision is left speculating about its customers' responses to predictions of hypothetical adverse agency action at a later date. That kind of guesswork cannot satisfy traceability.

Hikvision also has failed to show that the Order is "final" as required to invoke this Court's jurisdiction under the Hobbs Act. *See* 28 U.S.C. § 2342(1). Hikvision challenges the FCC's "Authority to Revoke Existing Equipment Authorizations," Pet. Br. 23 (heading I.A), but the Order does not revoke any existing equipment authorizations. Instead, it sets forth a process by which the Commission's subordinate bureaus have discretion to revoke existing equipment authorizations after another round of notice and comment. And indeed, at the end of that subsequent notice-and-comment process, the bureaus may decline to revoke Hikvision's existing equipment authorizations. The Order is thus a textbook interlocutory step because it does not represent a final decision by the Commission to revoke existing equipment authorizations.

II. The Secure Equipment Act provides the Commission with authority to revoke authorizations for equipment that poses a national-security risk under the agency's equipment-authorization rules. The statute draws from two preexisting regulatory frameworks: (i) the Covered List, *see* Secure Equipment Act § 2(a)(2), and (ii) "the equipment authorization procedures of the Commission," *id.* § 2(a)(1). If equipment is on the Covered List, it may no longer be authorized under the FCC's equipment-authorization procedures. That, in turn, triggers a preexisting equipment-authorization procedure that permits the FCC to revoke equipment that is not approvable in the first instance. *See* 47 C.F.R. § 2.939(a)(4). Thus, Congress's

"update" to "the equipment authorization procedures," Secure Equipment Act § 2(a)(1), conferred on the FCC authority to revoke authorizations for equipment on the Covered List under that existing "equipment authorization procedure."

That conferral of authority is confirmed by Section 2(a)(3) of the statute. It provides that the Commission's initial implementing rules cannot revoke authorizations on the basis that equipment is on the Covered List, *see* Secure Equipment Act § 2(a)(3)(A), but clarifies that the Commission is not prohibited from doing so in subsequent rules, *id.* § 2(a)(3)(B). That provision only makes sense if the Commission has authority in the first instance to revoke equipment because it appears on the Covered List.

Hikvision has no answer to the plain text of the Secure Equipment Act. That is presumably why it devotes nearly its entire brief to discussing Section 302 of the Communications Act. Although Section 302 was the original enabler of the FCC's equipment-authorization rules, the Secure Equipment Act "update[s]" those rules, § 2(a)(1), by integrating them with the Covered List, § 2(a)(2). It makes no sense to ignore that statutory "update" and pretend the Secure Equipment Act does not exist. But Hikvision largely does so, advocating for an interpretation that would contravene the Secure Equipment Act's plain text, render its subsection on revocation a complete nullity, and intensify the national-security risks the statute

19

sought to abate. This Court should decline Hikvision's invitation to blue-pencil the statute.

## ARGUMENT

## I.  HIKVISION HAS FAILED TO ESTABLISH THIS COURT'S JURISDICTION.

Hikvision's petition must be dismissed on two independent jurisdictional grounds.  *First*, Hikvision lacks Article III standing because it fails to show redressability injury or traceability.  *Second*, Hikvision does not challenge a final order.

### A.  Hikvision Has Failed To Establish Article III Standing.

To satisfy standing, Hikvision must show (1) an injury, (2) traceable to the Order, (3) that would be redressed by a favorable opinion.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  As "a direct-review petitioner," Hikvision was required to establish standing with evidence—equivalent to the summary-judgment standard—"in its opening brief."  *Entergy Arkansas, LLC v. FERC*, 134 F.4th 576, 580 (D.C. Cir. 2025).  This required "evidentiary presentation" cannot come "for the first time in reply."  *Id.* at 581.  Hikvision has failed to carry its burden to show standing for two reasons: redressable injury and traceability.

#### 1.  Hikvision Has Failed To Establish Redressable Injury.

"To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021).  Here, Hikvision seeks (at 40) vacatur

20

of the Order.  "[V]acatur of … agency action is prospective" relief.  *See Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 383 (D.C. Cir. 2026).  Because Hikvision seeks "forward-looking relief," it "must establish a substantial risk of future injury that is traceable to the Government." *Murthy v. Missouri*, 603 U.S. 43, 69 (2024).

