ORAL ARGUMENT NOT YET SCHEDULED

**No. 25-1274**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————————

HIKVISION USA, INC.,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

*Respondents*.

—————————————————

On Petition for Review of an Order of the
Federal Communications Commission

—————————————————

**INITIAL REPLY BRIEF OF PETITIONER
HIKVISION USA, INC.**

—————————————————

John T. Nakahata
Timothy J. Simeone
HWG LLP
1919 M St. NW, 8th Floor
Washington, DC 20036
(202) 730-1300

*Counsel to Hikvision USA, Inc.*

June 1, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ............................................................................ ii

GLOSSARY.................................................................................................... vi

SUMMARY OF ARGUMENT .........................................................................1

ARGUMENT ....................................................................................................3

    I.    THE COURT HAS JURISDICTION. .................................................3

        A.    Hikvision Has Standing. ...........................................................3

        B.    The *Order* is Final Agency Action. ..........................................9

    II.    THE FCC LACKS AUTHORITY TO REVOKE EXISTING AUTHORIZATIONS BASED ON THE COVERED LIST................11

        A.    The FCC Has Waived the Lead Argument It Makes Here.......12

        B.    The Secure Equipment Act Conveys No New Authority as to Existing Authorizations. ..........................................................14

        C.    Neither Section 302 Nor Any Other Provision Authorizes the FCC's Actions Here. ...............................................................21

CONCLUSION ...............................................................................................28

# TABLE OF AUTHORITIES

**CASES**

*Am. Libr. Ass'n v. FCC,*
406 F.3d 689 (D.C. Cir. 2005) ................................................................25

*Ass'n of Flight Attendants v. U.S. DOT,*
564 F.3d 462 (D.C. Cir 2009) ..................................................................6

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................................................10

*Brown v. Gardner,*
513 U.S. 115 (1994) ................................................................................20

*Canonsburg Gen. Hosp. v. Burwell,*
807 F.3d 295 (D.C. Cir. 2015) ................................................................13

*Carpenters Indus. Council v. Zinke,*
854 F.3d 1 (D.C. Cir. 2017) ......................................................................6

*China Unicom (Ams.) Operations Ltd. v. FCC,*
124 F.4th 1128 (9th Cir. 2024) ......................................................... 18, 19

*Columbia Broad. Sys. v. United States,*
316 U.S. 407 (1942) ................................................................................11

*Council for Urological Ints. v. Burwell,*
790 F.3d 212 (D.C. Cir. 2015) ................................................................13

*Czyzewski v. Jevic Holding Corp.,*
580 U.S. 451 (2017) ..................................................................................6

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ..................................................................................3

*Entergy Ark., LLC v. FERC,*
134 F.4th 576 (D.C. Cir. 2025) .................................................................5

*FDA v. Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ..................................................................................9

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ................................................................................22

*Friends of Animals v. Jewell,*
824 F.3d 1033 (D.C. Cir. 2016) ..............................................................16

*FTC v. Mandel Bros., Inc.*,
359 U.S. 385 (1959) ....................................................................23

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ....................................................................27

*Hikvision USA, Inc. v. FCC*,
97 F.4th 938 (D.C. Cir. 2024) ............................................ 17, 18

*Huawei Techs. USA, Inc. v. FCC*,
2 F.4th 421 (5th Cir. 2021) ........................................................22

*Int'l Telecard Ass'n v. FCC*,
166 F.3d 387 (D.C. Cir. 1999) ....................................................8

*Murthy v. Missouri*,
603 U.S. 43 (2024) ......................................................................7

*Nasdaq Stock Mkt. LLC v. SEC*,
1 F.4th 34 (D.C. Cir. 2021) .......................................................11

*Nat'l Ass'n of Broads. v. FCC*,
39 F.4th 817 (D.C. Cir. 2022) ...................................................22

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) ...................................................................26

*Nat'l Council for Adoption v. Blinken*,
4 F.4th 106 (D.C. Cir. 2021) ......................................................9

*New Eng. Power Co. v. New Hampshire*,
455 U.S. 331 (1982) ...................................................................16

*Saline Parents v. Garland*,
88 F.4th 298 (D.C. Cir. 2023) .....................................................6

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ...................................................................20

*United States v. Calamaro*,
354 U.S. 351 (1957) ...................................................................21

*United States v. Storer Broad. Co.*,
351 U.S. 192 (1956) ...................................................................10

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ...................................................................24

*W. Coal Traffic League v. Surface Transp. Bd.*,
998 F.3d 945 (D.C. Cir. 2021) ....................................................9

*West Virginia v. EPA*,
  597 U.S. 697 (2022)................................................................................ 24, 27

**STATUTES**

47 U.S.C. § 1004 .........................................................................................27

47 U.S.C. § 1005 .........................................................................................28

47 U.S.C. § 201(b) .......................................................................................22

47 U.S.C. § 214 ...........................................................................................18

47 U.S.C. § 254 ...........................................................................................22

47 U.S.C. § 302a(a)................................................................................ 22, 23

47 U.S.C. § 303(e) .......................................................................................26

47 U.S.C. § 303(g) .......................................................................................26

47 U.S.C. § 303(r).........................................................................................27

Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064.........................27

Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423................. 14, 15

**OTHER AUTHORITIES**

H.R. Rep. No. 90-1108 (1968).........................................................................25

Letter from Andrew D. Lipman, Counsel, Zhejiang Dahua Technology
  Co. Ltd., to Marlene H. Dortch, Secretary, FCC, ET Docket No. 21-232
  (filed Oct. 20, 2025) ................................................................................13

**ADMINISTRATIVE DECISIONS**

*Protecting Against National Security Threats to the Communications
  Supply Chain Through the Equipment Authorization Program*, Second
  Report and Order and Second Further Notice of Proposed Rulemaking,
  40 FCC Rcd. 8430 (2025)........................................... 3, 10, 11, 12, 13, 17

*Protecting Against National Security Threats to the Communications
  Supply Chain*, Report and Order, Order, and Further Notice of Proposed
  Rulemaking, 37 FCC Rcd. 13493 (2022) ........................................................18

Public Safety and Homeland Security Bureau and Office of Engineering
  and Technology Seek Comment on Prohibiting the Importation and
  Marketing of Previously Authorized Covered Communications Equipment
  Added to the Covered List in 2024 or Earlier, Public Notice, DA 26-294,
  PS Docket No. 26-72 (rel. Mar. 27, 2026).....................................................3, 7

**REGULATIONS**

47 C.F.R. § 1.115 ..................................................................................8

47 C.F.R. § 2.939(a)(4) .......................................................................19

47 C.F.R. § 2.939(e)...........................................................................10

# GLOSSARY

| | |
|---|---|
| *2022 Order & Further Notice* | *Protecting Against National Security Threats to the Communications Supply Chain*, Report and Order, Order, and Further Notice of Proposed Rulemaking, 37 FCC Rcd. 13493 (2022) |
| CALEA | Communications Assistance for Law Enforcement Act |
| Covered List | Covered List of communications equipment produced by foreign companies in the 2019 Secure and Trusted Communications Networks Act |
| FCC or Commission | Federal Communications Commission |
| Hikvision or Hikvision USA | Hikvision USA, Inc. |
| Motorola | Motorola Solutions, Inc. |
| *Order* | *Protecting Against National Security Threats to the Communications Supply Chain Through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, 40 FCC Rcd. 8430 (2025) |
| Public Notice | *Public Safety and Homeland Security Bureau and Office of Engineering and Technology Seek Comment on Prohibiting the Importation and Marketing of Previously Authorized Covered Communications Equipment Added to the Covered List in 2024 or Earlier*, Public Notice, DA 26-294, PS Docket No. 26-72 (rel. Mar. 27, 2026) |
| Secure Equipment Act | Secure Equipment Act of 2021, Pub. L. No. 117-55, 135 Stat. 423 |

| | |
|---|---|
| Section 214 | 47 U.S.C. § 214 |
| Section 302 | 47 U.S.C. § 302a |
| Section 303 | 47 U.S.C. § 303 |

## SUMMARY OF ARGUMENT

Petitioner Hikvision USA, Inc.'s ("Hikvision's") opening brief argued that the challenged *Order* exceeds any authority Congress delegated to the Federal Communications Commission ("FCC" or "Commission"). In response, instead of identifying statutory text conferring the claimed authority, both the Commission and intervenor Motorola Solutions, Inc. ("Motorola") substitute incantations of "national security" and analogies to broad "public interest" authority that Congress granted in unrelated contexts but did *not* grant here. These assertions fail to address the core question: did Congress provide the Commission statutory authority to withdraw *existing* equipment authorizations wholly or partially for Covered List products that meet radiofrequency emission requirements? Simply put, Congress did not.