Hikvision does not offer any evidence of ongoing or future injuries.  Its only evidence of injury is a declaration, which asserts injuries that have *already* occurred.  *See* Pet. Add.1 (¶ 4) ("Hikvision USA *observed* measurable changes"), *ibid.* ("customers *indicated* that the Order created uncertainty"), *ibid.* ("some customers *reduced* purchase volumes, *postponed* planned deployments, or *cancelled* projects"), *ibid.* ("distribution partners *reduced or deferred* planned stocking orders"), *ibid.* ("customers *postponed or suspended* deployment"), *ibid.* ("*requested* information"), *ibid.* ("*requested* extended payment terms or additional return flexibility"), *ibid.* ("*have had* a profound and direct impact"), *id.* (¶ 5) ("*necessitated* adjustments"), Add.2 (¶ 5) ("*disrupted* our inventory planning process"), *ibid.* ("*complicated* our cash collection efforts"), *ibid.* ("*has been compelled* to offer substantial discounts"), *id.* (¶ 6) (effects of "Order have been among several factors that *contributed to* workforce reductions and cost-containment measures") (all emphases added).

It is blackletter law that these "past harm[s]" are "not enough" to establish standing to pursue forward-looking relief.  *Murthy*, 603 U.S. at 70; *see also Bowles*

*v. Whitmer*, 120 F.4th 1304, 1311 (6th Cir. 2024) ("forward-looking preventative remedies will do nothing to redress an already-occurred injury"). Even if, in the past, customers cancelled orders, postponed projects, or bought at a discount, Hikvision does not say whether the company is still receiving cancellations, whether the projects are still postponed, or whether it is still offering discounts. Nor does Hikvision's declarant attest that vacating the Order would undo those past harms, and there is no obvious reason it would: customers may have uncancelled orders or found new suppliers; they may have resumed (or called off) postponed projects; and Hikvision's prices may have stabilized. Hikvision says nothing about these issues.

Compounding those omissions, the declaration overwhelmingly suggests transient harms. It alleges reductions and deferrals "*while [customers] conduct[ed] internal compliance and risk reviews* related to the Order," Pet. Add.1 (¶ 4) (emphasis added), delayed deployments "*pending customer regulatory or compliance review*," *ibid.* (emphasis added), and customer "*evaluation* of non-Hikvision equipment due to perceived regulatory risk," *ibid.* (emphasis added). Yet, Hikvision does not say what happened after the completion of these customer reviews and evaluations (or whether they are still ongoing). Thus, not only does Hikvision focus only on past harms, those past harms have natural end dates.

These gaps in Hikvision's declaration are fatal. Hikvision bore the "burden of production" to "*establish[ ]*" redressable injury, *Entergy Arkansas*, 134 F.4th at

580 (emphasis added), not to raise a "possibility of" it, *Doe 1 v. Apple Inc.*, 96 F.4th 403, 416 (D.C. Cir. 2024); *see also Air Excursions LLC v. Yellen*, 66 F.4th 272, 278 (D.C. Cir. 2023) (explaining that even the "plausibility standard requires 'more than a sheer possibility' that the plaintiff has standing").

Because Hikvision's declaration does not assert that any harms "are still" ongoing or that vacatur "would … appreciably affect [its] position," Hikvision fails to establish standing for "forward looking … relief." *Apple*, 96 F.4th at 413; *see also Gjoci v. United States Dep't of State*, 171 F.4th 430, 435 (D.C. Cir. 2026) ("Appellants cannot establish standing … [without] facts establishing they are suffering an ongoing injury or face an immediate threat of injury" (cleaned up)).

This deficiency is dispositive because "past injuries *alone* are insufficient to establish standing." *Gjoci*, 171 F.4th at 435 (emphasis added) (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)); *Apple*, 96 F.4th at 413 ("mere existence of past injury" insufficient). And while "past injuries" can be "relevant … for their predictive value," *Murthy*, 603 U.S. at 59, that does not matter where, as here, the party asserting standing does not "explicitly allege" any ongoing or future injury for which that predictive value would be relevant, *Apple*, 96 F.4th at 413.