The Commission's brief underscores the absence of such authority by arguing that the Secure Equipment Act somehow expanded Section 302, without changing its text, to supply authority that otherwise did not exist. The *Order* itself, however, expressly disclaimed reliance on any "new authority" to revoke existing authorizations so this argument is a post hoc rationalization and should be rejected.

The Commission's new argument also fails on its own terms. In the Secure Equipment Act, Congress barred future authorizations for Covered List equipment. But Congress stopped there—nothing in the statute authorizes the Commission to

revoke existing authorizations or otherwise unwind prior agency approvals. Statutory construction is not alchemy: The Commission cannot combine Title III's decades-old framework for regulating radiofrequency interference with the Secure Equipment Act to mystically create authority that Congress never granted. That is particularly true given the broad implications of the Commission's argument beyond this case. Congress does not confer sweeping authority in arcane ways.

Nor do references to the Commission's authority in other contexts solve the problem. The question is not whether Congress *could* provide the authority to revoke existing authorizations on broad "public interest" grounds. The issue is whether Congress did so here and, contrary to the arguments of the Commission and Motorola, Title III contains no such authority.

The jurisdictional arguments raised by the Commission and Motorola ignore the real-world effects of the *Order* described in the declaration accompanying Hikvision's opening brief. Hikvision did not rely on speculation to establish standing. It submitted sworn evidence describing concrete customer responses to the *Order* itself—including delayed purchases, postponed deployments, requests for alternative suppliers, and demands for commercial concessions. Neither the FCC nor Motorola offers contrary evidence. Instead, they hypothesize that these marketplace reactions might somehow stem from different government actions taken years earlier that did not threaten existing authorizations at all.

This case is simple. The FCC has asserted authority that Congress did not confer. Title III and the Secure Equipment Act cannot, together, provide what neither contains. The *Order* should therefore be vacated.

**ARGUMENT**

**I.     THE COURT HAS JURISDICTION.**

**A.     Hikvision Has Standing.**

1.     Hikvision has established standing consistent with the precedents of this Court and the Supreme Court. Multiple cases establish that parties can demonstrate injury caused by an agency decision by relying on "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see* Hikvision Br. 22 (collecting authorities).

Here, as Hikvision argued, it is predictable that an FCC order creating, for the first time, a process to bar future sales of already-authorized Hikvision Covered List products would result in customers beginning to migrate to alternative suppliers, and that these customer actions would harm Hikvision. Despite the FCC's and Motorola's attempts to minimize its significance, the *Order* under review threatens to take away "as soon as practicable" Hikvision's ability to import and sell already-authorized products. *Order* ¶ 48 (JA __); *see also* Public Notice at 5 (Reply Add. 6) (proposing to ban importation and marketing thirty days after the effective date of any revocation order). Faced with a possible near-term ban on

further sales, customers that must plan for the future and incorporate devices into larger projects with longer timelines will predictably seek other alternatives.

Hikvision, however, did not rely solely on this economically logical conclusion. It submitted a sworn declaration under penalty of perjury from Wu Chen, the General Manager of its U.S. operations, whose responsibilities include "customer relations, operational planning, and financial performance," and who "regularly interact[s] with customers." Chen Decl. ¶ 1 (Add. 1). Mr. Chen's declaration identified specific customer actions that occurred in "late 2025"—the period after the *Order*—"*[a]s a result of the issuance of the Order*." *Id.* ¶ 4 (emphasis added). More specifically, Mr. Chen described ways that customers reacted to the issuance of the *Order*, including that "distribution partners reduced or deferred planned stocking orders," "[i]ntegrator customers postponed or suspended deployment of projects involving Hikvision USA equipment," "[s]ome customers requested information regarding alternative suppliers or indicated that project stakeholders required evaluation of non-Hikvision USA equipment," and others "increasingly requested extended payment terms or additional return flexibility" because of "increased uncertainty surrounding future deployment of Hikvision USA products." *Id.* The FCC's repeated claims that Mr. Chen's

statements are "vague," FCC Br. 24, 30, disregard his specific descriptions of how customer behavior changed to Hikvision's detriment.[1]

Just as in prior cases where customer responses to regulatory action supported standing, *see* Hikvision Br. 22, Hikvision showed that these actions caused it economic harm. In particular, Hikvision "has been compelled to offer substantial discounts, thereby sacrificing a portion of [its] profit margins." Chen Decl. ¶ 5.

The FCC does not dispute that such economic harms create standing. Instead, the agency speculates, with no evidence whatsoever, that the economic harms to Hikvision, which Mr. Chen's original declaration makes clear occurred in late 2025, could have resulted from actions *years earlier*, such as the "*2022 Order*'s prohibition on *new* equipment authorizations"; this Court's partial affirmance of that order in early 2024; or perhaps the even earlier placement of Hikvision products on the Covered List in March 2021. FCC Br. 30 (emphasis added); *see* Motorola Br. 25 (similar).

---

[1] This case is thus nothing like *Entergy Arkansas, LLC v. FERC*, 134 F.4th 576 (D.C. Cir. 2025), on which the FCC relies. FCC Br. 27, 30–31. There, the petitioner's opening brief "provided neither argument, nor analysis, nor evidence to support its standing." *Entergy Ark.*, 134 F.4th at 581. Mr. Chen, in contrast, provided detailed descriptions of Hikvision customer reactions to the *Order* in his initial Declaration, and has provided additional illustrative examples in his Reply Declaration. Chen Reply Decl. ¶ 5 (Reply Add. 1).

Those arguments about things that happened far in the past make little sense, and certainly do not counter Hikvision's sworn evidence. None involved revoking existing authorizations and terminating existing supply. *See, e.g., Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) ("When performing that inherently imprecise task of predicting or speculating about causal effects, common sense can be a useful tool."). Even if these much earlier actions addressing different issues somehow affected customer behavior as to already-authorized products in late 2025,[2] as long as the *Order* caused part of Hikvision's economic injury, Hikvision has standing. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Motorola cites cases that the Court should not be required to engage in "guesswork" as to "how independent decisionmakers will exercise their

---

[2] The fundamental differences between this case and *Saline Parents v. Garland*, 88 F.4th 298 (D.C. Cir. 2023), which the FCC cites (at 28), are illuminating. There, the plaintiffs were not "targets" of the relevant action and thus faced no imminent harm. 88 F.4th at 305. By contrast, Hikvision is identified by name in the statutes the FCC purports to implement, and it has shown that its customers have in fact responded to the government action in a way that harms it. Similarly, *Ass'n of Flight Attendants v. U.S. DOT*, 564 F.3d 462 (D.C. Cir 2009), unlike this case, involved multiple contemporaneous factors (such as higher fuel prices) that could have caused the harm at issue, and the affiant, unlike Mr. Chen, had no "personal knowledge of the cause or was otherwise competent to testify." *Id.* at 466.

judgment." Motorola Br. 25 (quoting *Murthy v. Missouri*, 603 U.S. 43, 57 (2024)).

Hikvision seeks no such speculation—it has provided sworn, uncontradicted

evidence as to how customers *have* acted and how Hikvision has been obliged to

respond. Motorola's lawyers may theorize that there is "no reason why

Hikvision's customers would predictably not buy previously-authorized Hikvision

equipment," *id.* at 25, but Mr. Chen has provided direct, detailed, and entirely

plausible evidence to the contrary; Motorola has offered nothing but its own say-

so. Indeed, Motorola goes so far as to postulate that customers might react to the

FCC *Order* by purchasing more of Hikvision's products. *See id.* at 26. But the

uncontradicted evidence from Mr. Chen indicates that is not what has happened.

Indeed, the fact that Hikvision has been forced to issue statements that its products

remain available for now, *see id.*, confirms that the *Order* was causing its

customers to act in ways that forced Hikvision to respond.

The FCC's suggestion (at 29) that Hikvision may have standing later to

bring an "as-applied" challenge ignores a real-world problem and threatens to

leave Hikvision without any meaningful remedy. As Hikvision explained in its

opening brief (at 15), the FCC has delegated to its subcomponents the *application*

of the agency's avowed revocation authority to specific Hikvision products. Those

subcomponents are authorized to issue orders revoking Hikvision's authorizations

within thirty days. *See* Public Notice at 5. Under this Court's precedents, while

such staff-level orders have the same force and effect as Commission decisions, they are not subject to ordinary judicial review upon issuance or even after they take effect. *See Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999). Such review requires Hikvision to first obtain a full-Commission order addressing an Application for Review of the staff decision—but the FCC has no deadline for that review and may choose to delay action until it is far too late to undo the damage of the staff decision. *See* 47 C.F.R. § 1.115. Leaving Hikvision without access to ordinary judicial review of the FCC's legal authority unless the full Commission chooses to rule on an Application for Review would be unfair. More importantly, there is no basis for delay here because Hikvision has demonstrated standing under established law.