"[T]he bottom line is that 'it is simply not all that hard' to write a declaration with enough detail to establish" ongoing or future injury, and Hikvision has "fallen

… short of that mark here." *Paxton v. Dettelbach*, 105 F.4th 708, 715 (5th Cir. 2024) (quoting *Antonyuk v. Chiumento*, 89 F.4th 271, 371 (2d Cir. 2023)).

### 2. Hikvision Has Failed To Establish Injury Traceable To The Order.

Hikvision also falters on traceability because its asserted "line of causation between the illegal conduct and injury" is "too speculative" and "too attenuated." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

Start with the obvious: the Order does not revoke, limit, or affect in any way Hikvision's equipment that was previously authorized. Hikvision has just as much legal right to sell such equipment now as it did before the Order took effect. Thus, while Hikvision claims (at 21) "it is the object of the agency action under review," that is simply not true. All the relevant commands in the Order bind the Commission's subordinate bureaus, not Hikvision. *See Order*, Appendix A (JA___–___) (§ 2.939(e)). And the bureaus are not required to modify or revoke Hikvision's existing equipment authorizations. They "must make their [own] determination" after notice and comment, *ibid.* (§ 2.939(e)(4)), and may maintain Hikvision's authorizations if "other factors outweigh the national security risks," *id.* ¶ 46 (JA___). Thus, Hikvision alleges not that it is adversely affected by the Order itself, but that the Order sets up a process that might culminate in a different order that might adversely affect it in the future.

Then, Hikvision goes a step further.  It relies not on that possible future impact but on its customers' concerns about it.  That is, Hikvision says (at 21) the Order has created regulatory uncertainty, which will, in turn, cause customers to purchase less.  "The one-step-removed, anticipatory nature of [Hikvision's] alleged injuries" runs headfirst into the Supreme Court's "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Murthy*, 603 U.S. at 57; *see also Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025).

Hikvision's preemptive response to that obvious deficiency (at 22)—that it "relies … on the predictable effect of Government action on the decisions of third parties"—is unconvincing.  There is no reason why Hikvision's customers would predictably not buy previously-authorized Hikvision equipment as a result of the Order.  Again, the Order itself does nothing to Hikvision, and the process it envisions may well leave Hikvision with all its preexisting equipment authorizations in place.  And while limits on Hikvision's equipment authorizations are a possibility, they are not a new one.  As Hikvision concedes (at 13–14), the FCC claimed "authority" to "revok[e]" its equipment authorizations in 2022, *see 2022 Order* ¶¶ 114–17 (JA___–___), and Congress first determined that Hikvision posed a national-security eight years ago, Pub. L. No. 115-232, § 889(f)(3)(B), 132 Stat. at 1918.  If these events did not cause customers to stop doing business with Hikvision—despite serious

regulatory and security risks—it is not clear why the Order would suddenly bring about that result.

In fact, the Order offers some regulatory *assurance* to Hikvision's customers. The bureaus may not "prohibit[ ] the continued *use of* [previously authorized] devices." *Order* ¶ 40 (JA___) (emphasis added). Thus, if Hikvision's customers can indefinitely use any equipment they purchase from Hikvision—and they may in the future lose the ability to purchase Hikvision equipment—the Order may, if anything, *increase* sales. *Cf. Am. Gas Ass'n v. FERC*, 428 F.3d 255, 258 (D.C. Cir. 2005) (discussing "artificial scarcity"). Indeed, just this month, Hikvision appears to have started using this regulatory assurance as a selling point. *See, e.g.*, Press Release, Hikvision, Important Notice to Our Partner, https://tinyurl.com/43wmwfn6 (last visited Apr. 30, 2026) ("Importantly, the continued use or operation of any such equipment that is already in the hands of end users would not be prohibited.").