2. The FCC does not contest that, if the *Order* is causing injury to Hikvision, a decision vacating the *Order* would redress that injury, but Motorola does (at 20–24) contest redressability. Motorola's argument depends on a basic misreading of the Chen Declaration's statement that, because of customer responses to the *Order*, "Hikvision USA has been compelled to offer substantial discounts." Chen Decl. ¶ 5. The natural reading of that language is that Hikvision is *continuing* to offer lower prices because of customer reactions to the *Order*— which is, in fact, the case—and that the company will need to do so, so long as the *Order* remains in force. In contrast, if the *Order* is overturned and the uncertainty

8

it created removed, customers will be as willing to buy Hikvision's currently authorized products as before, and Hikvision will no longer be required to offer these discounts. In other words, "[c]ausation and redressability . . . are often 'flip sides of the same coin,'" *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024) (citation omitted), because "correcting the conduct that causes an injury typically solves the problem." *W. Coal Traffic League v. Surface Transp. Bd.*, 998 F.3d 945, 951 (D.C. Cir. 2021).

Although Mr. Chen's existing declaration is more than sufficient to show how customer reaction has caused continuing harm to Hikvision, out of an abundance of caution, Hikvision attaches to this brief Mr. Chen's reply declaration, which removes any doubt that Hikvision is still charging lower prices as a result of customer concerns. *See* Chen Reply Decl. ¶ 3 (Reply Add. 1); *see generally Nat'l Council for Adoption v. Blinken,* 4 F.4th 106, 112 (D.C. Cir. 2021) (permitting supplemental declarations on standing where petitioner "reasonably thought it had established standing" in its initial declarations, and the "initial declarations . . . went a long way toward showing standing").

**B.  The *Order* is Final Agency Action.**

Motorola, but not the Commission, contends (at 28–31) that this Court lacks jurisdiction because the *Order* allegedly is not final. *See generally Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997). That argument is contrary to established precedent.

The *Order* definitively concluded "that it has the requisite authority under the Act to review any existing authorization for covered equipment, and to determine the necessity for revoking such authorization" and established a specific process for its subcomponents to apply that conclusion. *Order* ¶¶ 41–50 (JA __). The FCC even adopted a new regulation reflecting those actions and specifying the test its subcomponents must apply in making those determinations. *See Order*, App. A (JA __) (new subsection (e) of 47 C.F.R. § 2.939).

Because the FCC has definitively decided the legal question posed here and established how that authority would be applied, its order is final without application to a specific authorization. Indeed, in *Bennett*, the Court concluded that a Biological Opinion issued by the Fish and Wildlife Service was final even though it would need to be applied by a separate agency to have concrete consequences. *See* 520 U.S. at 179 (contrasting the Biological Opinion with determinations that "were purely advisory and in no way affected the legal rights of the relevant actors"); *United States v. Storer Broad. Co.*, 351 U.S. 192, 198–99 (1956) (finding final agency action where the FCC adopted a regulation regarding issuance of licenses, even though no specific application was before the Commission); *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417–18

10

(1942) (deeming an order adopting broadcasting regulations reviewable even though they "did not operate of their own force to deny or cancel a license").

Motorola's reliance on *Nasdaq Stock Market LLC v. SEC*, 1 F.4th 34 (D.C. Cir. 2021) is misplaced. In *Nasdaq*, the SEC issued an order directing stock exchanges to submit a proposal for a national market system plan that would not "become effective unless approved by the [SEC]." *Id.* at 35 (citation omitted). This Court held that the order "was no more than a call for a proposal that would then be subject to further notice, comment, and revision," and that the SEC had "committed to no particular plan features." *Id.* at 37. Indeed, the SEC expressly stated there that it had not yet "reached *any* conclusions with respect to *any* of the issues involved." *Id.* at 38 (citation omitted).

## II. THE FCC LACKS AUTHORITY TO REVOKE EXISTING AUTHORIZATIONS BASED ON THE COVERED LIST.

Our opening brief demonstrated that Section 302 of the Communications Act does *not* "authorize[] the Commission" to "promulgate" any regulations applicable to radiofrequency devices that it determines are consistent with the "public interest." *Order* ¶ 42 (JA __). Section 302's plain text provides the FCC authority only as to interference-related matters. *See* Hikvision Br. 23–26.

The FCC's primary response to this argument is to claim that, whatever Section 302 meant when Congress enacted it, the Secure Equipment Act changed the meaning of Section 302 so that it *now* grants the FCC the power to "limit or

revoke equipment authorizations." FCC Br. 32. In the FCC's words, even if the "Commission's preexisting Title III authority would not have empowered the agency to refuse equipment authorization based on national security concerns," the "Secure Equipment Act now requires that this authority be read to confer that power." *Id.* at 33.

That argument is incorrect. First, it is contrary to the FCC's statements in the *Order* and thus not properly presented. Second, the Secure Equipment Act expressly provides the FCC added authority over *new* authorizations of equipment on the Covered List, but not over revocation of *existing* ones. Third, with or without the Secure Equipment Act, the FCC must still point to a statute granting it authority, and no statute does so.

## A. The FCC Has Waived the Lead Argument It Makes Here.

The Commission's contention that the Secure Equipment Act expands its authority is contrary to the FCC's *Order*. *See Order* ¶ 41 n.178 (JA __). There, the Commission expressly stated that it did not "claim any new authority to revoke or limit equipment authorizations." *Id.* (JA __). Because the Commission claimed no such new authority, it found irrelevant the argument by opponents of revocation that "the Secure Equipment Act does not afford the Commission any new authority to revoke or limit authorizations that it did not have before

enactment of that statute." *Id.* (JA __).[3] Before this Court, however, the Commission claims that, "[w]hatever the merits" of arguments as to its Title III authority before the Secure Equipment Act, that statute "now requires" that the Commission's authority "be read to confer th[e] power" at issue here. FCC Br. 33. This argument inherently relies on the Secure Equipment Act somehow expanding the agency's pre-existing authority, contrary to the FCC's contention. *Id.* at 38–39.

The FCC's brief thus epitomizes the post hoc interpretation by counsel of a statute the agency administers that courts routinely reject. *See, e.g., Council for Urological Ints. v. Burwell*, 790 F.3d 212, 223 (D.C. Cir. 2015) (rejecting statutory argument when agency "did not articulate it during the 2008 rulemaking and, in fact, contradicted it"). The case cited by the FCC (at 40–41), did not involve an agency's inconsistent interpretations of a governing statute. Rather, it addressed the judicial doctrine of issue preclusion, and is thus inapposite. *See Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 304 (D.C. Cir. 2015).

---

[3] *See also* Letter from Andrew D. Lipman, Counsel, Zhejiang Dahua Technology Co. Ltd., to Marlene H. Dortch, Secretary, FCC, ET Docket No. 21-232, at 2 (filed Oct. 20, 2025) (JA __) (cited by the Commission as the source of this argument).

**B.    The Secure Equipment Act Conveys No New Authority as to Existing Authorizations.**

Even if the FCC had made this argument in its *Order*, it would still be fundamentally flawed.

Assuming that the Secure Equipment Act could theoretically be understood to expand the authority conferred in Title III without amending its text, the language of the Secure Equipment Act makes clear that it did no such thing. That text explicitly grants the FCC expanded authority to deny *new* equipment authorizations for items on the Covered List, but it equally clearly leaves the law unchanged as to whether the FCC may revoke existing authorizations.

This textual distinction is clear throughout the statute. *Contra* Motorola Br. 39 (incorrectly suggesting that Hikvision's argument focuses on one subsection alone). Section 2(a)(1) of the Secure Equipment states that, within one year in a specifically identified proceeding, the Commission "shall adopt rules . . . in accordance with paragraph (2), to update the equipment authorization procedures of the Commission." Secure Equipment Act of 2021 § 2(a)(1), 135 Stat. at 423. Subsection (2), in turn, establishes that the "update" Congress had in mind only involved proscribing *new* authorizations for Covered List equipment. It states that, "[i]n the rules adopted under paragraph (1), the Commission shall clarify that the *Commission will no longer review or approve any application for equipment*

14

*authorization for equipment* that is on the [Covered List]." *Id.* § 2(a)(2) (emphasis added).