Hikvision's assertions of past harm do not render the causal chain less speculative. For one, Hikvision concedes that "several factors" other than the Order have caused its recent financial woes. Add.2 (¶ 6). And that makes sense: Hikvision has been formally deemed a national-security risk since 2018, and revocation has been on the table for years. That "lack of specific causation" is a serious "weakness" that shows Hikvision's customers have long had "independent[ ]" reasons to take their business elsewhere. *Murthy*, 603 U.S. at 59–60. And even if, in the past, some

customers cited the Order as a basis to "postpone[ ] or suspend[ ]" their business, they may well have reversed course after "compliance and risk reviews," Add.1 (¶ 4), revealed that the Order did not actually make it unlawful to buy Hikvision's already-authorized equipment or that any future de-authorization would not prohibit customers from using equipment they purchase in the meantime.  Hikvision, which ultimately bears the burden of establishing standing, offers no evidence to believe its version of causality in the status quo.

In sum, Hikvision theorizes that because the Order *permits* the FCC's bureaus to limit existing equipment authorizations, the bureaus *might* limit Hikvision's authorizations, customers *might* predict that course of action after their regulatory reviews, and those customers *might* stop buying Hikvision's equipment as a result— even though they have put up with regulatory uncertainty for years and now have assurance that they will continue to be able to use whatever Hikvision equipment they buy now.

That daisy-chain of hypotheticals cannot satisfy traceability.  It is impermissibly speculative because Hikvision has failed to show that it is "sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383.  And even if that were not speculative, it is impermissibly "attenuated"—"that is, … the

[Order] is so far removed from its distant (even if predictable) ripple effects that [Hikvision] cannot establish Article III standing." *Ibid.*

**B. Hikvision Has Failed To Identify A Final Order.**

Even if Hikvision could show standing, it flunks finality. The Hobbs Act provides the Court with jurisdiction to review "all *final* orders of the [FCC] made reviewable by section 402(a)." 28 U.S.C. § 2342(1) (emphasis added). Thus, to be reviewable, an order must satisfy the familiar two-part test for finality: (1) it must be the consummation of the agency's decisionmaking process, and (2) it must carry legal consequences. *See Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1103 (D.C. Cir. 2001); *accord In re W. Coal Traffic League*, 108 F.4th 905, 909 (D.C. Cir. 2024) (explaining that term "final orders" in the "Hobbs Act" incorporates finality test from *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

The Order fails the first prong of finality because it does not consummate the agency's decisionmaking on whether to revoke preexisting equipment authorizations. This Court's decision in *Nasdaq Stock Mkt. LLC v. SEC*, 1 F.4th 34 (D.C. Cir. 2021), shows why. There, the SEC, after notice and comment, issued an order directing stock exchanges to submit a proposal for a framework that would not "become effective unless approved by the [SEC]." *Id.* at 35–36. The stock exchanges challenged the SEC's order on the grounds that, *inter alia*, the order directed them to propose a framework with elements that "violated" the statute. *Id.*

at 36. The Court found that it lacked jurisdiction under a statute that authorized review of only "final orders." *Id.* at 37 (citing 15 U.S.C. § 78y(a)(1)). The Court held that the order was interlocutory because it "was no more than a call for a proposal that would then be subject to further notice, comment, and revision." *Id.* at 37–38.

So too here. Hikvision's argument is that the FCC lacks "Authority to Revoke Existing Equipment Authorizations," Pet. Br. 23 (heading I.A), but the Order does not revoke any existing equipment authorizations. Instead, it directs the Bureau to put on "public notice" a "proposed prohibition" limiting existing equipment authorizations, *Order*, Appendix A (JA___) (§ 2.939(e)(1)–(2)), subject to "a public comment period," *ibid.* (JA___–___) (§ 2.939(e)(3)). The Order expressly confers on the bureaus discretion to *not* limit existing authorizations at the end of that subsequent notice-and-comment process. *Ibid.* (§ 2.939(e)), *id.* ¶ 46 (JA___–___). Thus, just like the order in *Nasdaq*, the order here is "no more than a call for a proposal [by the bureaus] that w[ill] then be subject to further notice, comment, and revision." 1 F.4th at 37. Or, as Hikvision recently put it: "The FCC's proposed action is NOT FINAL." Press Release, Hikvision, Important Notice to Our Partner, https://tinyurl.com/43wmwfn6 (last visited Apr. 30, 2026) (emphasis in original).