In the very next statutory subsection, Congress established that it was treating existing authorizations differently. Section 2(a)(3) states first that the "rules adopted" as a result of Congress's mandate in paragraph (1) "may not provide for review or revocation of any equipment authorization granted before the date on which such rules are adopted." *Id.* § 2(a)(3)(A). Congress then adopted a "Rule of Construction" that "[n]othing in this section may be construed to *prohibit* the Commission, other than in the rules adopted under paragraph (1), from— (i) examining the necessity of review or revocation of any equipment authorization on the basis of the equipment being on the list described in paragraph (2); or (ii) adopting rules providing for any such review or revocation." *Id.* § (2)(a)(3)(B) (emphasis added).

Plainly, a statutory provision that does not *prohibit* certain agency action is not the same as a provision *authorizing* such action. The Secure Equipment Act thus 1) excludes existing authorizations from the "update" mandated by Section (2)(a)(1) in which the FCC "shall adopt rules"; and 2) provides that the Commission is not "prohibit[ed]" by "this section" from exercising whatever authority the Commission might otherwise possess—then or in the future—over existing equipment authorizations.

Section (2)(a)(3) is thus a savings clause and not a grant of authority.[4]  As demonstrated in Hikvision's opening brief (at 38–39), multiple cases establish that such savings clauses do not provide an agency authority that it did not otherwise possess.  *See, e.g., New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (savings clause in Federal Power Act did not provide affirmative grant of authority for state to restrict electricity in interstate commerce in violation of the Commerce Clause).  The FCC ignores those cases.

The Commission concedes that "the Secure Equipment Act is not phrased as an explicit grant of authority to the agency," FCC Br. 32, but argues that "when Congress directs an agency to promulgate, maintain, or reinstate a rule, this operates to 'amend[] the applicable substantive law'" to grant the agency authority. *Id.* (quoting *Friends of Animals v. Jewell*, 824 F.3d 1033, 1045 (D.C. Cir. 2016)). That may be true, but it is irrelevant here.  If Congress had "directed" the FCC in the Secure Equipment Act to revoke *existing* authorizations, this would be a different case (and the Secure Equipment Act would be the source of authority for

---

[4]  Contrary to Motorola's suggestion (at 39), reading Section 2(a)(3) as a savings clause does not render it surplusage.  As with all savings clauses, Congress was indicating that ordering the FCC to proscribe new authorizations did not necessarily prevent the FCC from using other authority, if it existed, as to extant authorizations.  As the cases Hikvision has cited demonstrate, however, there still must be such existing authority.

the FCC's action). The FCC can cite no such direction, however, because the Secure Equipment Act contains none.

Nor is there merit to the FCC's attempts to erase the distinction in the Secure Equipment Act between new and existing authorizations. The FCC contends that there is "no coherent statutory basis for such a distinction." FCC Br. 36. That is just wrong. The text of the Secure Equipment Act shows that Congress explicitly granted authority in one of those cases, but not in the other. And it was perfectly reasonable for Congress to do so, as equipment that has long been approved for use without incident involves much more significant reliance interests and a much lower security risk. Indeed, the FCC acknowledged those distinctions in limiting the *Order* to new marketing and imports, thus leaving untouched all products currently in use. *See Order* ¶ 40 (JA __). That result is incompatible with the notion that those products present an equal risk to national security. *Contra* Motorola Br. 40.

The FCC's related claim (at 33–34) that this Court's prior *Hikvision* decision resolves the issue of authority to revoke existing authorizations is similarly baseless. As the Court correctly understood, the FCC order involved in that case addresses only new authorizations. *See Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 943 (D.C. Cir. 2024) ("[I]n November 2022, the FCC issued the Order that Petitioners now challenge. As mandated by Congress in the [Secure Equipment

Act], the Order promulgates the rule contemplated by the [Notice of Proposed Rulemaking]: It bans equipment authorizations for 'covered' equipment."); *see also 2022 Order & Further Notice* ¶ 118 (JA ___) (explaining that the agency was "making no decision" as to whether existing authorizations should be revoked). The language the FCC itself quotes (at 33) shows that the Court understood that the Secure Equipment Act "remove[d] any doubt that the FCC was empowered to issue the equipment-authorization ban that [Hikvision] challenge[s]." *Hikvision USA*, 97 F.4th at 945. The case says nothing about revocations of existing authorizations, which the Secure Equipment Act treats very differently. Nor did that decision reach the scope of the Commission's pre-existing Section 302 authority, as the Court's understanding of the Secure Equipment Act decided the issue there regarding new authorizations.

In this regard, *China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024), does not suggest that in this context the FCC has an "'implied incidental authority to revoke" authorizations based on the agency's public interest analysis. FCC Br. 36 (quoting *China Unicom*, 124 F.4th at 1143). *China Unicom* arose under 47 U.S.C. § 214, which, as Hikvision has demonstrated, is unlike Section 302 in that it provides broad "public interest" authority. Hikvision Br. 30. Crucially, moreover, the Ninth Circuit's decision is explicitly based on the breadth of the authority that Congress provided the agency in granting

that initial license. The court highlighted that the "FCC's authority in 'issuing the original certificate' *does* include the authority to deny it on the grounds invoked by the agency here." *China Unicom*, 124 F.4th at 1148; *see also id.* at 1148–49 (contrasting Section 214 with Title III of the Communications Act, which grants more limited authority to the agency to grant broadcast licenses).

Here, as Hikvision explained in its opening brief and addresses further below, the plain text of Section 302 does not authorize the FCC to consider anything other than interference concerns in authorizing equipment—indeed, if its text could reasonably be read to provide broader authority, the FCC would not now be straining to argue that the Secure Equipment Act somehow transformed Title III's terms.

For the same reasons, and contrary to the arguments of the FCC (at 37) and Motorola (at 32–33), the existence of 47 C.F.R. § 2.939(a)(4), which authorizes the FCC to revoke an authorization because of conditions "which would warrant . . . refusing to grant an initial application," does not suggest that Congress would have understood that the agency could revoke authorizations based on factors not identified in Section 302—which relates entirely to radiofrequency emissions. Indeed, given that *Congress* wrote the Secure Equipment Act to grant the FCC explicit authority only to deny new authorizations but not to revoke existing ones,

19

it would be perverse to interpret the *agency's* regulation to provide the very authority that Congress did not provide.

The Commission and Motorola essentially argue that Congress's adoption of the Secure Equipment Act gave the Commission's regulation broader legal effect than authorized by the statute itself: The statute on its face authorizes denials of only new authorizations for Covered List equipment and not existing ones, the argument goes, yet the statute *plus* the regulation authorizes both. There is nothing in the statutory text that suggests Congress intended such a result, nor is there evidence of a broad legislative understanding of a consistent prior practice that could even arguably support such an understanding. *See generally Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001) ("[W]e are loath to replace the plain text and original understanding of a statute with an amended agency interpretation."); *Brown v. Gardner*, 513 U.S. 115, 121 (1994) ("[T]he record of congressional discussion preceding reenactment makes no reference to the VA regulation, and there is no other evidence to suggest that Congress was even aware of the VA's interpretive position. 'In such circumstances we consider the . . . re-enactment to be without significance.'"

(quoting *United States v. Calamaro*, 354 U.S. 351, 359 (1957))).[5]  In sum, the

Commission could not have passed a new regulation *after* the Secure Equipment

Act purporting to find authority for revocations in a statute that fails to provide it;

it follows that neither can the Commission "discover" such authority to expand a

statute in a pre-existing regulation.

**C.      Neither Section 302 Nor Any Other Provision Authorizes the
FCC's Actions Here.**

Whether or not the Secure Equipment Act has any relevance here, it is

common ground between Hikvision and the FCC that that statute alone does not

provide the FCC the requisite authority to revoke authorizations.  According to the

FCC brief, the Secure Equipment Act is not "a freestanding grant of new

authority," but instead works together with prior law to "confer" power on the

agency.  FCC Br. 33, 39.

The Commission's own argument thus requires some pre-Secure Equipment

Act "existing authority" that Congress could reasonably "constru[e]" to authorize

the Commission to revoke existing equipment authorizations based on the

Commission's conception of the public interest.  FCC Br. 39.  After all, an "agency

---

[5]   It is telling that Motorola's support for "what Congress intended" is a lone
statement of a single legislator, made only during a committee markup. Motorola
Br. 36.