*Nasdaq* is no outlier either. This Court routinely holds nonfinal "preliminary, procedural, or intermediate agency action[s] or ruling[s]" that merely "direct[ ]

[subordinate officials] to proceed with [an] administrative process" that may lead to a reviewable order. *DRG Funding Corp. v. Sec'y of HUD*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quotations omitted); *see also MediNatura, Inc. v. FDA*, 998 F.3d 931, 939–40 (D.C. Cir. 2021) ("import alert" not final where subsequent process would allow "importer [to] submit evidence to establish [its product]'s admissibility"); *Southwest Airlines Co. v. DOT*, 832 F.3d 270, 275–77 (D.C. Cir. 2016) ("the agency's initiation of a [further] proceeding … undermines [Petitioner]'s claim that the [action] marked the consummation of the agency's decisionmaking process").

Finally, it would be no answer to claim that the Order is final because it definitively codifies a bureau-level procedure. That was true in *Nasdaq* too: the order "was definitive on the question whether the three challenged plan elements had to be included in the proposal." 1 F.4th at 39. But "the actual question before the agency"—"whether the … three [challenged] features should be included in the eventual plan"—remained subject to further proceedings. *Ibid.* Here too, the actual question of whether to "revoke existing equipment authorizations," Pet. Br. 23 (heading I.A) (capitalization altered); *id.* at 3 ("[w]hether" FCC can "revoke or limit existing equipment authorizations"), remains pending. Indeed, "the completion of [the FCC's] processes may obviate the need for judicial review" because the bureaus may decide that Hikvision's existing equipment authorizations should remain in place. *MediNatura*, 998 F.3d at 939; *see also CSX Transp., Inc. v. Surface Transp.*

30

*Bd.*, 774 F.3d 25, 30 (D.C. Cir. 2014) ("When completion of an agency's processes may obviate the need for judicial review, it is a good sign that an intermediate agency decision is not final.").

Because the "Order is not 'final,'" Hikvision's petition should be "dismissed." *Nasdaq*, 1 F.4th at 39.

## II. THE ORDER IS LAWFUL.

The Commission was right in 2021 that it had authority under Sections 302, 303, 1, and 4(i), to de-authorize equipment on the Covered List, *see 2021 Notice* ¶¶ 65–67, 82–86 (JA___–___, ___–___), and the Commission is right to continue to rely on that authority in its brief, FCC Br. 41–51. But as explained below, the Secure Equipment Act has moved that assertion of authority from being simply correct to being beyond question.

### A. The Secure Equipment Act Grants The Commission Discretion To Use Covered-List Designations As A Basis To Limit Or Revoke Existing Equipment Authorizations.

The Secure Equipment Act provides that Covered-List designations may be used as a basis to limit or revoke equipment authorizations under the Commission's existing equipment-authorization procedures.

Start with the text of Sections 2(a)(1) and (2)—the first two substantive provisions of the statute. "[T]he Commission shall adopt rules in the proceeding initiated in the [2021 Notice] … to update the equipment authorization procedures

of the Commission." Secure Equipment Act, § 2(a)(1). "In th[ose] rules," the Commission must "clarify that [it] will no longer review or approve any application for equipment authorization for equipment that is on the" Covered List. *Id.* § 2(a)(2).

This text shows that "Congress did not write [the statute] on a blank slate." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 235 (2020). Instead, it "update[d] the equipment authorization procedures of the Commission." Secure Equipment Act, § 2(a)(1). Where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of" that prior law. *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). And indeed, this Court has already found that "Congress … plainly was aware" of "the Covered List," because it is "incorporated" by reference "into the [Secure Equipment Act]." *Hikvision*, 97 F.4th at 946. Because the equipment-authorization procedures are also incorporated by reference into the Secure Equipment Act, "Congress … plainly was aware" of those procedures too. *See ibid.* Thus, the statute cannot be divorced from "the equipment authorization procedures of the Commission" that it "update[s]." § 2(a)(1).