21

must identify statutory authority for any action it takes." *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022).[6]

1.      The FCC's primary candidate for the pre-Secure Equipment Act "existing authority" remains Section 302.  According to the Commission, Section 302 "broadly authorizes the Commission to adopt 'reasonable' regulations 'consistent with the public interest, convenience, and necessity.'"  FCC Br. 42 (quoting 47 U.S.C. § 302a(a)).  The FCC can make such an argument only by plucking a few phrases from context and rearranging them in a way that Congress emphatically did not.  Here is Section 302(a) in full:

> The Commission may, *consistent with the public interest, convenience, and necessity*, make *reasonable regulations* (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy.  Such regulations shall be applicable to the manufacture, import, sale, offer

---

[6]   While later enactments may "shape or focus" "broad" language from earlier statutes, the statutory text must still be best read to grant the agency the authority it seeks.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000); *cf. Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 429, 446 (5th Cir. 2021) (affirming FCC construction of broad public interest language in 47 U.S.C. § 201(b) and 47 U.S.C. § 254 under *Chevron* step two and concluding that subsequent enactments did not "render[] the FCC's constructions unreasonable").

for sale, or shipment of such devices and home electronic equipment and systems, and to the use of such devices.

47 U.S.C. § 302a(a) (emphasis added).

The text as a whole makes clear that the "reasonable regulations" Congress authorized are to be about two topics: they are to "govern[] the interference potential of devices" and to "establish[] minimum performance standards for home electronic equipment and systems." *Contra* FCC Br. 42–43 (asserting without analysis of statutory text that the specific reference to "interference potential" merely "identifies the class of devices to which Section 302 applies"). And it is equally clear from the language of the full provision that the reference to acting "consistent with the public interest, convenience, and necessity" is a limitation on the FCC's authority to enact regulations on those two topics: the FCC's rules on those issues must be "consistent with the public interest."

There is nothing "myopic," FCC Br. 49, about this statutory interpretation. It is based on the full text of the provision and the context in which Congress used the words at issue. *See, e.g., FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) (describing statutory construction as fitting, "if possible, all parts into a[] harmonious whole"). Moreover, as Hikvision has explained without response, if the FCC's reading were correct, then Section 302's reference to making regulations governing two enumerated topics would be superfluous; Congress could have simply told the FCC to regulate devices "capable of emitting radio

frequency energy" and to do so "in the public interest."  The FCC's understanding

thus violates basic statutory interpretation principles.  *See* Hikvision Br. 26.

The Court should be especially suspicious of the FCC's novel reading,

because the FCC still cannot cite a single decision in the nearly sixty years since

Congress enacted Section 302 where the Commission or the courts have

understood that provision in the capacious manner urged here.  *See, e.g., West*

*Virginia v. EPA*, 597 U.S. 697, 724 (2022) (rejecting agency's "'claim[] to

discover in a long-extant statute an unheralded power' representing a

'transformative expansion in [its] regulatory authority'" (quoting *Util. Air Regul.*

*Grp. v. EPA*, 573 U.S. 302, 324 (2014))); Hikvision Br. 28–29 (demonstrating

without rebuttal that the few prior agency decisions the FCC cites are readily

distinguishable).  Nor does the FCC attempt to address the fundamental textual

differences between Section 302 and other provisions that do grant the agency

broad "public interest" authority.  *See* Hikvision Br. 30–31.  Similarly, the FCC

does not dispute the legislative history establishing that both the FCC and

Congress understood Section 302 to address discrete interference issues.  *See id.* at

5–7, 33–35.  To be sure, as the FCC suggests (at 44), it is "ultimately the

provisions of our laws" that govern, but here the legislative history strongly

*confirms* what those provisions say on their face: "The purpose of the bill is to

authorize the Federal Communications Commission to prescribe reasonable

regulations governing the interference potential of certain devices capable of interfering with radio communication." H.R. Rep. No. 90-1108, at 1 (1968).

Beyond all that, the FCC still cannot square its argument here with either the agency's own position or this Court's analysis in *American Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005). The FCC argues that that case involved the extent of agency jurisdiction when "devices are *not* engaged in communications." FCC Br. 45. It does not dispute, however, that if its current interpretation of Section 302 were correct, it would have had authority in that context. The devices in that case were digital television receivers, which are subject to Section 302. The Commission, however, explicitly disclaimed any reliance on Section 302 in that case, and the Court cited Section 302 as evidence undermining the "FCC's current view that it always has had sweeping jurisdiction over receiver apparatus." *Am. Libr. Ass'n*, 406 F.3d at 707.

2. The FCC also suggests (at 45–47) that a few subsections of Section 303 "buttress" its reading of Section 302, but those provisions are even farther afield from providing the general public interest authority the FCC claims. Indeed, if those provisions authorized regulation of devices even as to the basic issue of interference, the FCC would not have needed Congress to enact Section 302. The record is clear, however, that neither Congress nor the FCC itself believed that its

25

existing authority was sufficient even for that limited purpose.  *See* Hikvision Br. 36–37.

The Commission first cites Section 303(g)'s direction that the agency "generally encourage the larger and more efficient use of radio."  FCC Br. 5, 25. As that text itself suggests, this subsection is about spectrum management.  And the full subsection makes clear that it is about managing broadcast spectrum in particular: It authorizes the Commission to "[s]tudy new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest."  47 U.S.C. § 303(g).  And *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943), the case on which the FCC relies, likewise stresses that the agency's "expansive powers" arise in the unique context of radio broadcasting: "The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States.  To that end Congress endowed the Communications Commission with comprehensive powers to promote and realize the vast potentialities of radio." *Id.* at 217, 219 (citing 47 U.S.C. § 303(g)).

The Commission also cites Section 303(e), which states that the Commission may "[r]egulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein."  47 U.S.C. § 303(e); FCC Br. 5, 26.  It then tries to

divorce the phrase "external effects" from the rest of the provision and suggest that it is an "expansive" term that allows the agency to address effects having nothing to do with "emissions." FCC Br. 46–47. The Commission, however, can cite no agency order since Congress enacted that provision in 1934, *see* Communications Act of 1934, Pub. L. No. 73-416, § 303, 48 Stat. 1064, 1082, that suggests that it has such extraordinary reach; the agency is thus again purporting to discern an "unheralded power" in a "long-extant statute." *West Virginia*, 597 U.S. at 724. In any event, read in the context of the reference to the "purity and sharpness of the emissions from each station"—a clear allusion to electromagnetic emissions—the reference to "external effects" plainly refers to other physical "effects" from apparatuses. *See, e.g., Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps.").[7]

3.      Hikvision demonstrates in its opening brief that the provision of Communications Assistance for Law Enforcement Act ("CALEA") that the FCC has cited, 47 U.S.C. § 1004, applies to telecommunications carriers, not equipment manufacturers, and thus provides the agency no relevant authority. *See* Hikvision Br. 37. The FCC's brief does not dispute that fact. It suggests fleetingly that the

---

[7]   Section 303(r) does not provide any authority beyond that provided over interference and spectrum regulation elsewhere in Title III. By its terms, it empowers the Commission to make rules and regulations "necessary to carry out the provisions of this Act." 47 U.S.C. § 303(r).

rules at issue here "bear on carriers' ability to meet their obligations" as to intercepting communications. FCC Br. 47–48. But the FCC ignores the fact that a separate CALEA provision, 47 U.S.C. § 1005, highlighted in Hikvision's opening brief (at 37) specifies the limited actions that manufacturers must take to assist carriers. CALEA thus provides no basis for the different authority the Commission asserts here.

## CONCLUSION

The Court should hold unlawful, vacate, and set aside the *Order*.

Respectfully submitted,

/s/ John T. Nakahata
John T. Nakahata
Timothy J. Simeone
HWG LLP
1919 M St. NW, 8th Floor
Washington, DC 20036
(202) 730-1300
jnakahata@hwglaw.com

*Counsel to Hikvision USA, Inc.*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.  I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 6,374 words according to the word-count feature of Microsoft Word.