Key here is the express revocation provision in those equipment-authorization procedures: Section 2.939. For 52 years, the FCC's equipment-authorization procedures have included a rule allowing the FCC to "revoke any equipment authorization … [b]ecause of conditions coming to the attention of the Commission which would warrant it in refusing to grant an original application." 47 C.F.R.

§ 2.939(a)(4) (2021); *see Amendment of Part 0 & 2 of the Rules*, 45 F.C.C.2d, Appendix C (§ 2.939(a)(4)). The rationale for that rule is simple and unchallenged: if equipment would not qualify for original approval, then "the existing equipment authorization no longer applies." *Amendment of Part 0 & 2 of the Rules*, 45 F.C.C.2d, ¶ 44.

The Secure Equipment Act directly implicates this half-century-old "equipment authorization procedure[ ]." § 2(a)(1). The statute orders the Commission to "no longer … approve any application for equipment authorization for equipment that is on the [Covered List]." *Id.* § 2(a)(2). As a result, equipment's presence on the Covered List is a "condition[ ] … which would warrant [the Commission] in refusing to grant an original application." 47 C.F.R. § 2.939(a)(4) (2021). Thus, by making that "update [to] the equipment authorization procedures of the Commission," Secure Equipment Act, § 2(a)(1), Congress provided that "[t]he Commission may revoke any equipment authorization" on the basis that the equipment is on the Covered List, 47 C.F.R. § 2.939(a)(4) (2021); *accord 2022 Order* ¶ 114 (JA___).

Indeed, where "Congress expressly direct[s] that" a new provision "be inserted into" a broader preexisting scheme, the elements of that preexisting scheme "extend to" new "amendment[s]." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377–78 (1999); *see id.* at 378 n.5 (giving effect to Congress's adoption of law "not

as a freestanding enactment, but as an amendment to, and hence *part of*," a preexisting regulatory scheme (emphasis in original)); *accord* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 252–53 (2012) ("Part of the statute's context is the *corpus juris* of which it forms a part[.]") *United States v. Wilson*, 290 F.3d 347, 356 (D.C. Cir. 2002) ("Congress is presumed to preserve, not abrogate, the background understandings against which it legislates."). Thus, Congress understood that making presence on the Covered List a basis to deny equipment authorizations would trigger the Commission's preexisting discretion to revoke equipment that could not be authorized in the first instance.

The next subsection expressly confirms this understanding. "In the rules adopted under [Section 2(a)(1)], the Commission may not provide for *review or revocation* of any equipment authorization granted before the date on which such rules are adopted *on the basis of the equipment being on the [Covered List]*." Secure Equipment Act, § 2(a)(3) (emphases added). In other words, now that "being on the [Covered List]" was a "basis" for "review or revocation" because of the prospective prohibition in the preceding subsection, *ibid.*, Congress understood that the Commission had discretion under "the equipment authorization procedures," *id.* § 2(a)(1), to "revoke any equipment authorization" for equipment on the Covered List, 47 C.F.R. § 2.939(a)(4) (2021). Section 2(a)(3)(A) of the statute took away

that discretion in the Commission's initial rulemaking. *Accord 2022 Order* ¶ 116 (JA___).

But the statute preserved the Commission's revocation discretion in subsequent rulemakings. Section 2(a)(3)(B) of the Secure Equipment Act provides that "[n]othing in this section may be construed to prohibit the Commission, other than in the rules adopted under [Section 2(a)(1)], from (i) examining the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the [Covered List]; or (ii) adopting rules providing for any such review or revocation." Thus, after the promulgation of the 2022 Order, the Commission was free to revoke equipment on the basis of it being on the Covered List under Section 2.939 of the "equipment authorization procedures." Secure Equipment Act, § 2(a)(1); *accord 2022 Order* ¶ 116 (JA___).