/s/ John T. Nakahata
John T. Nakahata

**CERTIFICATE OF SERVICE**

I certify that on this 1st day of June 2026, the foregoing brief was filed via CM/ECF.  Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ John T. Nakahata
John T. Nakahata

# REPLY ADDENDUM

# TABLE OF CONTENTS

**Reply Declarations in Support of Standing**

Reply Declaration of Wu Chen...................................................................................1

**Administrative Decisions**

*Public Safety and Homeland Security Bureau and Office of Engineering and Technology Seek Comment on Prohibiting the Importation and Marketing of Previously Authorized Covered Communications Equipment Added to the Covered List in 2024 or Earlier*, Public Notice, DA 26-294, PS Docket No. 26-72 (rel. Mar. 27, 2026) ............................................................2

**Statutes and Regulations**

47 C.F.R. § 1.115 .....................................................................................................8

47 C.F.R. § 2.939(e).................................................................................................12

# REPLY DECLARATION OF WU CHEN

I, Wu Chen (a.k.a. Eric Chen), hereby declare the following:

1.      I am the same Wu Chen who filed the Declaration attached to Hikvision's opening brief.  I remain employed by Hikvision USA, Inc. ("Hikvision USA") as General Manager and am still responsible for oversight of U.S. operations, including sales strategy, distribution channel management, customer relations, operational planning, and financial performance. In this role, I regularly interact with customers and review company sales data, customer purchasing patterns, and operational performance metrics.

2.      In my prior declaration, I stated that "in response to customer requests and to prevent customers from abruptly terminating their partnerships with us, Hikvision USA has been compelled to offer substantial discounts, thereby sacrificing a portion of our profit margins."

3.       Because our customers remain concerned about the effects of the *Order* on their ability to continue obtaining Hikvision products and have reduced or delayed orders or threatened to do so, Hikvision is still offering substantial discounts on its products.

4.      Customers have told me that, absent the uncertainty created by the FCC's Order, they would not have the same concerns and would order products at prior levels.

5.      My earlier declaration also stated that "[c]ertain distribution partners reduced or deferred planned stocking orders while conducting internal compliance and risk reviews involving Hikvision USA equipment."  This kind of conduct has continued.  For example, after filing my initial declaration, Hikvision learned from a security integrator that a longtime U.S. Hikvision distributor appears to no longer stock Hikvision cameras at all at that integrator's branch.  A different integrator seeking to buy 126 Hikvision cameras was informed by a distributor that Hikvision orders are no longer being filled pending FCC developments.

6.      I am not aware of any comparable circumstances involving these or other Hikvision distributors adopting what appear to be *policies* of not providing Hikvision products—as opposed to running out of such products or otherwise being *unable* to provide them—from before the issuance of the current *Order*.

7.      The discounts described above, and situations where distributors stock fewer or no Hikvision products or decline to fill Hikvision orders due to the Order, cause economic harm to Hikvision.

Executed: May <u>29</u>, 2026

_____
Wu Chen

Add. 1

# PUBLIC NOTICE

**Federal Communications Commission**
45 L Street NE
Washington, DC 20554

News Media Information 202-418-0500
Internet: www.fcc.gov

DA 26-294
Released: March 27, 2026

**PUBLIC SAFETY AND HOMELAND SECURITY BUREAU AND OFFICE OF ENGINEERING AND TECHNOLOGY SEEK COMMENT ON PROHIBITING THE IMPORTATION AND MARKETING OF PREVIOUSLY AUTHORIZED COVERED COMMUNICATIONS EQUIPMENT ADDED TO THE COVERED LIST IN 2024 OR EARLIER**

**PS Docket No. 26-72**

**Comments Due:   30 days after publication in the *Federal Register***

Introduction

By this Public Notice, the Public Safety and Homeland Security Bureau (PSHSB) and Office of Engineering and Technology (OET) propose to prohibit the continued importation and marketing of certain previously authorized equipment that has been determined to "pose an unacceptable risk to the national security of the United States or the security and safety of United States persons" (covered equipment).[1]  In particular, we propose to apply such prohibitions to communications equipment added to the Covered List in 2024 or earlier.[2]  We seek comment on these proposals and the relevant factors, including national security and economic and supply chain considerations, that would justify prohibiting the continued importation and marketing of such previously authorized covered equipment.  While importation and marketing would be prohibited, this prohibition would not affect continued use or operation of already-purchased communications equipment.  The prohibition considered in this Public Notice also would not affect equipment added to the Covered List after 2024.

---

[1] Pursuant to sections 2(a) and (d) of the Secure and Trusted Communications Networks Act of 2019, and sections 1.50002 and 1.50003 of the Commission's rules, the Federal Communications Commission's Public Safety and Homeland Security Bureau (PSHSB) publishes a list of communications equipment and services that have been determined by one of the sources specified in that statute to pose an unacceptable risk to the national security of the United States or the security and safety of United States persons (covered equipment).  Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 133 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601-1609) (Secure Networks Act); 47 CFR §§ 1.50002, 1.50003.  For the current version of the Covered List, *see* Federal Communications Commission, *List of Equipment and Services Covered By Section 2 of The Secure Networks Act*, https://www.fcc.gov/supplychain/coveredlist (last updated January 7, 2026) (FCC Covered List).  The process by which the Commission would exercise this authority was established in the *Equipment Authorization Security Second Report and Order (EA Security Second R&O)*.  *Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program*, Second Report and Order and Second Further Notice of Proposed Rulemaking, ET Docket No. 232, FCC 25-71, paras. 40-50 (2025) (*EA Security 2d R&O*); 47 CFR § 2.939(e).

[2] FCC Covered List.

Add. 2

Background

        In November 2022, the Federal Communications Commission (FCC or Commission) adopted rules to prohibit authorization of equipment identified on the Covered List.[3] However, the Commission did not revoke previously granted authorizations of covered equipment.[4] In October 2025, the Commission adopted the *EA Security Second R&O* which, among other things, established a procedure to limit the scope of an existing authorization of covered equipment to prohibit continued importation or marketing of such equipment, without revoking the underlying authorization.[5] The Commission noted that its goal is to mitigate potential national security risks associated with covered equipment in the nation's supply chain that was authorized prior to a Covered List addition under 47 USC 1601(b).[6] The Commission directed PSHSB and OET to "institute proceedings to determine whether to apply these prohibitions to some or all of the equipment currently on the Covered List" and it delegated authority to PSHSB and OET to apply such prohibitions pursuant to the framework and process outlined in the *EA Security Second R&O*.[7] The Commission gave specific directives to PSHSB and OET regarding how to analyze and implement the new procedures.[8]

        Today, we initiate a proceeding to prohibit the continued importation and marketing of equipment added to the Covered List in 2024 or earlier but was authorized before the adoption of our 2022 rules.[9] We initially focus on this equipment because it has been on our Covered List for years.

Discussion

        The Commission has legal authority to review an existing authorization for covered equipment, and to revoke such authorization pursuant to current rules.[10] Under section 2.939(a), the Commission may "revoke . . . any equipment authorization" for various reasons, including "conditions coming to the attention of the Commission which would warrant it in refusing to grant an original application."[11] Likewise, under section 2.939(e), PSHSB and OET "may place limitations on an existing authorization for covered equipment authorizations to prohibit continued importation or marketing" of such equipment.[12]

---

[3] *See generally Protecting Against National Security Threats to the Communications Supply Chain through the Equipment Authorization Program; Protecting Against National Security Threats to the Communications Supply Chain through the Competitive Bidding Program*, Report and Order, Order, and FNPRM, 37 FCC Rcd 13493, 13509-98, paras. 32-263 (2022) (*EA Security R&O and FNPRM*). The Commission explained that this proceeding builds upon the important ongoing efforts by the Commission, Congress, and the Executive Branch to take further action to protect the security of America's critical communications networks and equipment supply chains. *Id.* at 13494-95, para. 1; *see also id.* at 13497-505, 13507-08, paras. 5-23, 31.

[4] *Id.* at 13535, para. 107.

[5] *EA Security 2d R&O*, FCC 25-71, paras. 40-50; 47 CFR 2.939(e), 2.803, 2.1204.

[6] *Id.* at paras. 32, 40.

[7] *Id.* at paras. 45, 48.

[8] *Id*. at paras. 42-50.

[9] *See* Federal Communications Commission, *List of Equipment and Services Covered By Section 2 of The Secure Networks Act*, https://www.fcc.gov/supplychain/coveredlist (last updated January 7, 2026).

[10] *EA Security R&O and FNPRM*, 37 FCC Rcd at 13537, para. 114.

[11] 47 CFR § 2.939(a).

[12] 47 CFR § 2.939(e). "OET and PSHSB will issue a public notice announcing the intent to limit the scope of equipment authorizations to prohibit the further importation or marketing of specified devices identified by class,

(continued….)

We propose to prohibit the continued importation and marketing of any covered equipment added to the Covered List in 2024 or earlier.[13]  It would not include any equipment added to the Covered List in 2025.  This prohibition would specifically apply to covered equipment that was authorized before the adoption of our 2022 rules.  Below, we provide a brief analysis of the relevant factors that would justify limitation on the authorization of previously authorized "covered" equipment and tentatively conclude that prohibiting the importation and marketing of this previously authorized covered equipment serves the public interest.