The statute's express instructions regarding revocations show "that Congress was well aware of the legal and administrative landscape when it enacted the [Secure Equipment Act]." *Hikvision*, 97 F.4th at 947. Its "selectiv[e]" limitation of *when* the FCC could review and revoke equipment "strongly suggests that but for th[at] change[ ] … [Congress] intended to incorporate fully the [revocation] procedures of the" Commission's equipment-authorization rules. *Lorillard*, 434 U.S. at 582.

Another textual clue reinforces this plain meaning. "[T]he text of the [Secure Equipment Act] refers to the [2021 Notice], which was explicit that," *Hikvision*, 97

F.4th at 946, the Commission intended to use its existing "rules for revoking authorizations of equipment," *2021 Notice*, ¶¶ 80–89 (JA\_\_\_–\_\_\_). That reference makes even "clearer" "Congress's awareness of" the FCC's existing revocation discretion, *Hikvision*, 97 F.4th at 946, in the rules it "update[d]," Secure Equipment Act, § 2(a)(1).

The text is dispositive, but the "legislative history … supports this analysis." *Guerrero-Lasprilla*, 589 U.S. at 234. When the bill for the Secure Equipment Act was introduced in the House, it made no mention of revocation or existing equipment authorizations. *See* H.R. 3919 (June 15, 2021). When Congress added the revocation provisions, the bill's sponsor—Representative Steve Scalise—explained what Congress intended with the amendment. In its initial rulemaking, "the FCC cannot retroactively review or revoke equipment licenses." Unedited Transcript, House Energy and Commerce Committee Markup, 106:2366–67 (July 21, 2021), *available at* https://tinyurl.com/36ycw5f7. But, for subsequent rulemakings, the "amendment" "ma[de] sure that the FCC has the explicit ability to take the actions *to remove* these licenses [i.e., equipment authorizations]" in order to "prevent these malign companies [on the Covered List] from having any presence in our networks." *Id.* 108:2413–19 (emphasis added).

Thus, the Commission "adopting rules providing for … review or revocation" of existing equipment authorizations, Secure Equipment Act, § 2(a)(3)(B)(ii);

*accord Order* ¶ 40 (JA___) (adopting "'partial' revocation proposal"), is expressly permitted by the Secure Equipment Act in tandem with equipment-authorization rules it "update[s]," § 2(a)(1); *see also* FCC Br. 37.

**B.     Hikvision's Contrary Reading Of The Commission's Authority Is Unconvincing.**

Hikvision advances several unpersuasive arguments in challenging the Commission's statutory authority. *First*, Hikvision says that Section 302 of the Communications Act "relate[s] to interference concerns," *e.g.*, Pet. Br. 25, and so revocation decisions can be based only on radiofrequency interference. That ignores the elephant in the room. The Secure Equipment Act "*update[d]* the equipment authorization procedures of the Commission," § 2(a)(1) (emphasis added), by treating designation "on the [Covered List]" as a basis not to "review or approve any application for equipment authorization," § 2(a)(2). Congress did so specifically because it found the FCC's rules authorizing "equipment that transmits over radio frequencies" to offer an effective tool "to address … national security risks." H. Rep. 117-148 at 2–3 (2021). As explained above, that decision directly triggered the Commission's revocation discretion in the "equipment authorization procedures" that Congress chose to "update." *See supra* II.A. Thus, Hikvision's pages and pages of argument about the limitations on Section 302 and its claims of unbounded authority are all beside the point.

*Second*, Hikvision asserts (at 37–38) a supposed "concession" in the Order that the Secure Equipment Act has no bearing on the Commission's authority. The Order concedes no such thing. The Commission explained that the Secure Equipment Act enabled the agency to use its "existing authority to revoke equipment authorizations," *Order* ¶ 42 n.178 (JA\_\_\_), as it "concluded" "[i]n the [2022 Order]," *id.* ¶ 41 (JA\_\_\_). As explained above, that interpretation gives effect to Congress's choice to not regulate in the abstract but to "update the equipment authorization procedures of the Commission," Secure Equipment Act § 2(a)(1), which included a 52-year-old revocation procedure specifically for equipment that could not have been originally authorized, *see* 47 C.F.R. § 2.939(a)(4). That is why the agency "conclude[d] that it is well within the Commission's responsibilities and mandate … to revoke an existing equipment authorization under section 2.939(a)(4)," as "confirmed by the Secure Equipment Act." *2022 Order* ¶¶ 114–15 (JA\_\_\_–\_\_\_).