*National security impacts*.  We start with national security concerns, because, as the Commission noted in the *EA Security Second R&O*, "[i]t is obvious and unarguable that no governmental interest is more compelling than the security of the Nation."[14]  In the *EA Security Second R&O,* the Commission stated that older models of covered equipment, which are still widely sold in the U.S., pose an unacceptable risk to national security when imported or marketed in the United States, "not only when such equipment is new to the market."[15]  The Commission agreed with commenters who pointed out that certain previously authorized devices that are now considered covered equipment "likely remain[] marketable in the United States" and "may present continuing national security threats."[16]

The Commission's initial, 2021 additions to the Covered List were pursuant to a specific national security determination made by Congress.  Section 2(c) of the Secure and Trusted Communications Networks Act of 2019 (Secure Networks Act) requires the Commission to place on the Covered List certain communications equipment and services listed in statute.[17]  The Commission previously found that this directive constituted a specific determination that such equipment poses an "unacceptable risk to the national security of the United States or the security and safety of United States persons."[18]  Such determination remains applicable.  Separately, the addition of "equipment with integrated Kaspersky Lab, (or any of its successors and assignees) cybersecurity or anti-virus software" was based on a specific determination by the Department of Commerce that "Kaspersky's provision of cybersecurity and anti-virus software to U.S. persons, including through third-party entities that integrate Kaspersky cybersecurity or anti-virus software into commercial hardware or software, poses undue and unacceptable

---

type, or other description sufficient to identify the devices."  47 CFR § 2.939(e)(1).  "The public notice will include an assessment of the impact of the proposed prohibition with consideration of public interest factors, including: the unacceptable risks the equipment was found to pose, the economic and supply chain impacts, and any other criteria as specified by the Commission. The public notice should give particular weight to the specific determination(s), and any accompanying rules or analyses, through which the relevant equipment was added to the Covered List.  47 CFR § 2.939(e)(2).

[13] Certain of the Commission's rules apply to each "entity identified on the Covered List."  For instance, section 2.906(d) of the Commission's rules prohibits entities "identified on the Covered List" from obtaining equipment authorization through the Commission's Supplier's Declaration of Conformity (SDoC) process.  *See* 47 CFR §§ 2.906(d), 2.907(c).  In addition, the rules governing certification apply to any equipment produced by entities "identified on the Covered List," even if the equipment otherwise qualifies as an "exempted device" under section 15.103 of our rules.  *See* 47 CFR § 15.103.

[14] *EA Security 2d R&O*, FCC 25-71, para. 45 (quoting *Haig v. Agee,* 453 U.S. 280, 307 (1981)).

[15] *EA Security 2d R&O*, FCC 25-71, para. 40.

[16] *Id*.

[17] 47 U.S.C. § 1601(c)(3).

[18] *See Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs,* WC Docket No. 18-89, Second Report and Order, 35 FCC Rcd 14284, 14315-14316 (2020).

Add. 4

risks to U.S. national security and to the security and safety of U.S. persons."[19]  Accordingly, we tentatively conclude that prohibiting the continued importation and marketing of previously authorized equipment added at that time is necessary to protect national security by mitigating risks to the U.S. communications sector.  We seek comment on this proposed analysis.

*Economic and supply chain impacts*.  We seek comment on the potential economic and supply chain impacts of prohibiting the continued importation and marketing of already-authorized covered equipment that was added to the Covered List in 2024 or earlier.  How would this proposed action affect the financial interests of consumers, providers, and manufacturers in the communications sector?  As the Commission noted in the *EA Security Second R&O*, it may consider "countervailing economic concerns when implementing the prohibitions for already-authorized devices."[20]  What are the economic or supply chain considerations that weigh in favor or against taking this proposed action?  We invite commenters to provide data that we should consider in our analysis.

We tentatively conclude that our proposed action would not have substantial economic and supply chain impacts.  First, devices added to the Covered List as part of the Kaspersky listing in 2024 are already prohibited from importation or marketing under Department of Commerce rules.[21]  Second, equipment added to the Covered List in the initial 2021 listing has not received authorization since November 11, 2022, over three years ago.  Moreover, a significant amount of this equipment has been removed from U.S. communications networks in recent years.[22]  Do commenters agree that economic and supply chain impacts are relatively minor?  Has industry sufficiently filled any void created by the lack of new authorizations for covered equipment the past three years?  As lifecycle benchmarks are reached and equipment becomes obsolete, have consumers taken advantage of the marketplace for trusted entities that provide such equipment as bona fide alternatives to covered equipment?  Would this proposed change in policy be cost-effective for the public in terms of obtaining trusted equipment?  Would providers' compliance costs decrease as they replace covered equipment with trusted equipment?

*Other Considerations*.  We also note that certain equipment is only on the Covered List "to the extent it is used for the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes."[23]  How, if at all, should we consider this use-based limitation on what qualifies as covered equipment?  Should we exempt any equipment subject to this use-based limitation from any prohibition on importation and marketing?  Or should we subject all such equipment to any prohibition?

*Public interest analysis*.  We tentatively conclude that prohibiting the importation and marketing of previously authorized covered equipment that was added to the Covered List in 2024 or earlier is consistent with the public interest, because it protects American communications networks from devices specifically determined by Congress or a national security agency to "pose an unacceptable risk to the

---

[19] Department of Commerce, Final Determination, Case No. ICTS-2021-002, Kaspersky Lab, Inc., 89 Fed. Reg. 52434 (June 24, 2024) (Final Determination), https://www.federalregister.gov/documents/2024/06/24/2024-13532/final-determination-case-no-icts-2021-002-kaspersky-lab-inc.

[20] *EA Security 2d R&O*, FCC 25-71, para. 46.

[21] Final Determination at 52437.

[22] *See* Wireline Competition Bureau, Secure and Trusted Communications Networks Reimbursement Program Sixth Report (June 30, 2025), https://www.fcc.gov/document/supply-chain-reimbursement-program-sixth-report.  "The Bureau is pleased to report that Reimbursement Program recipients continue to progress with their plans to permanently remove, replace, and dispose of covered communications equipment and services."  *Id*. at 2.

[23] See Covered List;  2019 NDAA.

national security of the United States or the security and safety of United States persons."[24]  We also tentatively conclude that there are no public interest factors that outweigh our tentative conclusion regarding the proposed ban on import and marketing of this previously equipment.  We seek comment on this public interest analysis.  Do commenters agree that the national security benefits outweigh any negative economic or supply chain factors?  Are there any other public interest considerations that weigh in favor or against taking this proposed action?  We invite commenters to provide any information that would assist the Commission in its balancing of the need to address the national security risks posed by the continued use of covered equipment in communications networks with the impact of the proposed prohibitions on government partners, consumers, industry, and the public at large.

Implementation

*Existing authorizations*.  We clarify that, if this prohibition is adopted, the continued use or operation of covered equipment that is already in the hands of users would remain authorized.  This is consistent with the approach that the Commission adopted in the *EA Security Second R&O*.  The limitation on existing authorizations would not result in the revocation of an existing authorization of covered equipment and, therefore, would not affect the continued use or operation of devices that consumers already possess.

*Implementation timeline*.  We propose that all parties must cease all importation and marketing activities within 30 days of the effective date of the prohibition.  We believe that this timeline is reasonable and strikes the appropriate balance between addressing the national security concerns and minimizing any potential adverse economic or supply chain impacts.  We seek comment on the proposed timeline and invite input from the responsible parties and relevant manufacturers, importers, distributors, retailers, and other interested entities.  Specifically, we request that commenters address implementation considerations including the quantity of devices that have already been imported into the U.S. and are available for or being held for marketing or sale, new or recently updated device models that are en route to the U.S. or pending shipment, and devices that are subject to executed distribution, marketing, or sales agreements, but have not yet entered the supply chain.  Should the Commission's prohibition on importation take immediate effect, while the marketing prohibition would take effect within 30 days, to avoid a rush to import new devices?

Procedural Matters

Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).

- *Electronic Filers*:  Comments may be filed electronically using the Internet by accessing the ECFS:  https://www.fcc.gov/ecfs.