*Third*, Hikvision claims that the Secure Equipment Act does not grant any authority for "review or revocation of [an existing] equipment authorization on the basis of the equipment being on the [Covered List]," Secure Equipment Act § 2(a)(3)(B), but instead merely "does not 'prohibit' the FCC from exercising" such authority. Pet. Br. 38–39. But that supposed distinction violates the maxim that statutes are "not interpret[ed] … in a vacuum." *Sec'y of Lab., Mine Safety & Health*

*Admin. v. KC Transp., Inc.*, __ F.4th ____, 2026 WL 1042075, at *12 (D.C. Cir. Apr. 17, 2026) (quotations omitted).

To reach this strained reading, Hikvision simply ignores the first half of the statute. Section 2(a)(1) and (2) "update the equipment authorization procedures of the Commission," Secure Equipment Act § 2(a)(1)–(2), and those procedures have long included an express revocation provision, 47 C.F.R. § 2.939. Thus, "[t]ry as it might to isolate [Section 2(a)(3)] from its surrounding provisions, [Hikvision] cannot avoid the obvious." *Crowley Gov't Servs., Inc. v. GSA*, 143 F.4th 518, 533 (D.C. Cir. 2025). When the statute says it does not "prohibit the Commission" from "examining the necessity of review or revocation of any equipment authorization," Secure Equipment Act § 2(a)(3)(B), it is referring to the existing procedures that the statute "updates" and that provide for revocation, *see supra* II.A. Hikvision misses this because it fails to interpret "the words of [the] statute … in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016).

Indeed, Hikvision's hyper fixation on Section 2(a)(3) would impermissibly "treat [the] entire subsection as mere surplusage." *Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005); *see also Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction … renders an entire subparagraph meaningless, … the canon against surplusage applies with special force." (cleaned up)). Section

2(a)(3)(A) prohibits "the Commission," in its initial implementing rules, from revoking equipment authorizations "on the basis of the equipment being on the [Covered List]." Yet, if the Commission was already powerless to revoke on that basis, this prohibition would be meaningless. Next, Section 2(a)(3)(B) provides that the previous provision does not "prohibit the Commission" from revoking "on the basis of the equipment being on the [Covered List]" at a later date. Again, if the FCC lacked such revocation authority, this provision would have no effect. Hikvision's reading would thus render "meaningless" this "entire sub[section]." *Contra Nat'l Ass'n of Mfrs. v. DOD*, 583 U.S. 109, 128 (2018).

Finally, Hikvision's reading of the statute "would produce absurd results." *United States v. Griffin*, 119 F.4th 1001, 1014 (D.C. Cir. 2024). In Hikvision's view, Congress would have found that equipment posed "an unacceptable risk to the national security of the United States or the security and safety of United States persons," 47 U.S.C. § 1601(b)(2)(C), and then mandated that this unacceptably risky equipment forever remain available to U.S. purchasers in a statute that expressly contemplates the FCC's use of its revocation authority. That toothless, nonsensical construction of the Secure Equipment Act would have a lot of appeal to our nation's adversaries. But it would be anathema to the Congress that sought to thwart them.

## CONCLUSION

In light of the foregoing, this Court should dismiss or deny the petition for review.

Dated: April 30, 2026

Respectfully Submitted,

*/s/ Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.
  *Counsel of Record*
Bennett L. Ross
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
TMJohnson@wiley.law

*Counsel for Motorola Solutions, Inc.*

# CERTIFICATE OF COMPLIANCE

This brief complies with Circuit Rule 32(e)(2)(B) because it contains 9,074 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

April 30, 2026

*/s/ Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.

## CERTIFICATE OF SERVICE

I certify that on April 30, 2026, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

April 30, 2026

*/s/ Thomas M. Johnson, Jr.*
Thomas M. Johnson, Jr.