- *Paper Filers*:  Parties who choose to file by paper must file an original and one copy of each filing.
  - Filings can be sent by hand or messenger delivery, by commercial courier, or by the U.S. Postal Service.  **All filings must be addressed to the Secretary, Federal Communications Commission.**
  - Hand-delivered or messenger-delivered paper filings for the Commission's Secretary are accepted between 8:00 a.m. and 4:00 p.m. by the FCC's mailing contractor at 9050 Junction Drive, Annapolis Junction, MD 20701.  All hand deliveries must be held

---

[24] 47 U.S.C. § 1601(b); *see also EA Security R&O and FNPRM*, 37 FCC Rcd at 13511-13513, paras. 40-43.

together with rubber bands or fasteners. Any envelopes and boxes must be disposed of before entering the building.
- Commercial courier deliveries (any deliveries not by the U.S. Postal Service) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.
- Filings sent by U.S. Postal Service First-Class Mail, Priority Mail, and Priority Mail Express must be sent to 45 L Street NE, Washington, DC 20554.

- *People with Disabilities*: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530.

The proceeding this Public Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's ex parte rules.[25] Persons making ex parte presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral ex parte presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the ex parte presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during ex parte meetings are deemed to be written ex parte presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written ex parte presentations and memoranda summarizing oral ex parte presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's ex parte rules.

For further information, please contact Chris Smeenk at 202-418-1630 or Chris.Smeenk@fcc.gov, or Rebecca Clinton at 202-418-7815 or Rebecca.Clinton@fcc.gov, Attorney Advisors, Operations and Emergency Management Division, Public Safety and Homeland Security Bureau.

---

[25] 47 C.F.R. §§ 1.1200 *et seq.*

# 47 C.F.R. § 1.115

**§ 1.115 Application for review of action taken pursuant to delegated authority.**

(a) Any person aggrieved by any action taken pursuant to delegated authority may file an application requesting review of that action by the Commission. Any person filing an application for review who has not previously participated in the proceeding shall include with his application a statement describing with particularity the manner in which he is aggrieved by the action taken and showing good reason why it was not possible for him to participate in the earlier stages of the proceeding. Any application for review which fails to make an adequate showing in this respect will be dismissed.

(b)

(1) The application for review shall concisely and plainly state the questions presented for review with reference, where appropriate, to the findings of fact or conclusions of law.

(2) The application for review shall specify with particularity, from among the following, the factor(s) which warrant Commission consideration of the questions presented:

(i) The action taken pursuant to delegated authority is in conflict with statute, regulation, case precedent, or established Commission policy.

(ii) The action involves a question of law or policy which has not previously been resolved by the Commission.

(iii) The action involves application of a precedent or policy which should be overturned or revised.

(iv) An erroneous finding as to an important or material question of fact.

(v) Prejudicial procedural error.

(3) The application for review shall state with particularity the respects in which the action taken by the designated authority should be changed.

(4) The application for review shall state the form of relief sought and, subject to this requirement, may contain alternative requests.

(c) No application for review will be granted if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass.

Note: Subject to the requirements of § 1.106, new questions of fact or law may be presented to the designated authority in a petition for reconsideration.

(d) Except as provided in paragraph (e) of this section and in § 0.461(j) of this chapter, the application for review and any supplemental thereto shall be filed within 30 days of public notice of such action, as that date is defined in § 1.4(b). Opposition to the application shall be filed within 15 days after the application for review is filed. Except as provided in paragraph (e)(1) of this section, replies to oppositions shall be filed within 10 days after the opposition is filed and shall be limited to matters raised in the opposition.

(e)

(1) Applications for review of an order designating a matter for hearing that was issued under delegated authority shall be deferred until exceptions to the initial decision in the case are filed, unless the presiding officer certifies such an application for review to the Commission. A matter shall be certified to the Commission if the presiding officer determines that the matter involves a controlling question of law as to which there is substantial ground for difference of opinion and that immediate consideration of the question would materially expedite the ultimate resolution of the litigation. A request to certify a matter to the Commission shall be filed with the presiding officer within 5 days after the designation order is released. A ruling refusing to certify a matter to the Commission is not appealable. Any application for review authorized by the presiding officer shall be filed within 5 days after the order certifying the matter to the Commission is released or such a ruling is made. Oppositions shall be filed within 5 days after the application for review is filed. Replies to oppositions shall be filed only if they are requested by the Commission. Replies (if allowed) shall be filed within 5 days after they are requested. The Commission may dismiss, without stating reasons, an application for review that has been certified, and direct that the objections to the order designating the matter for hearing be deferred and raised when exceptions in the initial decision in the case are filed.

(2) Applications for review of final staff decisions issued on delegated authority in formal complaint proceedings on the Enforcement Bureau's Accelerated Docket (see, *e.g.,* § 1.730) shall be filed within 15 days of public notice of the

decision, as that date is defined in § 1.4(b). These applications for review oppositions and replies in Accelerated Docket proceedings shall be served on parties to the proceeding by hand or facsimile transmission.

(f) Applications for review, oppositions, and replies shall conform to the requirements of §§ 1.49, 1.51, and 1.52, and shall be submitted to the Secretary, Federal Communications Commission, Washington, DC 20554. Except as provided below, applications for review and oppositions thereto shall not exceed 25 double-space typewritten pages. Applications for review of interlocutory actions in hearing proceedings (including designation orders) and oppositions thereto shall not exceed 5 double-spaced typewritten pages. When permitted (see paragraph (e)(1) of this section), reply pleadings shall not exceed 5 double-spaced typewritten pages. The application for review shall be served upon the parties to the proceeding. Oppositions to the application for review shall be served on the person seeking review and on parties to the proceeding. When permitted (see paragraph (e)(1) of this section), replies to the opposition(s) to the application for review shall be served on the person(s) opposing the application for review and on parties to the proceeding.

(g) The Commission may grant the application for review in whole or in part, or it may deny the application with or without specifying reasons therefor. A petition requesting reconsideration of a ruling which denies an application for review will be entertained only if one or more of the following circumstances is present:

(1) The petition relies on facts which related to events which have occurred or circumstances which have changed since the last opportunity to present such matters; or

(2) The petition relies on facts unknown to petitioner until after his last opportunity to present such matters which could not, through the exercise of ordinary diligence, have been learned prior to such opportunity.

(h)

(1) If the Commission grants the application for review in whole or in part, it may, in its decision:

(i) Simultaneously reverse or modify the order from which review is sought;

(ii) Remand the matter to the designated authority for reconsideration in accordance with its instructions, and, if an evidentiary hearing has been held, the remand may be to the person(s) who conducted the hearing; or

(iii) Order such other proceedings, including briefs and oral argument, as may be necessary or appropriate.

(2) In the event the Commission orders further proceedings, it may stay the effect of the order from which review is sought. (See § 1.102.) Following the completion of such further proceedings the Commission may affirm, reverse or modify the order from which review is sought, or it may set aside the order and remand the matter to the designated authority for reconsideration in accordance with its instructions. If an evidentiary hearing has been held, the Commission may remand the matter to the person(s) who conducted the hearing for rehearing on such issues and in accordance with such instructions as may be appropriate.

Note:

For purposes of this section, the word "order" refers to that portion of its action wherein the Commission announces its judgment. This should be distinguished from the "memorandum opinion" or other material which often accompany and explain the order.

(i) An order of the Commission which reverses or modifies the action taken pursuant to delegated authority is subject to the same provisions with respect to reconsideration as an original order of the Commission. In no event, however, shall a ruling which denies an application for review be considered a modification of the action taken pursuant to delegated authority.

(j) No evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission believes should have been taken in the original proceeding shall be taken on any rehearing ordered pursuant to the provisions of this section.

(k) The filing of an application for review shall be a condition precedent to judicial review of any action taken pursuant to delegated authority.

**47 C.F.R. § 2.939(e)**

**§ 2.939 Revocation, withdrawal, or limitation of equipment authorization.**

(e) The Office of Engineering and Technology (OET) and the Public Safety and Homeland Security Bureau (PSHSB) may place limitations on an existing authorization for covered equipment authorizations to prohibit continued importation or marketing, pursuant to the following procedures:

(1) OET and PSHSB will issue a public notice announcing the intent to limit the scope of equipment authorizations to prohibit the further importation or marketing of specified devices identified by class, type, or other description sufficient to identify the devices.

(2) The public notice will include an assessment of the impact of the proposed prohibition with consideration of public interest factors, including: the unacceptable risks the equipment was found to pose, the economic and supply chain impacts, and any other criteria as specified by the Commission. The public notice should give particular weight to the specific determination(s), and any accompanying rules or analyses, through which the relevant equipment was added to the Covered List.

(3) The public notice will provide for a public comment period of no less than 30 days.

(4) OET and PSHSB will review the submissions, may request additional information as may be appropriate, and must make their determination as to whether to place limitations on the existing authorization to prohibit the further importation or marketing of the relevant devices, providing the reasons for such decision.